UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

JON CHRISTOPHER EVANS,                    CASE NO. 09-03763-NPO

DEBTOR.                                   CHAPTER 7

JOINTLY ADMINISTERED WITH RELATED CASES


DEREK A. HENDERSON, TRUSTEE                          PLAINTIFF
FOR THE BANKRUPTCY ESTATE OF
JON CHRISTOPHER EVANS AND
JOINTLY ADMINISTERED RELATED
CASES

V.                                        ADV. PROC. NO. 10-00005-NPO

COMMUNITY BANK OF MISSISSIPPI,                      DEFENDANTS
BANCORPSOUTH BANK, FIRST BANK,
STATE BANK & TRUST COMPANY,
BANK OF YAZOO CITY, BANK OF THE
SOUTH, CITIZENS NATIONAL BANK
OF MERIDIAN, HOLMES COUNTY
BANK & TRUST COMPANY, BANK
FIRST FINANCIAL SERVICES,
RENASANT BANK, METROPOLITAN
BANK, FIRST COMMERCIAL BANK,
NATIONAL BANK OF COMMERCE,
GUARANTY BANK & TRUST
COMPANY, CADENCE BANK,
BRITTON & KOONTZ NATIONAL
BANK, WACHOVIA BANK, SOUTH
TRUST BANK, OMNI BANK,
MERCHANTS & PLANTERS BANK,
FIRST BANK OF MCCOMB, HERITAGE
BANKING GROUP, THE CARTHAGE
BANK, BANKPLUS, UNION PLANTERS
BANK, PEOPLES BANK & TRUST
COMPANY, FIRST TRUST BANK FOR
SAVINGS, FIRST ALLIANCE BANK,
FIRST STATE BANK, FIRST SECURITY
BANK, PATRIOT BANK, TRUST ONE

BANK, FIRST TENNESSEE BANK,
BANK OF BARTLETT, BANK OF
AMERICA, MERCHANTS & FARMERS
BANK, BANK OF FOREST, COPIAH
BANK, CONSUMER NATIONAL BANK,
REGIONS BANK, MISSISSIPPI VALLEY
TITLE INSURANCE COMPANY AND
OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY

### MEMORANDUM OPINION AND ORDER ON MISSISSIPPI VALLEY TITLE INSURANCE COMPANY AND OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

There came on for consideration (1) Mississippi Valley Title Insurance Company and Old

Republic National Title Insurance Company's Motion for Partial Summary Judgment (the "Motion")

(Adv. Dkt. 301)[1] and Mississippi Valley Title Insurance Company and Old Republic National Title

Insurance Company's Memorandum Brief in Support of Motion for Partial Summary Judgment (the

"Title Companies Brief") (Adv. Dkt. 302) filed by Mississippi Valley Title Insurance Company and

Old Republic National Title Insurance Company ("Title Companies"); (2) Response of First Alliance

Bank, Patriot Bank, First State Bank, Holmes County Bank, and State Bank & Trust Company to

Title Companies' Motion for Partial Summary Judgment (the "First Alliance Response") (Adv. Dkts.

308 & 309) and Brief of First Alliance Bank, Patriot Bank, First State Bank, Holmes County Bank,

and State Bank & Trust Company in Response to Title Companies' Motion for Partial Summary

Judgment (the "First Alliance Response Brief") (Adv. Dkt. 310) filed by First Alliance Bank ("First

Alliance"), Patriot Bank ("Patriot"), First State Bank ("First State"), Holmes County Bank

---

[1] Citations to the record are as follows: (1) citations to docket entries in this adversary
proceeding are cited as "(Adv. Dkt. _____)" and (2) citations to the docket entries in the main
bankruptcy case are cited as "(Case No. 09-03763-NPO, Dkt. _____)."

("Holmes"), and State Bank & Trust Company ("State Bank"); (3) First Security Bank's Response to the Title Insurance Companies' Motion for Partial Summary Judgment (the "FSB Response") (Adv. Dkt. 312) and Memorandum in Support of First Security Bank's Response to the Title Insurance Companies' Motion for Partial Summary Judgment (the "FSB Response Brief") (Adv. Dkt. 313) filed by First Security Bank ("FSB"); (4) Title Companies' Reply Brief in Support of Motion for Partial Summary Judgment (the "Title Companies Reply Brief") (Adv. Dkt. 331) filed by the Title Companies; (5) Title Companies' Reply Brief in Support of Motion for Partial Summary Judgment (Adv. Dkt. 337) filed by the Title Companies; (6) Response of OmniBank to Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Partial Summary Judgment [Dkt. 301] (the "OmniBank Response") (Adv. Dkt. 338) and Brief of OmniBank in Response to Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Partial Summary Judgment [Dkt. 303] (the "OmniBank Response Brief") (Adv. Dkt. 339) filed by OmniBank; and (7) Title Companies' Reply Brief in Support of Motion for Partial Summary Judgment (Adv. Dkt. 361) filed by the Title Companies in the above-referenced adversary proceeding (the "Adversary").

Having reviewed the pleadings and all the exhibits attached thereto, together with other pleadings on file and the briefs submitted by the parties, the Court finds that partial summary judgment should be granted in favor of the Title Companies on the tort claims of FSB, Patriot, First Alliance, Holmes, First State, and OmniBank (the "Banks"), as set forth below.[2]

---

[2] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

**Jurisdiction**

This Court has jurisdiction over the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(K).[3] Notice of the Motion was proper under the circumstances.

**Facts**

In making its determination of facts on the Motion, this Court must view the evidence submitted by the parties in the light most favorable to the non-moving party. <u>McPherson v. Rankin</u>,

---

[3] FSB, Patriot, First Alliance, Holmes, First State, and OmniBank each allege in cross-claims they filed against the Title Companies that this matter is a core proceeding. *See* Amended Crossclaim Against Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (Adv. Dkt. 135); Crossclaim of Patriot Bank (Adv. Dkt. 177); Crossclaim of First Alliance Bank (Adv. Dkt. 178); Amended Crossclaim of Holmes County Bank (Adv. Dkt. 187); Amended Crossclaim of First State Bank (Adv. Dkt. 188); and Crossclaim (Adv. Dkt. 198) of OmniBank. In each of their responses, however, the Title Companies "deny that this is a core proceeding under 28 U.S.C. § 157." *See* Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Answer and Affirmative Defenses to Amended Cross-Claim of First Security Bank (Adv. Dkt. 142); Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to Patriot Bank's Cross-Claim (Adv. Dkt. 217); Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First Alliance Bank's Cross-Claim (Adv. Dkt. 212); Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to Holmes County Bank's Amended Cross-Claim (Adv. Dkt. 215); Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First State Bank's Amended Cross-Claim (Adv. Dkt. 213); and Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to OmniBank's Cross-Claim (Adv. Dkt. 216). The Court need not address the core/non-core distinction because the parties clearly have consented to the final adjudication by this Court of all of their claims. *See* 28 U.S.C. § 157(c)(2); *see also* <u>Oxford Expositions, LLC v. Questex Media Group (In re Oxford Expositions, LLC)</u>, No. 11-01095-DWH, 2011 WL 4074028 (Bankr. N.D. Miss. Sept. 13, 2011) (holding that power to consent under 28 U.S.C. § 157(c)(2) remains undisturbed after <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011)). Notably, the Title Companies have not mentioned in any of their numerous pre-trial filings that they have withdrawn their consent to this Court's authority. *See* Fed. R. Bankr. P. 7012(b).

736 F.2d 175, 178 (5th Cir. 1984). With that standard in mind, the Court finds that there are no genuine issues with respect to the following facts set forth in the briefs submitted to the Court:

**Snowden Policies and First Alliance**

1.      In 2004, Jon Christopher Evans ("Chris Evans") approached First Alliance about obtaining a loan secured by two parcels of land, Tracts 10E and 10F, in Southaven, DeSoto County, Mississippi.

2.      Charles H. Evans ("Charles Evans") and Chris Evans are brothers (the "Evans Brothers").

3.      Charles Evans served as the "approved attorney" for the Title Companies in this transaction.

4.      On November 11, 2004, the Title Companies issued two title commitments, bearing commitment numbers M-306425 and M-306426 (the "First Alliance Title Commitments") to First Alliance. (First Alliance Crossclaim Ex. 1).[4] The First Alliance Title Commitments stated that Tracts 10E and 10F were owned by James C. Hensen and Cassandra E. Hensen (the "Hensens"). On the date the First Alliance Title Commitments were issued, however, Tracts 10E and 10F were owned by Woodgreen Development Corporation ("Woodgreen"), an entity controlled by Chris Evans. In addition, there were numerous deeds of trust and other liens on the properties in favor of other banks from whom the Evans Brothers had borrowed funds.

5.      On November 22, 2004, First Alliance loaned $760,000.00 to Snowden Grove

---

[4] Some of the exhibits that the Banks have incorporated by reference are attached to the crossclaims filed by the Banks. Those exhibits are cited as "('Name of Bank' Crossclaim Ex. ___)". The Banks have also attached exhibits to the First Alliance Response, which are cited as "(First Alliance Ex. ___)". The exhibits attached by the Title Companies to the Motion are cited as "(Title Companies Ex. ___)".

Investors, LLC ("Snowden"), an entity controlled by Chris Evans. (First Alliance Crossclaim Ex. 2). To secure the loan, Snowden executed a deed of trust in favor of First Alliance on Tracts 10E and 10F.

6.     On December 2, 2004, the Title Companies issued First Alliance two title insurance policies, bearing policy numbers M-306425 and M-306426, on Tracts 10E and 10F. (First Alliance Crossclaim Ex. 3). Loan policy numbers M-306425 and M-306426 are hereinafter referred to as the Snowden Policies.

7.     The Snowden Policies insured First Alliance against loss or damage sustained by certain conditions, including title to the estate or interest not being vested in Snowden and any defect in, or lien or encumbrance on the title. (First Alliance Crossclaim Ex. 3).

**Cedar Lake Policy I and First State**

8.     In 2005, Chris Evans approached First State about obtaining a loan secured by two parcels of land, Tracts 10G and 10H, in Southaven, DeSoto County, Mississippi.

9.     Charles Evans served as the "approved attorney" for the Title Companies in this transaction.

10.    On or about June 10, 2005, the Title Companies issued a title commitment, bearing commitment number M-306506 (the "First State Title Commitment"), to First State. (First State Crossclaim Ex. 1). The First State Title Commitment stated that Tracts 10G and 10H were owned by Woodgreen. Additionally, the First State Title Commitment stated that Tracts 10G and 10H were free of any liens or encumbrances. On the date the First State Title Commitment was issued, however, there were numerous deeds of trust and other liens on the properties in favor of other banks from whom the Evans Brothers had borrowed funds.

11.     On June 17, 2005, First State loaned approximately $420,000.00 to Cedar Lake Investors, LLC ("Cedar Lake"), an entity controlled by Chris Evans.  The loan was secured by a first lien position on Tracts 10G and 10H.  (First State Crossclaim Ex. 2)

12.     On June 23, 2005, the Title Companies issued First State a title insurance policy, bearing policy number M-306506, on Tracts 10G and 10H.  (First State Crossclaim Ex. 3).  Loan policy number M-306506 is hereinafter referred to as the Cedar Lake Policy I.

13.     The Cedar Lake Policy I insured First State against loss or damage sustained by the occurrence of certain conditions, including title to the estate or interest not being vested in Cedar Lake and any defect in, or lien or encumbrance on the title.  (First State Crossclaim Ex. 3).

**Cedar Lake Policy II and Patriot**

14.     In 2005, Chris Evans approached Patriot about obtaining a loan on two parcels of land, Tracts 10J and 10K, in Southaven, DeSoto County, Mississippi.

15.     Charles Evans served as the "approved attorney" for the Title Companies in this transaction.

16.     On or about July 7, 2005, the Title Companies issued a title commitment, bearing commitment number M-306520 (the "Patriot Title Commitment"), to Patriot.  (Patriot Crossclaim Ex. 1).  The Patriot Title Commitment stated that Tracts 10J and 10K were owned by Woodgreen. Additionally, the Patriot Title Commitment stated that Tracts 10J and 10K were free of any liens or encumbrances.  On the date the Patriot Title Commitment was issued, however, there were numerous deeds of trust and other liens on the properties in favor of other banks from whom the Evans Brothers had borrowed funds.

17.     On July 22, 2005, Patriot loaned Cedar Lake $500,000.00.  The loan was secured by

a first lien position on Tracts 10J and 10K.  (Patriot Crossclaim Ex. 2).

18.    On August 2, 2005, the Title Companies issued Patriot a title insurance policy, bearing policy number M-306520, on Tracts 10J and 10K.  (Patriot Crossclaim Ex. 3).  Loan policy number M-306520 is hereinafter referred to as the Cedar Lake Policy II.

19.    The Cedar Lake Policy II insured Patriot against loss or damage sustained by the occurrence of certain conditions, including title to the estate or interest not being vested in Cedar Lake or any defect in, or lien or encumbrance on the title. (Patriot Crossclaim Ex. 3).

**Madison Avenue Policies and OmniBank**

20.    In 2007, Chris Evans approached OmniBank about obtaining loans secured by two parcels of land, Tracts 2B and 2C, in Madison County, Mississippi.

21.    Charles Evans served as the "approved attorney" for the Title Companies in these transactions.

22.    In 2007, OmniBank loaned approximately $1.5 million to Madison Avenue Development Company, LLC ("Madison Avenue"), an entity controlled by Chris Evans.  The loans were secured by a first lien position on Tracts 2B and 2C.

23.    On February 6, 2007, the Title Companies issued OmniBank a title insurance policy, bearing policy number M-306737, on Tract 2B.  (OmniBank Crossclaim Ex. A).  Then, on March 14, 2007, the Title Companies issued to OmniBank another title insurance policy, bearing policy number M-306758, on Tract 2C.  (OmniBank Crossclaim Ex. B).  Loan policy numbers M-306737 and M-306758 are hereinafter referred to as the Madison Avenue Policies.

24.    The Madison Avenue Policies stated that Madison Avenue owned Tracts 2B and 2C. Additionally, the Madison Avenue Policies stated that Tracts 2B and 2C were free of any liens or

encumbrances.  On the dates the Madison Avenue Policies were issued, however, Tracts 2B and 2C were owned by C&L, Inc. and Highland Development Group, Inc., respectively, both entities controlled by Chris Evans.  In addition, there were numerous deeds of trust and other liens on the properties in favor of other banks from whom the Evans Brothers had borrowed funds.

25.     The Madison Avenue Policies insured OmniBank against loss or damage sustained or incurred by reason of any defect in, or lien or encumbrance on the title.  (OmniBank Crossclaim Ex. B).

**Park Place Policy and Holmes**

26.     In 2008, Chris Evans approached Holmes about obtaining a loan secured by a parcel of land, Tract 1G, in Madison County, Mississippi.

27.     Charles Evans served as the "approved attorney" for the Title Companies in this transaction.

28.     On April 22, 2008, Holmes loaned $780,127.00 to Park Place Commons, LLC ("Park Place"), an entity controlled by Chris Evans.  The loan was secured by a first lien position on Tract 1G.  (Holmes Crossclaim Ex. 1).

29.     On April 28, 2008, the Title Companies issued Holmes a title insurance policy, bearing policy number LP107019, on Tract 1G.  (Holmes Ex. 2).  Loan policy number LP107019 is hereinafter referred to as the Park Place Policy.

30.     The Park Place Policy stated that Tract 1G was free of any liens or encumbrances.  On the date the Park Place Policy was issued, however, there were numerous deeds of trust and other liens on the property in favor of other banks from whom the Evans Brothers had borrowed funds.

31.     The Park Place Policy insured Holmes for loss or damage sustained by the

occurrence of certain conditions, including title to the estate or interest not being vested in Park Place and any defect in, or lien or encumbrance on the title.  (Holmes Crossclaim Ex. 2).

**Nottaway Policy and Holmes**

32.     In 2009, Chris Evans again approached Holmes about obtaining a loan secured by a parcel of land, Tract 1F, in Madison County, Mississippi.

33.     Charles Evans served as the "approved attorney" for the Title Companies in this transaction.

34.     On February 11, 2009, Holmes loaned $800,292.00 to Nottaway Pointe, LLC ("Nottaway"), an entity controlled by Chris Evans.  The loan was secured by a first lien position on Tract 1F.  (Holmes Crossclaim Ex. 3).

35.     On February 12, 2009, the Title Companies issued Holmes a title insurance policy, bearing policy number LP107085, on Tract 1F.  (Holmes Crossclaim Ex. 4).  Loan policy number LP107085 is hereinafter referred to as the Nottaway Policy.

36.     The Nottaway Policy stated that Tract 1F was free of any liens or encumbrances.  On the date the Nottaway Policy was issued, however, there were numerous deeds of trust and other liens on the property in favor of other banks from whom the Evans Brothers had borrowed funds.

37.     The Nottaway Policy insured Holmes against loss or damage sustained by the occurrence of certain conditions, including title to the estate or interest not being vested in Nottaway and any defect in, or lien or encumbrance on the title.  (Holmes Crossclaim Ex. 4).

**Brashear Policy and FSB**

38.     In 2008, Chris Evans approached FSB about obtaining a lien secured by two parcels of land, Tracts 10E and 10O, in Southaven, DeSoto County, Mississippi.

39.     Charles Evans served as the "approved attorney" for the Title Companies in these transactions.

40.     On April 28, 2008, FSB loaned $900,165.00 to Brashear Heath LLC ("Brashear"), an entity controlled by Chris Evans.  The loan was secured by a first lien position on Tracts 10E and 10O.

41.     On May 22, 2008, the Title Companies issued FSB a title insurance policy, bearing policy number LP107030, on Tracts 10E and 10O.  (FSB Crossclaim Ex. 1).  Loan policy number LP107030 is hereinafter referred to as the Brashear Policy.

42.     The Brashear Policy stated that Tracts 10E and 10O were free of any liens or encumbrances.  On the date the Brashear Policy was issued, however, there were numerous deeds of trust and other liens on the properties in favor of other banks from whom the Evans Brothers had borrowed funds.

43.     The Brashear Policy insured FSB against any loss or damage sustained because of "Title [to Tracts 10E and 10O] being vested other than as stated in Schedule A" and/or because of a "defect in the Title caused by fraud."  (FSB Crossclaim Ex. 1).

**Twin City Policy and FSB**

44.     In 2009, Chris Evans approached FSB about obtaining a loan secured by a parcel of land, Tract TC-2B, in Southaven, DesSoto County, Mississippi.

45.     Charles Evans served as the "approved attorney" for the Title Companies in this transaction.

46.     On January 16, 2009, FSB loaned $801,128.00 to Twin City Commons Development LLC ("Twin City"), an entity controlled by Chris Evans.  The loan was secured by a first lien

position on Tract TC-2B.

47.     On January 20, 2009, the Title Companies issued FSB a title insurance policy, bearing policy number LP107084, on Tract TC-2B.  (FSB Crossclaim Ex. 2).  Loan policy number LP107084 is hereinafter referred to as the Twin City Policy.

48.     The Twin City Policy stated that Tract TC-2B was free of any liens or encumbrances. On the date the Twin City Policy was issued, however, there were numerous deeds of trust and other liens on the property in favor of other banks from whom the Evans Brothers had borrowed funds.

49.     The Twin City Policy insured FSB against any loss or damage sustained because of "Title [to Tract TC-2B] being vested other than as stated in Schedule A" and/ or because of a "defect in the Title caused by fraud."  (FSB Crossclaim Ex. 2).

**Adversary Proceeding**

50.     On January 18, 2010, Derek A. Henderson, the duly appointed chapter 7 trustee for the bankruptcy estate of Chris Evans and for jointly-administered related cases (the "Trustee"), filed a First Amended Complaint (the "Amended Complaint") (Adv. Dkt. 3) against the Banks, as well as other banks, and the Title Companies.  The Trustee asked the Court to determine the extent, validity, and priority of the liens granted by entities controlled by Chris Evans on multiple tracts of real property.  At issue here are parcels of land that comprise Tracts 1, 2, 10, and TC.

51.     On December 1, 2010, FSB filed an Amended Crossclaim Against Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "FSB Crossclaim") (Adv. Dkt. 135).  In the FSB Crossclaim, FSB asserts causes of action against the Title Companies for: (1) breach of contract, (2) breach of the obligation of good faith and fair dealing in claims handling, (3) negligence, including the negligent supervision and retention of Charles Evans,

and (4) aiding and abetting.  In response, the Title Companies filed Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Answer and Affirmative Defenses to Amended Cross-Claim of First Security Bank (Adv. Dkt. 142) on December 27, 2010.

52.     On April 28, 2011, Patriot filed the Crossclaim of Patriot Bank (Adv. Dkt. 177), in which it asserts causes of action against the Title Companies for: (1) direct fraud, (2) negligent misrepresentation, (3) imputed fraud, (4) failure to audit, supervise and monitor Charles Evans, (5) breach of contract-title policy, (6) bad faith and tortious breach of contract, (7) promissory and/or equitable estoppel, (8) breach of contract-independent promise to cure, (9) contempt, and (10) attorney's fees.  In response, the Title Companies filed Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to Patriot Bank's Cross-Claim (Adv. Dkt. 217) on May 16, 2011.

53.     On April 28, 2011, First Alliance filed the Crossclaim of First Alliance Bank (Adv. Dkt. 178).  The Crossclaim of First Alliance Bank asserts causes of action against the Title Companies for: (1) direct fraud, (2) negligent misrepresentation, (3) imputed fraud, (4) failure to audit, supervise and monitor Charles Evans, (5) breach of contract-title policy, (6) bad faith and tortious breach of contract, (7) promissory and/or equitable estoppel, (8) breach of contract-independent promise to cure, (9) contempt, (10) indemnification under the closing protection letter, and (11) attorney's fees.  In response, the Title Companies filed Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First Alliance Bank's Cross-Claim (Adv. Dkt. 212) on May 16, 2011.

54.     On April 29, 2011, Holmes filed an Amended Crossclaim of Holmes County Bank (Adv. Dkt. 187).  The Amended Crossclaim of Holmes County Bank asserts causes of action against

the Title Companies for: (1) breach of contract-title policy, (2) bad faith and tortious breach of contract, (3) failure to audit, supervise, or monitor Charles Evans, and (4) attorney's fees. In response, the Title Companies filed Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to Holmes County Bank's Amended Cross-Claim (Adv. Dkt. 215) on May 16, 2011.

55.     On April 29, 2011, First State filed an Amended Crossclaim of First State Bank (Adv. Dkt. 188). The Amended Crossclaim of First State Bank asserts causes of action against the Title Companies for: (1) direct fraud, (2) negligent misrepresentation, (3) imputed fraud, (4) failure to audit, supervise or monitor Charles Evans, (5) breach of contract-title policy, (6) bad faith and tortious breach of contract, (7) promissory and/or equitable estoppel, (8) breach of contract-independent promise to cure, (9) contempt, and (10) attorney's fees. In response, the Title Companies filed Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First State Bank's Amended Cross-Claim (Adv. Dkt. 213) on May 16, 2011.

56.     On May 4, 2011, OmniBank filed a Crossclaim (Adv. Dkt. 198) against the Title Companies. OmniBank in its Crossclaim asserts causes of action against the Title Companies for: (1) breach of contract, (2) breach of obligation of good faith and fair dealing in claims handling, (3) negligence including negligent supervision and retention of Charles Evans, and (4) aiding and abetting. In response, the Title Companies filed Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to OmniBank's Cross-Claim (Adv. Dkt. 216) on May 16, 2011.

57.     On August 10, 2011, the Title Companies filed the Motion (Adv. Dkt. 301) against

FSB, Patriot, First Alliance, Holmes, First State, and OmniBank seeking judgment as a matter of law on their claims for (1) direct and indirect fraud, (2) negligent misrepresentation, (3) negligent failure to audit, supervise, monitor and retain Charles Evans, (4) breach of independent agreement to cure, (5) promissory/equitable estoppel, (6) aiding and abetting, (7) breach of closing protection letter, and (8) contempt.

## Introduction

Before addressing the merits of the Motion, the Court pauses here to discuss the procedural posture of the present Motion. The Motion is the first of two motions that the Title Companies have filed in the Adversary in which they seek partial summary judgment on claims asserted by Patriot, First Alliance, Holmes, First State, and OmniBank, and is the second of three such motions on claims asserted by FSB.[5]  In this Opinion, the Court disposes of the Title Companies request for partial summary judgment only as to the tort claims asserted by the Banks.

## Discussion

The Banks do not oppose all of the relief requested by the Title Companies in the Motion. Specifically, First Alliance and Patriot do not contest the Motion as to their claims for: (1) promissory and/or equitable estoppel arising out of representations made by the Title Companies regarding the Order Granting Motion to Approve Title Resolution Agreement, Including (I) Conditional Sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II)

---

[5] For clarification, the Title Companies do not seek any relief against State Bank in the present Motion.  In a separate motion, the Title Companies seek partial summary judgment on certain tort claims asserted by State Bank in Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Partial Summary Judgment (the "Second Tort Motion") (Adv. Dkt. 303).  Instead of filing a separate response to the Second Tort Motion, State Bank filed a joint response to the present Motion in the First Alliance Response. The Court addresses the Second Tort Motion in a separate opinion. (Adv. Dkt. 390).

Recognition of Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims, (IV) Resolution of Certain Litigation, and (V) Other Relief (the "Title Resolution Order") (Case No. 09-03763-NPO, Dkt. 683) and (2) breach of the independent promise of the Title Companies to cure the title defects by way of the Title Resolution Order.  (First Alliance Brief at 2).  Also, First Alliance does not contest the entry of partial summary judgment on its claim for indemnification under a closing protection letter issued by the Title Companies on October 26, 2004.  (First Alliance Brief at 2).  Additionally, First Alliance, Patriot, and First State do not contest the Motion as to their claims of contempt against the Title Companies for failing to comply with the Title Resolution Order.  (First Alliance Brief at 2).  The Court, therefore, finds that the Motion should be granted as to these aforementioned claims.

For ease of reference, the Court sometimes refers to some of the Banks as the "Fraud-Claim Banks" or the "Negligence-Claim Banks."  These subgroups are based on the predominate nature of the claims they asserted against the Title Companies.  The discussion below defines these groups and addresses their claims separately.

## A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a),[6] made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, summary judgment is appropriate when viewing the evidence in the light most favorable to the nonmoving party, the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, show that there is no genuine dispute

---

[6] Pursuant to the Rules Enabling Act, 28 U.S.C. § 2072, Rule 56 of the Federal Rules of Civil Procedure was amended, as of December 1, 2010.  The amendment did not change the standard for granting summary judgment.  *See* Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendments ("The standard for granting summary judgment remains unchanged.").

as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); *see* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986).  By its express terms, Rule 56(a) provides for partial summary judgment.

Fed. R. Civ. P. 56(a).  Once the moving party has made its required showing, Rule 56(c)(1) further

provides, in relevant part:

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by: (A) citing to particular parts of materials in the record . . . ; or (B)
> showing that the materials cited do not establish the absence or presence of a genuine
> dispute, or that an adverse party cannot produce admissible evidence to support the
> fact.

Fed. R. Civ. P. 56(c)(1).

"Summary judgment . . . serves, among other ways, to root out, narrow,  and focus the issues,

if not resolve them completely."  Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415

(5th Cir. 1993).  The effect of a partial summary judgment, if granted, is to lessen "the length and

complexity of trial on the remaining issues. . . all to the advantage of the litigants, the courts, those

waiting in line for trial, and the American public in general."  Id.  Ultimately, the role of this Court

is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial."  Anderson, 477 U.S. at 249; *see* Hamilton v. Segue Software Inc., 232

F.3d 473, 477 (5th Cir. 2000).  Even absent the presence of any genuine issue, the Court has the

discretion to deny motions for summary judgment and allow parties to proceed to trial so that the

record might be more fully developed for the trier of fact.  *See* Kunin v. Feofanov, 69 F.3d 59, 62

(5th Cir. 1995); Black v. J.I. Case Co., 22 F.3d 568, 572 (5th Cir. 1994); Veillon v. Exploration

Services, Inc., 876 F.2d 1197, 1200 (5th Cir. 1989).

## B.  Fraud

First Alliance, Patriot, and First State (hereinafter, the "Fraud-Claim Banks" in section "B" only) allege causes of action for direct and imputed fraud[7] arising from statements in the title insurance commitments issued by the Title Companies.  In the Motion, the Title Companies ask this Court to grant partial summary judgment in their favor because the fraud claims of the Fraud-Claim Banks are barred by the doctrines of waiver and election of remedies, and by the statute of limitations.  Additionally, they contend that they are entitled to partial summary judgment on the merits of the fraud claims because there is no evidence in the record of any false material statements made by the Title Companies in the title insurance commitments.  The Court addresses each of these arguments in turn.

### 1.  Doctrines of Waiver and/or Election of Remedies

The Title Companies assert in the Motion that the Fraud-Claim Banks waived their claims of direct and imputed fraud.  They also assert, in the same vein, that these fraud claims are barred by the doctrine of election of remedies.

Under Mississippi law, allegations of fraud render a title insurance policy "voidable," not "void."  Allen v. Mac Tools, Inc., 671 So. 2d 636, 641 (Miss. 1996), citing Turner v. Wakefield, 481 So. 2d 846, 848-49 (Miss. 1985).  As a result, the decision whether to void a policy must be "promptly made" by the party wishing to rescind, otherwise the agreement is ratified and a waiver

---

[7] The fraud claim of First Alliance differs slightly from the fraud claims of First State and Patriot.  Whereas First Alliance bases its fraud claim on the statement in the First Alliance Title Commitment that the Hensens owned Tracts 10E and 10F and that there were no outstanding liens or encumbrances, First State and Patriot base their fraud claims on statements in the First State Title Commitment and Patriot Title Commitment, respectively, that there were no outstanding liens or encumbrances.  (Title Companies Ex. 1).

occurs. Id. Similarly, the doctrine of election of remedies holds that where an individual claims to be fraudulently induced to enter into a contract, the defrauded party must elect either to rescind the contract and pursue his claim for fraud, or affirm the contract and sue for contractual damages. *See* Bogy v. Ford Motor Co., 538 F.3d 352, 354-55 (5th Cir. 2008), citing Turner, 481 So. 2d at 848-49. Once the election has been made, that decision is final. Turner, 481 So. 2d at 848.

The Title Companies contend that the Fraud-Claim Banks had the option either to rescind their title insurance policies and sue for fraud, or to affirm the title insurance policies and sue for breach of contract. Because it is undisputed that the Fraud-Claim Banks submitted claims under their respective title insurance policies, which were issued pursuant to the title insurance commitments, and that the Title Companies not only purchased the collateral that secured the loans, but also then conveyed the collateral to the Fraud-Claim Banks, the Fraud-Claim Banks are precluded from bringing claims for fraud against the Title Companies by the doctrines of waiver and election of remedies, so say the Title Companies. In short, the Title Companies contend that the Fraud-Claim Banks cannot retain the benefits they received under the title insurance policies and also seek additional damages for fraud.

The Fraud-Claim Banks counter that the false statements in the title insurance commitments induced them into entering into the loan agreements, not the title insurance policies. They insist that the only contracts that they could have rescinded and that would have rendered them whole, were the loan agreements. Under the rationale of the Title Companies, however, the Fraud-Claim Banks had to rescind the title insurance commitments and the title insurance policies. The Fraud-Claim Banks complain that rescission of those contracts would have resulted in little benefit to them.

The Court does not trod on completely new ground in considering the application of these

legal doctrines under these circumstances. In <u>G&B Investments, Inc. v. Henderson (In re Evans)</u> ("Evans I"), No. 10-00040-NPO, 2011 WL 4712176, *21 (Bankr. S.D. Miss. Oct. 7. 2011) (Adv. No. 10-00040-NPO, Adv. Dkt. 446), this Court ruled after the trial of a separate adversary proceeding with very similar facts that the doctrines of waiver and election of remedies precluded a bank from seeking recovery against the Title Companies for fraud.[8]  Here, the Fraud-Claim Banks have not identified any factual issue that would require resolution at trial, or warrant  consideration of these legal doctrines after a trial on the merits.  The Court agrees with the Title Companies that under Mississippi law, as it currently stands, the Fraud-Claim Banks had to rescind the title insurance policies and return the benefits they received as a result of the claims they submitted to the Title Companies under those title insurance policies, in order to recover damages from the Title Companies on their fraud claims.  The Court further agrees with the Title Companies that the Fraud-Claim Banks incorrectly view the issue of rescission as revolving around the loan transactions between the Fraud-Claim Banks and Chris Evans, rather than the transactions between the Fraud-Claim Banks and the Title Companies.  Accordingly, the Court finds that the Title Companies are entitled to summary judgment as to the claims of fraud by the Fraud-Claim Banks.  In the interest of judicial economy, however, the Court will consider the statute of limitations issue and the summary-judgment challenge to the merits of the fraud claims raised by the Title Companies.

### 2.    Statute of Limitations

The Title Companies maintain that the fraud claims of the Fraud-Claim Banks are barred by

---

[8] Currently, there is pending Bank of Forest's Motion for Amendment of Memorandum Opinion and Order (Adv. No. 10-00040-NPO, Adv. Dkt. 455), in which Bank of Forest asserts that the Title Companies waived the affirmative defenses of waiver and election of remedies by failing to include them in the pre-trial order.

the three-year statute of limitations under Miss. Code Ann. § 15-1-49, which provides, in pertinent part:

> (1)    All actions for which no other period of limitation is prescribed shall be commenced within three years next after the cause of such action accrued, and not after.
>
> (2)    In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

Miss. Code Ann. § 15-1-49.  Because the Fraud-Claim Banks initiated litigation against the Title Companies more than five years after the title insurance commitments had been issued, their claims are time-barred.  *See* <u>Dunn v. Dent</u>, 153 So. 798 (Miss. 1934) ("action for such deceit accrues upon the completion of the sale induced by such false representation, or upon the consummation of the fraud").

The Court agrees with the Fraud-Claim Banks that the statute of limitations in these circumstances did not begin to run until the alleged fraud became known, or should have become known, to the policyholder.  *See* <u>Parker v. Horace Mann Life Ins. Co.</u>, 949 So. 2d 57, 59 (Miss. Ct. App. 2006).  Because there are fact issues as to when the Fraud-Claim Banks knew, or should have known through the exercise of reasonable diligence about the alleged misrepresentations, the Court finds that the Title Companies are not entitled to partial summary judgment on the ground that their fraud claims are time-barred under Mississippi law.

### 3.    Fraudulent Representation/Intentional Misrepresentation

The Title Companies assert that there is no genuine issue of fact that the title insurance commitments they issued the Fraud-Claim Banks contained accurate information about the condition of the titles for their respective properties, assuming for the sake of argument that the title insurance

commitments contained any such representations.  The Title Companies, therefore, contend that the Fraud-Claim Banks cannot satisfy the first two elements of their fraud claims.  In Mississippi, the elements of a fraudulent representation/intentional misrepresentation claim are: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.  Trim v. Trim, 33 So. 3d 471, 478 (Miss. 2010), citing McCord v. Healthcare Recoveries, Inc., 960 So. 2d 399, 406 (Miss. 2007).

In support of the Motion, the Title Companies submit to the Court the Affidavit of W. Parrish Fortenberry ("Fortenberry"), the executive vice-president, senior claims and title counsel for Mississippi Valley Title Insurance Company.  (Title Companies Ex. 1).  Although Mississippi law requires that chancery clerks maintain an alphabetical index, both direct and reverse, of grantors and grantees, Fortenberry testified that in the chain of title of the respective properties, there were no prior liens in the official grantor/grantee indices maintained by the Clerk of the Chancery Court of DeSoto County, Mississippi (the "Chancery Clerk").[9]

The Fraud-Claim Banks disagree.  The Fraud-Claim Banks submit to the Court copies of deeds of trust, all of which had been duly recorded by the Chancery Clerk, which on their face, contradict the testimony of Fortenberry.  (First Alliance Exs. 2-6).  Apparently, Snowden had executed deeds of trust in favor of other banks prior to the issuance of the title insurance

---

[9] The First State Title Commitment stated that Woodgreen owned Tracts 10G and 10H and there were no liens on the property.  The First Alliance Title Commitment stated that the Hensens owned Tracts 10E and 10F and there were no liens or encumbrances on the property; and, the Patriot Title Commitment stated that Woodgreen owned Tracts 10J and 10K and there were no liens or encumbrances on the property.  (Title Companies Ex. 1).

commitments on all of the subject parcels of land. (First Alliance Ex. 6).

In response, the Title Companies maintain that there were no outstanding liens because the liens created by the deeds of trust were "wild deeds" not found in the "chain of title," and, therefore, not part of the public record. In this way, the Title Companies make no distinction between "chain of title" and "of record." According to the Title Companies, Mississippi law does not require that an attorney search for "wild deeds" outside the chain of title. *See* Morgan v. Mars, 43 So. 2d 563, 564 (Miss. 1949). In other words, the Title Companies do not dispute that there were in fact liens on the properties. Instead, the Title Companies argue that they had no duty to search outside the chain of title for "wild deeds," such as the deeds of trust granted by Snowden. *See* Miss. Code Ann. § 89-5-3. "Locating a wild deed is the prototypical 'needle in a haystack' search," according to the Title Companies. (Title Companies Reply Brief at 7).

The Fraud-Claim Banks counter that the words "chain of title" do not appear in the title commitments, which simply state that there are "no liens and encumbrances to be satisfied and discharged of record." (First Alliance Ex. 1). The Fraud-Claim Banks consider it immaterial whether the deeds of trust appeared in the chain of title, because the plain language of the title insurance policies required the Title Companies to list *all* encumbrances and liens on their properties. The Title Companies could have included language in the title insurance policies that excluded "wild deeds" from coverage but did not do so. Here, all of the deeds of trust did appear "in the public records" in the official grantor/grantee indices.

Mississippi applies the plain meaning of a contract where the contract's term are unambiguous. Leonard v. Nationwide Mut. Ins. Co., 499 F.3d 419, 429 (5th Cir. 2007), citing Robley v. Blue Cross/Blue Shield, 935 So. 2d 990, 996 (Miss. 2006). The Court finds that the plain

meaning of the title insurance commitments is clear. The title insurance commitments state that Schedule B lists all "exceptions to defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by the Commitment." (First Alliance Ex. 1). Schedule B in each of the title insurance commitments lists two right-of-ways to Mississippi Power & Light and a 10-foot easement to DeSoto County, Mississippi. (First Alliance Ex. 1). The title insurance commitments, however, fail to list the encumbrances and liens held by other banks. The Court finds that the Title Companies have not shown that they are entitled to partial summary judgment on the merits of the fraudulent misrepresentation claims.

## C.    Negligence

The Court has already found that the doctrines of waiver and/or election of remedies bar the fraud claims of First Alliance, Patriot, and First State, including their claims for fraudulent representation and negligent misrepresentation.[10] The Court next addresses the issues raised by the Title Companies in the Motion regarding the merits of other negligence claims in addition to their negligent misrepresentation claims, which the Court considers first.

### 1.    Negligent Misrepresentation

First Alliance, Patriot, and First State assert claims of negligent misrepresentation based on allegedly false statements contained in the title commitments issued by the Title Companies. For a plaintiff to successfully assert a claim of negligent misrepresentation, the plaintiff must prove by

---

[10] In the Motion, the Title Companies ask the Court to apply the doctrines of waiver and/or election of remedies only to the fraud claims.

a preponderance of the evidence: (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such person/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.  Weible v. Univ. of S. Miss., No. 2010-CA-00442-COA, 2011 WL 5027203, *15 (Miss. Ct. App. Oct. 18, 2011), quoting Holland v. Peoples Bank & Trust Co., 3 So. 3d 94, 101 (Miss. 2008).

As previously discussed, the plain language of the title insurance commitments stated that it would list *all* liens and encumbrances on the properties.  The title insurance commitments, however, did not disclose liens on the properties held by other banks.  (First Alliance Ex. 1). Therefore, the Court finds that a genuine issue exists as to whether the title insurance commitments contained a misrepresentation.  Even so, the negligence representation claims of First Alliance, Patriot, and First State are barred by the doctrines of election of remedies and waiver, and as a result, the Motion should be granted for the reasons previously stated.

### 2.    Negligent Failure to Audit, Monitor, or Supervise Charles Evans

The Banks allege that the Title Companies had a duty to audit, monitor, and supervise, Charles Evans, their approved attorney.  The Title Companies contend that the Banks cannot prove the existence of a duty under Mississippi law.  *See, e.g.*, Enterprise Leasing Co. v. Bardin, 8 So. 3d 866, 868 (Miss. 2007) (plaintiff's first obligation in a  negligence case is proving that a duty exists). To successfully assert a claim of negligence, the Banks must prove: (1) a duty, (2) a breach of duty, (3) a reasonably close causal connection between the conduct complained of and the resulting injury,

and (4) actual loss or damage resulting to the interests of another.  Little v. Miller, 909 So. 2d 1256,

1259 (Miss. Ct. App. 2005), citing Foster by Foster v. Bass, 575 So. 2d 967, 972 (Miss. 1990).

The Banks maintain that the Supervision and Control Guidelines for Agencies and Approved

Attorneys (the "ALTA Guidelines"), developed by the American Land Title Association ("ALTA"),

of which the Title Companies are members, create a legal duty requiring title companies to audit,

monitor, and supervise their approved attorneys.[11]   The ALTA Guidelines suggest that title

companies have in place an evaluation system by which they can monitor escrow accounting

procedures, compliance with local and federal laws and statutes, and conflicts of interest.  (First

Alliance Ex. 22).  Additionally, the ALTA Guidelines state that "management  must ensure that ...

approved attorneys properly account for and control all escrow and settlement funds."  (First

Alliance Ex. 22).

The Banks contend that the Title Companies breached the duty because they "[n]ever

conduct[ed] any investigation or inquiry," but "accepted Charles Evans' certifications as to status

of title and verbatim copied them onto their Title Commitments and Title Polices."  (First Alliance

Response Brief at 35).  The Title Companies did not audit, monitor, or supervise Charles Evans, the

Negligence-Claim Banks argue, even though they had an auditing department.  (First Alliance Ex.

21).  Indeed, if the Title Companies had audited, monitored, or supervised Charles Evans, they would

have learned that he was writing checks to a men's clothing shop in Jackson, Mississippi, and paying

charges on his American Express card from funds drawn on the attorney trust account used for

---

[11] The Court entered an Order (Adv. Dkt. 387) on November 17, 2011, allowing the use
of the ALTA Guidelines in opposition to the Motion.  In that same Order, the Court excluded a
majority of the opinions in the expert report of George M. Pierson on the ground that they
constituted legal conclusions that impermissibly invaded the province of this Court.

escrow and disbursement of the loan proceeds in which the Title Companies' issued their policies. (First Alliance Ex. 25). Indeed, the Title Companies admit that if they known about Charles Evans' behavior, they would have removed him from their approved attorney's list earlier. (First Alliance Ex. 23).

The Title Companies do not dispute that they failed to audit, monitor or supervise Charles Evans. Additionally, the Title Companies admit that they have an in-house auditing department that audits their *agents* by "pull[ing] . . closing files and look[ing] at the deed, deeds of trust, [to] see if the different notices had been signed" and monitoring escrow accounts. (First Alliance Ex. 21). The auditing department, however, does not oversee the actions of the Title Companies' approved attorneys. The Title Companies state that they check *approved attorneys* only to ensure they have errors and omissions insurance in place and to find out if any clients have filed complaints against them with the applicable bar association. (First Alliance Ex. 21).

The Title Companies argue that an insurer has no duty to audit, monitor or supervise its approved attorneys as a matter of law. The Title Companies believe this issue is squarely settled by the Mississippi Supreme Court's decision in Hartford Steam Boiler Inspection & Ins. Co. v. Cooper, 341 So. 2d 665, 666 (Miss. 1977). There, the Mississippi Supreme Court held that an insurer of certain industrial equipment had no duty to an employee of its insured to inspect the equipment for safety hazards. Id. The employee sued the insurance company to recover damages from personal injuries he sustained as the result of the insurer's alleged negligent inspection of the equipment. Id. The Mississippi Supreme Court explained that if the insurer "had a duty to inspect, the obligation must derive either from the policy or because [the insurer] assumed responsibility for performing inspections to the extent that they should have recognized the inspection of the machines was

necessary for the protection of third persons." Id. at 667. "The incidental benefits that accrued to [the insured's] employees and the public by . . . inspections and recommendation should not rationally give rise to liability for failure to inspect a particular piece of equipment." Id., citing Zamecki v. Hartford Accident & Ind. Co., 95 A.2d 302 (1953).

According to the Title Companies, because the Hartford Steam court held that any underwriting efforts done by an insurer are solely for its own benefit and not for the benefit of the insured, Mississippi law does not impose a duty on title companies to audit, monitor, or supervise their approved attorneys. This holding, the Title Companies argue, is consistent with the results reached in other jurisdictions that have settled similar issues. For example, the United States Court of Appeals for the Eight Circuit in Bluehaven Funding, LLC v. First Am. Title Ins. Co., 594 F.3d 1055 (8th Cir. 2010), held that a title insurer does not owe a common-law duty to third parties to monitor, supervise, or review its title agents. Embracing language similar to the analysis in Hartford Steam, the Eighth Circuit found that the title insurer's contractual right to review the title agent's escrow files and accounts was solely for its own benefit and protection, and not for the benefit of any third party. Id. at 1061 (applying Missouri law). Although some courts have found that a title insurer may be negligent if it fails to discover and disclose a title defect, such liability appears to arise only in instances where a title company had expressly agreed to provide a title report or issued a preliminary title report that failed to disclose the defect. Focus Inv. Assocs. v. Am. Title Ins. Co., 992 F.2d 1231, 1236 (1st Cir. 1993) (holding that "[i]n the absence of a duty to search title, as a matter of law, there can be no liability for failing to do so").

Simply put, the issue before this Court is a question of law that no reported case in Mississippi has yet addressed, that is, whether a title insurance company owes a duty to a third party

to audit, supervise, or retain an approved attorney. Generally, Mississippi law imposes a duty on persons to take reasonable and due care in performing an act, even in the absence of a contract. River Prod. Co. v. Banker Hughes Prod. Tools, Inc., 98 F.3d 857, 859 (5th Cir. 1996), citing Dr. Pepper Bottling Co. v. Bruner, 148 So. 2d 199, 201 (Miss. 1962). "Determining whether a duty is owed is approached by asking 'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct,' rather than focusing solely on the level of relationship between the parties." Scafide v. Bazzone, 962 So. 2d 585, 592 (5th Cir. 2006), quoting PROSSER AND KEETON ON TORTS § 53, at 356-58 (5th ed. 1984). In general, Mississippi law does not recognize a fiduciary relationship or duty between an insurance company and its insured because courts deem the purchase of insurance to be an arms-length business transaction. Frye v. Am. Gen. Fin., Inc., 307 F. Supp. 2d 836, 843 (S.D. Miss. 2004).

Whether a duty is owed in a negligence action is a question of law. Here, the Court agrees with the construction and application of the Hartford Steam decision posited by the Title Companies. The Hartford Steam court held that an insurer has a duty to inspect its insured only when it is provided for in the policy. In this same vein, a insurer should have a duty to audit, monitor, or supervise an approved attorney only when it is provided for in the policy. Were this Court to impose a duty upon the Title Companies to audit, monitor, or supervise its approved attorneys, it would in essence create a fiduciary relationship between an insurance company and its insured in contravention of well-settled Mississippi law. See Frye, 307 F. Supp. 2d at 843. This finding is also consistent with the Eighth Circuit's decision in Bluehaven finding that an insurer had no duty to supervise its own agent. See Bluehaven, 594 F.3d 1055. The Court rejects the contention of the Negligence-Claim Banks that the ALTA Guidelines create a duty for the Title Companies to audit,

Page 29 of 34

monitor, or supervise their approved attorneys. The ALTA Guidelines are just that, guidelines, by which title companies should conduct their business. The failure to adhere to suggested guidelines does not impose liability. The Motion as to claims of the Banks arising out of the alleged negligence of the Title Companies to audit, monitor, or supervise Charles Evans should be granted on the ground that the Title Companies owed no such duty to the Banks under Mississippi law.

### 3. Negligent Retention

In addition to their other negligence claims, FSB and OmniBank, (hereinafter, the "Negligence-Claim Banks"), assert claims against the Title Companies for the negligent retention of their approved attorney, Charles Evans. A claim of negligent retention "is simply a negligence claim, requiring a finding of duty, breach of duty, causation and damage." Roman Catholic Diocese v. Morrison, 905 So. 2d 1213, 1229 (Miss. 2005). Mississippi law requires the presence of an employer-employee relationship to assert a claim of negligent retention. See Commercial Bank v. Hearn, 923 So. 2d 202, 204 (Miss. 2006). Moreover, an employer who exercised due care in hiring its employee may be held liable for the negligent retention of that employee only when the employer had either actual or constructive knowledge of the employee's incompetence or unfitness. Brown ex rel. Doe v. Ponotoc Cnty. School Dist., 957 So. 2d 410, 417 (Miss. Ct. App. 2007), citing Eagle Motor Lines, Inc. v. Mitchell, 78 So. 2d 482, 487 (Miss. 1955).

The Title Companies argue that partial summary judgment is proper because the Negligence-Claim Banks do not dispute that Charles Evans was never employed by them. Further, the Title Companies maintain that even if they were his employer, the Negligence-Claim Banks cannot meet their burden of showing that the Title Companies had actual or constructive knowledge of Charles Evans's unfitness. Their argument is premised on a finding that they acted properly when they added

Page 30 of 34

Charles Evans to the approved attorney list in 1984 and again in 2002.

The Negligence-Claim Banks counter that by keeping Charles Evans on the approved attorneys list after they knew or should have known about his fraudulent conduct, the Title Companies are liable for negligent retention. They contend that the existence of numerous title insurance policies on the same property should have alerted them that something was amiss.

The Court finds that because Charles Evans was never an employee of the Title Companies, the Title Companies cannot be held liable for negligent retention as a matter of law. Thus, the Motion as to the claim of negligent retention should be granted on the merits on the ground that there is no evidence of an employer-employee relationship. Given this finding, it is unnecessary for the Court to determine if genuine issues of fact exist as to whether the Title Companies had notice of Charles Evans' fraudulent scheme.

## D.      Aiding and Abetting under the RESTATEMENT (SECOND) OF TORTS § 876(c)

The Negligence-Claim Banks also allege that the Title Companies substantially assisted Charles Evans in his fraudulent scheme. As a result of these actions, the Negligence-Claim Banks contend that the Title Companies are liable for aiding and abetting Charles Evans pursuant to the RESTATEMENT (SECOND) OF TORTS § 876(c). They base their claims of aiding and abetting against the Title Companies primarily upon representations in the title insurance policies they issued, which reflected that the Negligence-Claim Banks had a first lien position on their mortgages, when in fact they did not.

The RESTATEMENT (SECOND) OF TORTS § 876 addresses the related claims of (1) civil conspiracy and (2) civil aiding and abetting under the common law. *See* <u>Lussier v. Bessette</u>, 16 A.3d 580, 583-87 (Vt. 2010). Civil conspiracy is defined in § 876(a), whereas the elements of civil aiding

and abetting are laid out in § 876(b) and § 876(c).   Stanton v. Bank of Am., N.A., No. 09-00404DAE-LEK, 2010 WL 4176375, *14 (D. Haw. Oct. 19, 2010).

The two subsections on aiding and abetting, § 876(b) and § 876(c), differ in important ways. Under § 876(b), liability exists when a party "knows that [another tortfeasor's] conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."   RESTATEMENT (SECOND) OF TORTS § 876(b).   Under § 876(c), liability exists "for harm resulting to a third person from the tortious conduct of another,  . . if he . . . gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."   RESTATEMENT (SECOND) OF TORTS § 876(c).   Thus, to meet the elements of aiding and abetting under § 876(c) the plaintiff must demonstrate that (1) the defendant's actions constituted a breach of duty and (2) the defendant provided substantial assistance to the primary party's breach.   Norman v. Brandt, 929 N.E. 2d 14, 21 (Ill. App. Ct. 2010).   Notably, § 876(c) does not require knowledge about the primary party's wrongdoing.

No Mississippi court has ever recognized any of the three subsections of the RESTATEMENT (SECOND) OF TORTS § 876 as viable causes of action.   Mississippi recognizes a common-law claim for civil conspiracy, but not under the auspices of § 876(a). *See* Perkins v. Wal-Mart Stores, Inc., 46 So. 3d 839 (Miss. Ct. App. 2010).   Additionally, no Mississippi court has recognized a claim for civil aiding and abetting, whether under § 876(b) or § 876(c).   Significantly, however, the federal district court in Dale v. ALA Acquisitions, Inc., 203 F. Supp. 2d 694 (S.D. Miss. 2002), made an *Erie*[12] guess that Mississippi would recognize a claim under § 876(b) for two reasons: (1) because a majority of other jurisdiction have done so and (2) because Mississippi recognizes the analogous

---

[12] Erie RR Co. v. Tompkins, 304 U.S. 64, 78 (1938).

tort of civil conspiracy. The first reason does not support recognition of § 876(c) because the variation of civil aiding and abetting set forth in § 876(c) differs from § 876(b) to such an extent that only a minority of jurisdictions recognize a claim under § 876(c). Thus, this Court declines to recognize § 876(c) as a viable cause of action in Mississippi. Accordingly, the Court finds that the Motion as to the claims of civil aiding and abetting should be granted.

## Conclusion

In conclusion, the Court finds that the Title Companies are entitled to partial summary judgment as a matter of law on the following tort claims:

(1)    claims of First Alliance and Patriot for promissory and/or equitable estoppel arising out of representations made by the Title Companies regarding the Title Resolution Order;

(2)    claims of First Alliance and Patriot for breach of independent promise of the Title Companies to cure the title defects by way of the Title Resolution Order;

(3)    claims of First Alliance for indemnification under a closing protection letter issued by the Title Companies on October 26, 2004;

(4)    claims of First Alliance, Patriot, and First State for contempt against the Title Companies for failing to comply with the Title Resolution Order;

(5)    claims of First Alliance, Patriot, and First State for fraudulent representation and/or intentional misrepresentation arising out of statements in the title insurance policies on the ground that the claims are precluded by the doctrines of waiver and/or election of remedies;

(6)    claims of First Alliance, Patriot, and First State for negligent misrepresentation arising out of statements in the title insurance policies on the ground that the claims are precluded by the doctrines of waiver and/or election of remedies;

(7)    claims of the Banks for negligent failure to audit, monitor, or supervise Charles Evans on the ground that the Title Companies owed no duty to the Banks to audit, monitor, or supervise

Charles Evans;

      (8)    claims of FSB and OmniBank for negligent retention of Charles Evans on the ground that there was no employer/employee relationship between the Title Companies and Charles Evans; and

      (9)    claims of FSB and OmniBank for civil aiding and abetting under the RESTATEMENT (SECOND) OF TORTS § 876(c) on the ground that Mississippi does not recognize such a cause of action.

      All other relief requested by the Title Companies that is not specifically granted herein is denied.

      SO ORDERED.

                                          _____

                                          Neil P. Olack
                                          United States Bankruptcy Judge
                                         Dated:  December 15, 2011