## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **JON CHRISTOPHER EVANS,** | **CASE NO. 09-03763-NPO** |
| **DEBTOR.** | **CHAPTER 7** |

**JOINTLY ADMINISTERED WITH RELATED CASES**

| | |
|---|---|
| **FIRST ALLIANCE BANK, FIRST STATE BANK,** | |
| **FIRST SECURITY BANK, AND PATRIOT BANK** | **CROSS-PLAINTIFFS** |
| **VS.** | **ADV. PROC. NO. 10-00005-NPO** |
| **MISSISSIPPI VALLEY TITLE INSURANCE** | **CROSS-DEFENDANTS** |
| **COMPANY AND OLD REPUBLIC NATIONAL** | |
| **TITLE INSURANCE COMPANY** | |

## MEMORANDUM OPINION AND ORDER
## ON CROSS-CLAIMS OF FIRST STATE BANK,
## FIRST ALLIANCE BANK, AND PATRIOT BANK
## AGAINST MISSISSIPPI VALLEY TITLE INSURANCE COMPANY
## AND OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
## <u>RELATED TO THE WOODGREEN PROPERTY—PHASE ONE:  LIABILITY</u>

This matter came before the Court on February 21-22, 2012, for the liability phase ("Phase One")[1] of the trial (the "Woodgreen Trial") on the cross-claims of (1) First State Bank ("First State"), (2) First Alliance Bank ("First Alliance"), and (3) Patriot Bank ("Patriot") against Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies") in the above-referenced adversary proceeding (the "Adversary").  Patriot, First State,

---

[1] With the consent of the parties, the Court bifurcated the bench trial into two phases:  (1) liability and (2) damages.

and First Alliance are together referred to as the "Woodgreen Banks." At the Woodgreen Trial,[2] William C. Brabec and M. Scott Jones represented the Title Companies; William Liston, III and W. Lawrence Deas represented the Woodgreen Banks.

The relevant pleadings in the Adversary, in the order in which they were filed, are: Crossclaim of Patriot Bank (Adv. Dkt. 177)[3] filed by Patriot; Crossclaim of First Alliance Bank (Adv. Dkt. 178) filed by First Alliance; Amended Crossclaim of First State Bank (Adv. Dkt.188) filed by First State; Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First Alliance Bank's Cross-Claim (Adv. Dkt. 212) filed by the Title Companies; Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First State Bank's Amended Cross-Claim (Adv. Dkt. 213) filed by the Title Companies; and Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to Patriot Bank's Cross-Claim (Adv. Dkt. 217) filed by the Title Companies. Having considered the evidence presented at the Woodgreen Trial, as well as the post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

## TABLE OF CONTENTS

Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

---

[2] The cross-claim of First Security Bank against the Title Companies, which was tried on February 29, 2012, will be addressed in a separate opinion.

[3] Citations to the record are as follows: (1) citations to docket entries in the Adversary are cited as "(Adv. Dkt. _____)"; (2) citations to docket entries in the main bankruptcy case of Jon Christopher Evans, Case No. 09-037630-NPO, are cited as "(Bankr. Dkt. _____)"; and (3) citations to docket entries in other adversary proceedings and bankruptcy cases are cited to the proceeding or case number first and then the docket number.

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.      Bankruptcy Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              1.      Chris Evans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              2.      Related Entities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              3.      Charles Evans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.      Adversary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

              1.      Summary Judgment Motions and Orders. . . . . . . . . . . . . . . . . . . . 9

              2.      Remaining Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      A.      Abandonment and/or Waiver of Breach of Good Faith
              and Fair Dealing Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      B.      Overview of Law of Good Faith and Fair Dealing. . . . . . . . . . . . . . . . . . . 30

      C.      Woodgreen Banks' Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

              1.      Subdivision of the Woodgreen Property. . . . . . . . . . . . . . . . . . . . 33

              2.      Exclusions and Exceptions in the Policies. . . . . . . . . . . . . . . . . . . 36

      D.      Title Companies' Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

              1.      Subdivision of the Woodgreen Property. . . . . . . . . . . . . . . . . . . . 38

              2.      Exclusions and Exceptions in the Policies. . . . . . . . . . . . . . . . . . . 41

              3.      Contractual Right to Cure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      E.      Court's Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

              1.      Subdivision of the Woodgreen Property. . . . . . . . . . . . . . . . . . . . 44

2.    Exclusions and Exceptions in the Policies.. . . . . . . . . . . . . . . . . . . . . . 45

3.    Contractual Right to Cure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (O).[4] Notice of the Woodgreen Trial was proper under the circumstances.

## Introduction

After bilking numerous lenders, in Mississippi and elsewhere, for untold millions, Jon Christopher Evans ("Chris Evans") and his brother, Charles H. Evans, Jr. ("Charles Evans"), (together, the "Evans Brothers"), pled guilty on January 18, 2011, to conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and bank fraud in violation of 18 U.S.C. § 1344.  *See* United States v. Evans, No. 3:10-CR-00118 (S.D. Miss. 2010).  On December 19, 2011, Chris Evans was sentenced to 168 months in prison, and Charles Evans was sentenced to 240 months.  As a component of the criminal proceedings, a judgment in the amount of $18,594,221.58 was imposed against each of the Evans Brothers under criminal forfeiture law, 18 U.S.C. § 981(a)(1)(C) and

---

[4] This finding of core jurisdiction is undisputed.  *See* Pretrial Order at 2 (Adv. Dkt. 444). The United States Supreme Court in Stern v. Marshall, 131 S. Ct. 2594 (2011), held that bankruptcy courts lack constitutional authority to enter a final judgment on a state-law, compulsory counterclaim that did not stem from the bankruptcy itself.  *See* Technical Automation Services Corp. v. Liberty Surplus Ins. Corp., 673 F.3d 399 (5th Cir. 2012) (holding that Stern did not reach so far as to render constitutionally infirm the statutory powers of federal magistrate judges and noting that Stern had very limited application).  In the event that a higher court disagrees that the Adversary involves "core" matters and/or otherwise determines that the Court lacks constitutional authority to enter a final order, the Court recommends that this Opinion be regarded as its proposed findings of fact and conclusions of law and further recommends that the District Court enter it as its own, after due consideration, in accordance with 28 U.S.C. § 157(c)(1).

§ 982(a)(2)(A). This introduction provides an overview of their *Ponzi*[5] scheme in order to set the stage for a description of the claims held by the Woodgreen Banks.

Chris Evans, as president of the Woodgreen Development Corporation LLC ("Woodgreen Development"), purchased twenty-three acres of commercial real estate in Southaven, DeSoto County, Mississippi, in 2004. This property is referred to as the "Woodgreen Property." All claims asserted in the Adversary involve transactions related to the Woodgreen Property, although the Evans Brothers did not limit their fraudulent scheme to one parcel of land. Indeed, property located elsewhere in Mississippi,[6] and even in at least one other state, have been the subject of contested matters and other adversary proceedings involving the Evans Brothers.

Both of the Evans Brothers were licensed to practice law in Mississippi during the relevant time period. Because Charles Evans was on the list of attorneys "approved" by the Title Companies, he was able to procure title insurance commitments and/or title insurance policies based on false applications. His brother, Chris Evans, induced lenders to make loans in the names of companies that he formed for this purpose. To secure the loans, these companies, which are referred to as the "Related Entities," granted deeds of trust on property that they did not actually own or that they never actually acquired, or that was already encumbered by other liens, all unbeknownst to the lenders. Charles Evans, of course, performed most of the closings on the real estate transactions himself. The scheme ended in early September 2009, when the Title Companies removed Charles Evans from their list of "approved" attorneys after discovering the fraud.

_____

[5] *See* Cunningham v. Brown, 265 U.S. 1, 7-8 (1924) (describing pyramid scheme of Charles Ponzi).

[6] *See, e.g.*, G&B Invs., Inc. v. Henderson (In re Evans), Adv. Proc. No. 10-00040-NPO (Bankr. S.D. Miss. 2009) (concerning the same type *Ponzi* scheme by the Evans Brothers but involving 105 acres of commercial property located in Madison County, Mississippi).

**Procedural History**

A.    **Bankruptcy Cases**

    1.    **Chris Evans**

On October 26, 2009, Chris Evans filed a voluntary petition under chapter 7 of the United States Bankruptcy Code in Case No. 09-03763-NPO.  Derek A. Henderson was appointed the chapter 7 trustee ("Trustee Henderson").

    2.    **Related Entities**

During the next few months, from November 12, 2009, until January 14, 2010, Chris Evans filed voluntary petitions for relief under chapter 7 on behalf of the Related Entities.  Trustee Henderson was appointed the chapter 7 trustee for each of these Related Entities.  In a series of orders, the Court consolidated the bankruptcy cases of the Related Entities for joint administration with the main bankruptcy case of Chris Evans (Bankr. Dkt. 161, 298 & 513).  These cases, which are referred to as the "Related Cases," are listed below in the order in which their petitions for relief were filed:

        Colony Developers, Inc. (Case No. 09-04016-NPO)
        Highland of Ridgeland, Inc. (Case No. 09-04017-NPO)
        Twin City Commons Development Company, LLC (Case No. 09-04091-NPO)
        Old Agency Business Park, Inc. (Case No. 09-04101-NPO)
        Cedar Lake Investors LLC (Case No. 09-04102-NPO)
        Colony Construction Ltd. (Case No. 09-04104-NPO)
        Town Park of Madison, LLC (Case No. 09-04105-NPO)
        Madison Avenue Development Co., LLC (Case No. 09-04109-NPO)
        White Oak Investment Company (Case No. 09-04118-NPO)
        Woodgreen Development Corporation (Case No. 09-04120-NPO)
        Nottaway Pointe LLC (Case No. 09-04124-NPO)
        Ridgeland Recreational, Corp. (Case No. 09-04125-NPO)
        Hanover Investments, LLC (Case No. 09-04126-NPO)
        Highland of Madison Development, Inc. (Case No. 09-04214-NPO)
        Highland Colony Group LLC (Case No. 09-04215-NPO)
        Paloma Ridge LLC (Case No. 09-04216-NPO)

Riverbend Group LLC (Case No. 09-04217-NPO)
Sawbridge Development, LLC (Case No. 09-04218-NPO)
Westfield Way LLC (Case No. 09-04219-NPO)
JCE Construction (Case No. 09-04369-NPO)
CE Development, Inc. (Case No. 09-04396-NPO)
Oakmont Mill LLC (Case No. 09-04398-NPO)
Snowden Lane Investments LLC (Case No. 09-04488-NPO)
C & L INC. (Case No. 09-04489-NPO)
Canton Oaks Investment & Redevelopment Company, LLC (Case No. 09-04490-NPO)
Westwoods Investments LLC (Case No. 09-04491-NPO)
Twinbrook Run Development Company, LLC (Case No. 09-04492-NPO)
Brashear Heath LLC (Case No. 09-04494-NPO)
463 Development Company LLC (Case No. 09-04505-NPO)
Park Place Commons LLC (Case No. 09-04508-NPO)
Parkway Crossing LLC (Case No. 09-04510-NPO)
Marner Park LLC (Case No. 09-04511-NPO)
Greenwood Place LLC (Case No. 10-00117-NPO)
Lake Harbor Development Company LLC (Case No. 10-00118-NPO)
Windsor Pass LLC (Case No. 10-00120-NPO)
Clear Creek Development (Case No. 10-00121-NPO)
Brisbane Centre LLC (Case No. 10-00122-NPO)
Landsdowne Group LLC (Case No. 10-00123-NPO)
Snowden Grove Investors LLC (Case No. 10-00124-NPO)

Of particular relevance to the Adversary are the chapter 7 petitions for relief filed by Chris Evans

on behalf of the following Related Entities:  Cedar Lake Investors LLC ("Cedar Lake") (Case No.

09-04102-NPO);  Woodgreen Development (Case No. 09-04120-NPO); and Snowden Grove

Investors LLC ("Snowden") (Case No. 10-00124-NPO).

**3.      Charles Evans**

On March 23, 2010, an involuntary petition for relief under chapter 7 was filed against

Charles Evans.  (Case No. 10-01117-NPO,  Dkt. 1).  On July 12, 2010, this Court entered an Order

for Relief in an Involuntary Case (Case No. 10-01117-NPO, Dkt. 28) against Charles Evans, who did

not file any pleading or defense to the involuntary petition.

**B.      Adversary**

The discovery of the Evans Brothers' fraudulent scheme and the bankruptcy filings that ensued shortly thereafter resulted in a "menagerie"[7] of claims, counterclaims, cross-claims, and third-party complaints filed in United States district court, federal bankruptcy court, and state court.  The Adversary was initiated by Trustee Henderson on January 15, 2010, by the filing of the Complaint (Adv. Dkt. 1), closely followed by the First Amended Complaint (the "Complaint") (Adv. Dkt. 3), filed on January 18, 2010.  In the Complaint, Trustee Henderson asked the Court to determine the extent, validity, and priority of liens on the Woodgreen Property.  Named as defendants in the Complaint were forty different lenders, including the Woodgreen Banks, as well as the Title Companies.  The Woodgreen Banks responded to the Complaint and asserted the following cross-claims[8] against the Title Companies: (1) direct fraud; (2) negligent misrepresentation; (3) imputed fraud; (4) negligent failure to audit, supervise and monitor Charles Evans; (5) breach of contract of the Policies; (6) bad faith and tortious breach of contract of the Policies; (7) promissory and/or equitable estoppel; (8) breach of contract of the independent promise to cure; (9) contempt of Court; and (10) attorney's fees[9] (the "Cross-claims") (Adv. Dkt. 177, 178 & 188).

---

[7] In his opening statement at the Woodgreen Trial, William C. Brabec referred to the collection of interests asserted against the Woodgreen Property as a "menagerie of problems," an apt reference given the varied mixture of claims brought against the Title Companies. (1 Trial Tr. at 12).

[8] First Alliance asserted an additional cause of action for indemnification under a closing protection letter.  (Adv. Dkt. 178, at 19).

[9] First Alliance and Patriot had not yet filed their cross-claims against the Title Companies when Trustee Henderson voluntarily dismissed all of his claims against them in the Adversary. *See infra* p.10 and note 12.  On April 29, 2011, the Court entered an Order Granting Motion of First Alliance Bank for Leave to Intervene and File Crossclaim (Adv. Dkt. 181) and an Order Granting Motion of Patriot Bank for Leave to Intervene and File Crossclaim (Adv. Dkt.

1.      **Summary Judgment Motions and Orders**

On August 10, 2011, the Title Companies filed the Mississippi Valley Title Insurance Company and Old Republic National Title Company's Motion for Partial Summary Judgment (the "Tort Motion") (Adv. Dkt. 301).  On August 26, 2011, the Title Companies filed the Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Summary Judgment on Insurance Contract Claims of Patriot Bank, First Alliance Bank, First State Bank and OmniBank (the "Contract Motion") (Adv. Dkt. 316).  The relief sought by the Title Companies in both the Tort Motion and the Contract Motion, if granted, would have resulted in the dismissal of all of the Cross-claims of the Woodgreen Banks.  (Adv. Dkt. 301 & 316).

After extensive briefing by the parties, the Court on December 15, 2011, rendered two decisions:[10] (1) Memorandum Opinion and Order on Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Partial Summary Judgment (the "Tort Opinion") (Adv. Dkt. 389), and (2) Memorandum Opinion and Order on Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Summary Judgment on Insurance Contract Claims of Patriot Bank, First Alliance Bank, First State Bank and OmniBank (the "Contract Opinion") (Adv. Dkt. 391).  In the Tort Opinion, the Court granted the Title Companies partial summary judgment against one or more of the Woodgreen Banks on the following Cross-claims: (1) promissory and/or equitable estoppel; (2) breach of independent

---

182).  Thus, First Alliance and Patriot are intervenors as well as claimants in the Adversary.

[10] The Court rendered a total of six opinions on requests for summary judgment in the adversary proceedings on December 15, 2011, but only two of these six opinions involved the Woodgreen Banks (Adv. Dkt. 388, 389, 390, 391, 392 & 393).

promise to cure the title defects; (3) indemnification under a closing protection letter; (4) contempt of Court; (5) fraudulent representation and/or intentional misrepresentation; (6) negligent misrepresentation; and (7) negligent failure to audit, monitor, or supervise Charles Evans. In the Contract Opinion, the Court denied the Title Companies partial summary judgment against the Woodgreen Banks on their claims for breach of contract and for breach of the duty of good faith and fair dealing.[11]

### 2.    Remaining Claims

As a result of multiple settlements and concessions among the parties,[12] the only claims in the Adversary that remain in dispute are those asserted against the Title Companies by First Alliance, Patriot, First State,[13] and First Security Bank. The consolidated Pretrial Order (Adv.

---

[11] Also in the Contract Opinion, the Court granted the Title Companies partial summary judgment against the Woodgreen Banks on their tort claims for bad faith. The Court nevertheless refers to its decision as the Contract Opinion, because it addressed mostly contract claims.

[12] By agreement of the parties, an Order Dismissing Certain Claims (Adv. Dkt. 118) was entered on July 13, 2010, which dismissed all of Trustee Henderson's claims in the Adversary. The voluntary dismissal of Trustee Henderson's claims did not affect any of the cross-claims against the Title Companies asserted by the lenders. A majority of these lenders then voluntarily dismissed their cross-claims, as reflected in the following orders and stipulations, some of which were filed after the Woodgreen Trial: Agreed Order (Adv. Dkt. 261), filed on June 13, 2011, dismissing the cross-claim of BankFirst Financial Services; Agreed Order (Adv. Dkt. 293), filed on July 26, 2011, dismissing the cross-claim of Guaranty Bank and Trust Company; Agreed Order Referring BankPlus' Claims to Arbitration (Adv. Dkt. 425), filed on January 31, 2012, referring the claims of BankPlus to arbitration; Stipulation of Dismissal with Prejudice (Adv. Dkt. 462), filed on February 23, 2012, dismissing the cross-claims of Merchants & Farmers Bank; Stipulation of Dismissal without Prejudice (Adv. Dkt. 470), filed on February 27, 2012, dismissing the cross-claim of OmniBank; and the Stipulation of Dismissal with Prejudice (Adv. Dkt. 480), filed on March 7, 2012, dismissing all claims by State Bank and Trust Company.

[13] The Woodgreen Banks and the Title Companies disagree about the precise nature of the claims that remained for the Woodgreen Trial, an issue addressed later in this Opinion.

Dkt. 444) was approved by the Court on February 13, 2012.

For the convenience of counsel and the parties, not all of these remaining claims were tried at the same time. The claims that are addressed in this Opinion are those asserted by the Woodgreen Banks. Phase One of the Woodgreen Trial on those claims took place on February 21-22, 2012. In Phase One of the Woodgreen Trial, the Court considered only issues of liability.

At the conclusion of the Woodgreen Trial, the parties submitted the following post-trial briefs on March 19, 2012: the Post-Trial Memorandum of First Alliance Bank, First State Bank and Patriot Bank (Adv. Dkt. 484), filed by the Woodgreen Banks, and the Post-Trial Brief (the "MVT Brief") (Adv. Dkt. 485) filed by the Title Companies. Then, on April 4, 2012, the Woodgreen Banks filed the Response of Woodgreen Banks to Post-Trial Memorandum Submitted by Title Companies (Adv. Dkt. 487), and the Title Companies filed the Title Companies' Response to Post-Trial Briefs Filed by the Banks (the "MVT Reply Brief") (Adv. Dkt. 488).

## FINDINGS OF FACT

In these findings of fact, the Court adopts the joint stipulated facts in the Pretrial Order (Adv. Dkt. 444) and makes a determination as to all other facts that are in dispute.

1.      On August 5, 2004, James C. Henson and Cassandra E. Henson (the "Hensons") conveyed twenty-three acres of real estate situated in Southaven, DeSoto County, Mississippi, (known as the Woodgreen Property) to Woodgreen Development by special warranty deed. (Jt. Stip. 3).[14] This deed was recorded in the office of the Chancery Clerk of DeSoto County, Mississippi (the

---

[14] The joint trial exhibits are cited as "(Jt. Ex. _____)"; and the trial exhibits of the Title Companies are cited as "(MVT Ex. _____)". Although the exhibits of the Woodgreen Banks are labeled as belonging to either First Alliance, First State, or Patriot, for the sake of simplicity, the exhibits are cited herein as "(Banks Ex. _____)". The numbers used to identify the Woodgreen Banks exhibits are sequential and, therefore, correspond to the numbers in the citations.

"DeSoto County Chancery Clerk's Office"), on December 29, 2004.  (Jt. Stip. 6; Banks Ex. 1).[15]

2.      From August 5, 2004, until November 20, 2009 (when Woodgreen Development filed its chapter 7 petition for relief), Woodgreen Development remained the sole land owner of all twenty-three acres of the Woodgreen Property.

3.      To fund the purchase of the Woodgreen Property, Chris Evans, through Woodgreen Development, obtained loans from four different lenders and granted each one a deed of trust on the Woodgreen Property, with each lender receiving an interest in a parcel of land of almost equal size. The lenders involved in these initial transactions are referred to as the "Tract 9 Lenders."[16]  The four parcels, referred to as Tracts 9A through 9D, run perpendicular to Goodman Road, which is a paved, public road.  (Jt. Stip. 4).  Tracts 9A through 9D are shown in Appendix 1 attached to the end of this Opinion.  (Banks Ex. 32).

4.      Chris Evans obtained additional loans on behalf of other Related Entities that were also secured by deeds of trust on the Woodgreen Property.  Presently, there are fifteen lots, each one roughly one-acre in size, that together comprise most of the Woodgreen Property.  Goodman Road, which runs south along the Woodgreen Property, does not border all of the lots, and there is no direct access to Goodman Road from those lots that do.  (Jt. Stip. 4, App. 3). The fifteen lots, referred to as Tracts 10A through 10O, are shown in Appendix 1.  (Banks Ex. 32).  All lenders who had an interest in Tracts 10A through 10O are collectively referred to as the "Tract 10 Lenders."[17]  As can be seen from Appendix 1, there is considerable overlap in the Woodgreen Property subject to the liens of the Tract 9 Lenders and the Tract 10 Lenders.

5.      The Woodgreen Banks, who were Tract 10 Lenders, presently own six (of the fifteen) lots that comprise the Woodgreen Property, as shown below:

---

[15] The joint stipulated facts in the Pretrial Order are numbered one through six. (Adv. Dkt. 444 at 63-4).  Joint stipulated facts are cited as "(Jt. Stip. ____)".  The stipulated facts for each of the Woodgreen Banks begin at number one and continue through 106, with each one having a labeled section of stipulations. (Adv. Dkt. 444 at 64-74).  The stipulated facts of the Woodgreen Banks are cited as "(Stip. ____)".

[16] The Tract 9 Lenders were Merchants and Farmers Bank, BancorpSouth, Community Bank, and BankFirst Financial Services.

[17] The Tract 10 Lenders are not to be confused with the Tract 9 Lenders, who had purchase-money loans.

| Lots | Woodgreen Bank |
|------|----------------|
| Tracts 10E & 10F | First Alliance |
| Tracts 10G & 10H | First State |
| Tracts 10J & 10K | Patriot |

The owners of the remaining nine lots include the Title Companies and various lenders who are not presently parties in the Adversary. How the Woodgreen Banks became owners of these six lots, and why they have not attempted to sell their lots, is discussed in detail below. Before beginning that discussion, however, it is first necessary to mention briefly Southaven's land-use regulations as they pertain to the Woodgreen Property.

**Southaven's Land Subdivision Ordinance**

6.      In areas within the City of Southaven, Mississippi, the subdivision and development of land is governed by the Land Subdivision Ordinance (the "Subdivision Ordinance") (SOUTHAVEN, MISS., ORDINANCE No. 29, art. 1) (Banks. Ex. 35).

7.      The Woodgreen Property, which is situated within the corporate limits of Southaven, is zoned as commercial property.

8.      Because it is zoned as commercial property, the Woodgreen Property is subject to the provisions of the Subdivision Ordinance.

9.      Whether a division of land requires compliance with the Subdivision Ordinance is determined according to the definition of a "subdivision." Under the Subdivision Ordinance, a "subdivision" is "the division of a tract or parcel of land into two (2) or more parcels or lots, any of which has an area of ten (10) acres or less, or into tracts or parcels of any size where one (1) or more of the parcels or lots does not border on a public road or is zoned commercial or industrial." (Banks Ex. 35, §12-3). Section 12-3 of the Subdivision Ordinance defines a "lot" as "any parcel of land having ten (10) acres or less, any parcel of land, regardless of size, not bordering a public road, and any parcel of land, regardless of size, which is zoned commercial or industrial." (Banks Ex. 35, § 12-3). Section 12-3 defines a "subdivider" as "any person, individual, firm, partnership, association, corporation, or trust, or any other group of combination acting as a unit who undertakes the subdivision of land as defined [in the Subdivision Ordinance]." (Banks Ex. 35, §12-3).

10.      Under the Subdivision Ordinance, the City of Southaven must approve any proposed subdivision plat before it may be recorded.

Sec. 12-4. Plat approval required.

It shall be unlawful for any person being the owner, agent or person having control of any land within the incorporated areas of the city to subdivide or lay out such land in lots unless by a plat in accordance with the regulations contained herein. No lots shall be sold nor any plat recorded until the plat has been approved as herein provided.

(Banks Ex. 35, § 12-4).

11. The general procedure for the approval of a proposed subdivision plat requires the "owner or his authorized agent" to submit a sketch plat, a preliminary plat, and a final plat. (SOUTHAVEN, MISS., ORDINANCE No. 29, art. IV(A)). Consistent with § 12-4 of the Subdivision Ordinance, § 12-36(c) states:

(c) No plat or replat subdividing land into lots shall be filed or recorded in the office of the chancery clerk of Desoto County, Mississippi, unless and until approved by the planning commission and governing authority and no lot shall be sold from such plat or replat until the plat is filed for record in the office of the chancery clerk of DeSoto County, Mississippi.

Id.

12. The Subdivision Ordinance contains the following enforcement provisions:

Sec. 12-9. Compliance.

It shall be illegal to sell, or offer to sell, any lot, tract or property which does not conform to the requirements and regulations of this title. In case of any violation of this title, the governing authority, in addition to other remedies, may institute any appropriate action or proceedings to prevent such unlawful acts.

(Banks Ex. 35, § 12-9).

Sec. 12-10. Penalty.

Any person, form or corporation who shall knowingly and willfully violate the terms, conditions or provisions of this title . . . shall be guilty of misdemeanor and upon conviction shall be sentenced to pay a fine not to exceed five hundred dollars ($500.00) and in case of continuing violations without reasonable effort on the part of the defendant to correct the same, each day the violation continues thereafter shall be a separate offense.

(Banks Ex. 35, § 12-10).

13.    No plat of any kind has ever been filed with, or approved by, the City of Southaven for the subdivision of the Woodgreen Property.[18]  (Stip. 3; 1 Trial Tr. at 51).  As of the date of the Woodgreen Trial, the City of Southaven had not initiated any legal action against the Woodgreen Banks  relating to the subdivision of the Woodgreen Property.

**Loans Made by the Woodgreen Banks**

14.    Each of the Woodgreen Banks entered into a loan agreement with a Related Entity controlled by Chris Evans.

**First Alliance**

15.    On November 22, 2004, Chris Evans, on behalf of Snowden, executed a promissory note in the amount of $760,000.00, and deeds of trust on Tracts 10E and 10F in favor of First Alliance.  (Stip. 16; Banks Ex. 42).  Tracts 10E and 10F border Goodman Road, but there are no curb cuts that would allow direct access to these lots from Goodman Road.  (App. 1).

16.    In making its loan to Snowden, First Alliance relied upon two appraisals of Tracts 10E and 10F conducted by C&I Appraisal Services, Inc. and dated August 4, 2004.  (Banks Exs.4-5 & 42; MVT Exs. 50-51).

17.    Snowden's deeds of trust executed in favor of First Alliance on Tracts 10E and 10F were both recorded on December 2, 2004, in the DeSoto County Chancery Clerk's Office. (Banks Exs. 3-4).  Chris Evans executed a loan modification agreement on Snowden's behalf on December 20, 2007, which was recorded on December 21, 2007, in the DeSoto County Chancery Clerk's Office.

18.    On December 2, 2004, the Title Companies issued policies of title insurance, numbers M-306425 and M-306426, which insured First Alliance's interest in Tracts 10E and 10F as the holder of a first deed of trust in the amount of the loan. (Banks Ex. 38).

---

[18] MISS. CODE ANN. § 17-1-23(2).  The transcript of the Woodgreen Trial is divided into two parts.   The first transcript, which is a record of the proceedings that took place on February 21, 2012, is cited as "(1 Trial Tr. at _____)"; and the second transcript, which is a record of the proceedings that took place on February 22, 2012, is cited as (2 Trial Tr. at _____)".

**First State**

19.     Chris Evans arranged for a surveyor to prepare three plats (the "Evans Plats"), which divided the Woodgreen Property into lots, with a circular drive connecting Tracts 10G, 10H, 10J, and 10K to Goodman Road.[19]  (Banks Exs. 47-48 & 54).  The Evans Plats were never approved by the City of Southaven and were never recorded in the DeSoto County Chancery Clerk's Office. Copies of the Evans Plats are attached to the end of the Opinion as Appendices 2-A, 2-B, and 2-C.

20.     Chris Evans gave First State copies of two of the Evans Plats, which are attached as Appendices 2-A and 2-B.

21.      On June 17, 2005, Chris Evans, on behalf of Cedar Lake, executed a promissory note in the amount of $424,319.50, and deeds of trust on Tracts 10G and 10H in favor of First State. (Stip. 1; Banks Exs. 5 & 49).  Tracts 10G and 10H do not border Goodman Road.  (Apps. 1, 2-A & 2-B).

22.     In making its loan to Cedar Lake, First State relied upon an appraisal  of Tracts 10G and 10H conducted by Sam Edwards and Jimmy Hickman, dated May 11, 2005. (MVT Ex. 53).

23.     The Cedar Lake deed of trust executed in favor of First State on Tracts 10G and 10H was recorded on June 23, 2005, in the DeSoto County Chancery Clerk's Office.

24.     On June 23, 2005, the Title Companies issued a policy of title insurance, number M-306506, which insured First State's interest in Tracts 10G and 10H as the holder of a first deed of trust in the amount of the loan.  (Banks Ex. 45).

**Patriot**

25.     During loan negotiations, Chris Evans gave Patriot an Evans Plat in which the circular drive connected Tracts 10J and 10K to Goodman Road.[20]  (Banks. Exs. 47-48, 54).  A copy of this plat is attached as Appendix 2-C.

26.     On July 22, 2005, Chris Evans, on behalf of Cedar Lake, executed a promissory note in the amount of $500,000.00, and a deed of trust on Tracts 10J and 10K in favor of Patriot.  (Stip. 30; Banks Exs. 6 & 55).  Tracts 10J and 10K do not border Goodman Road.  (App. 1).

27.     The Cedar Lake deed of trust executed in favor of Patriot on Tracts 10J and 10K was

---

[19] (1 Trial Tr. at 158).

[20] (1 Trial Tr. at 119).

recorded on August 2, 2005, in the DeSoto County Chancery Clerk's Office.

28.     On August 2, 2005, the Title Companies issued a policy of title insurance, number M-306520, which insured Patriot's interest in Tracts 10J and 10K as the holder of a first deed of trust in the amount of the loan. (Banks Ex. 53; MVT Ex. 10).

**Title Insurance Policies**

29.     The title insurance policies issued by the Title Companies to the Woodgreen Banks are based on standardized forms promulgated by the American Land Title Association in 1992. Hereinafter, they are collectively referred to as the "Policies."

30.     The Policies issued by the Title Companies provide protection against loss or damage incurred by the Woodgreen Banks, *inter alia*, because of:

>     1.     Title to the estate or interest described in Schedule A being vested other than as stated therein;
>     2.     Any defect in or lien or encumbrance on the title;
>     3.     Unmarketability of the title;
>     4.     Lack of a right of access to and from the land;
>     5.     The invalidity or unenforceability of the lien of the insured mortgage upon the title;
>     6.     The priority of any lien or encumbrance over the lien of the insured mortgage.

(Banks Exs. 38, 45, 53; MVT Ex. 10).

31.     If there is a title defect, the Policies provide options for the Title Companies to satisfy their contractual obligations. Of relevance here is the option under ¶ 4(b), which allows the Title Companies, at their own cost, to institute any action "which in [their] opinion may be necessary to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured."[21]  (MVT Ex. 10 at 2, ¶ 4(b)). By exercising this option, the Title Companies fulfill their obligations under the Policies and avoid liability as set forth in ¶ 8(a):

---

[21] Other options include:  ¶ 6(a)(i) (right to pay the "amount of insurance" together with costs, attorney's fees, and expenses); ¶ 6(a)(ii) (right to purchase the secured indebtedness); ¶ 6(b)(i) (right to pay or otherwise settle with other parties for or in the name of the insured); ¶ 6(b)(ii) (right to pay or otherwise settle with insured).  (MVT Ex. 10 at 2, ¶ 6).

8.    *Limitation of Liability.*

(a) If the company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(Banks Exs. 38, 45, 53; MVT Ex. 10).

## Title Insurance Claims

### First Alliance

32.    Schedule A of the title insurance policy issued to First Alliance described the status of the estate of Tracts 10E and 10F, as follows:

Fee simple title to the land hereby is vested in: Snowden Grove Investors, LLC

(Banks Ex. 38 at 3).  Record title to Tracts 10E and 10F was vested in Woodgreen Development, and not in Snowden,[22] on December 2, 2004, on December 20, 2007, and on December 21, 2007.  (Stip. 20)  Also, Tract 9 Lenders held a prior lien on the same property.

33.    First Alliance submitted a title insurance claim to the Title Companies under policy numbers M-306425 and M-306426 on December 9, 2009.  (Stip. 21).

### First State

34.    Schedule A of the title insurance policy issued to First State described the status of the estate of Tracts 10G and 10H, as follows:

Fee simple title to the land hereby is vested in: Cedar Lake Investors LLC.

(Banks Ex. 45 at 5).  Record title to Tracts 10G and 10H, however, was vested in Woodgreen Development, and not in Cedar Lake,[23] on June 23, 2005.  (Stip. 5).  Moreover, Tract 9 Lenders held

---

[22] Snowden filed a chapter 7 petition for relief on January 14, 2010 (Case No. 10-00124-NPO, Bankr. Dkt. 1).

[23] Cedar Lake filed a chapter 7 petition for relief on November 19, 2009 (Case No. 09-04102-NPO, Bankr. Dkt. 1).

a prior lien on the same property.

35.    First State submitted a title insurance claim to the Title Companies under policy number M-306506 on November 12, 2009.  (Stip. 6).

**Patriot**

36.    Schedule A of the title insurance policy issued to Patriot described the status of the estate of Tracts 10J and 10K, as follows:

> Fee simple title to the land is vested in: Cedar Lake Investors, LLC.

(Banks Ex. 53 at 3; MVT Ex. 10).  Record title to Tracts 10J and 10K was vested in Woodgreen Development, and not in Cedar Lake,[24] on August 2, 2005.  (Stip. 34).  Also, Tract 9 Lenders held a prior lien on the same property.  (App. 1).

37.    Patriot submitted a title insurance claim to the Title Companies under policy number M-306520 on March 1, 2010.  (Stip. 35).

**Title Resolution Agreement and Title Resolution Order**

38.    The Title Companies decided to purchase the Woodgreen Property, pay off the Tract 9 Lenders who had purchase-money loans, preserve the subdivision (but not as depicted in the Evans Plat), and convey the individual lots to the Woodgreen Banks.  On April 2, 2010, the Title Companies wrote the Woodgreen Banks a letter describing an agreement they had presented to Trustee Henderson for the purchase of the Woodgreen Property from the bankruptcy estates of the Related Entities.  (Banks Ex. 20).  The Title Companies believed the proposal, if agreed to by Trustee Henderson, would resolve the title insurance claims of the Woodgreen Banks.

> After purchasing the parcels . . . , the Title Companies intend to deed the properties to the lenders who hold the second position notes and deeds of trust.  The conveyance will avoid the time and expense of a foreclosure for the banks and will allow the immediate resale of these properties without title defect.

(Banks. Ex. 20).

39.    On April 15, 2010, the Title Companies wrote another letter to the Woodgreen Banks, providing them with more information about the proposed title resolution agreement.

---

[24] *See supra* note 23.

After purchasing these properties, the title companies will cure any other title or access defects and then convey title to lenders holding second equitable liens (the 10 tracts less 10I and 10L) on the property free of the automatic stay.

(Banks. Ex. 21).

40.     On April 17, 2010, the Title Companies and Trustee Henderson entered into a Title Resolution Agreement for the purchase of the Woodgreen Property, as well as for other real estate, from the bankruptcy estates of the Related Entities.[25]  (Bankr. Dkt. 552; MVT Ex. 19).

41.     On April 18, 2010, Trustee Henderson filed a Motion to Approve Title Resolution Agreement, Including (I) Conditional Sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II) Recognition of Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims, (IV) Resolution of Certain Litigation, and (V) Other Relief in the main bankruptcy case of Chris Evans (the "Motion for TRA Approval") (Bankr. Dkt. 552).

42.     Objections and responses to the Motion for TRA Approval were filed by various lenders, including objections by the Woodgreen Banks.  (Bankr. Dkt. 605, 614-15, 617, 620-24, 626-28, 630-32, & 634).

43.     First Alliance filed the Limited Objection of First Alliance Bank to Trustee's Motion to Approve Title Resolution Agreement (Bankr. Dkt.  605) on May 7, 2010.  First Alliance opposed the Motion for Title Resolution Agreement unless the Title Companies agreed to include language in the Title Resolution Order requiring them to "promptly purchase Tracts 10E and 10F" and "cure any and all other title or access defects."  *See* id.

44.     First State filed the Objection to Motion to Approve Title Resolution Agreement, including (I) Conditional sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II) Recognition of Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims, (IV) Resolution of Certain Litigation and (V) Other Relief [Dkt. #552]  (Bankr. Dkt. 617) on May 10, 2010.  First State opposed the Motion for Title Resolution Approval on numerous grounds.

45.     Patriot filed the Objection of Patriot Bank to Trustee's Motion to Approve Title Resolution Agreement(Bankr. Dkt.  632) on May 10, 2010. Patriot objected to the Motion for Title Resolution Approval on the ground that there was inadequate disclosure of the proposed settlement.

46.     The Title Companies resolved all of the objections, and on May 21, 2010, this Court entered an Order Granting Motion to Approve Title Resolution Agreement, Including (I) Conditional Sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II) Recognition of

---

[25] As stated previously, Trustee Henderson was appointed the case trustee in each of the Related Cases.

Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims, (IV) Resolution of Certain Litigation, and (V) Other Relief in the main bankruptcy case of Chris Evans (the "Title Resolution Order") (Bankr. Dkt. 683; MVT Ex. 20). The Title Resolution Order was signed and approved by each of the Woodgreen Banks.

47.     The Title Resolution Order did not require the Title Companies to convey the Woodgreen Property to the Woodgreen Banks but reflected the intention of the Title Companies to do so. (TRO ¶ 15; MVT Ex. 20).

> At [the] hearing, various Objections were resolved by the parties by clarifications and amendments to the proposed Agreements. The terms and provisions of this Order along with the announced clarifications and amendments stated on the record at hearing are binding and take precedence over any descriptions or provisions contained in the original Agreements attached to the Trustee's Motion or contained in the Trustee's Motion. For example, it was clarified that if the Claimants obtain title to the properties identified on [the Schedules] from the Trustee pursuant to 11 U.S.C. § 363, the Claimants intend to convey title to these properties to the Lenders, or their designees, as follows:

|  Tract No. | Bank Receiving Property: |
| --- | --- |
| * * * | |
| 10E | First Alliance Bank |
| 10F | First Alliance Bank |
| 10G & H | First State Bank |
| 10J & K | Patriot Bank |
| * * * | |

(TRO ¶ 15; MVT Ex. 20).

48.     The Title Companies hired a surveyor to prepare an unofficial plat of the Woodgreen Property based on the legal descriptions included in the deeds of trust. They received his survey plat (the "Unofficial Plat") on July 5, 2010. A copy of the Unofficial Plat is attached as Appendix 3 to the end of the Opinion. The surveyor also corrected the legal descriptions to account for certain gaps in subdividing the Woodgreen Property into various tracts. (Banks Exs. 25 & 32). The Unofficial Plat differs from the Evans Plats because it does not depict a circular drive. Instead, the Unofficial Plat shows an easement that ends in a cove. The Unofficial Plat was never submitted to, or approved by, Southaven. The Title Companies contend that the sole purpose of the Unofficial Plat was to provide a survey of the access easement. (1 Trial Tr. at 85).

49.     On July 6, 2010, the Title Companies sent a letter to each of the Woodgreen Banks stating that the Title Companies would convey their respective lots directly to them unless they requested that the lot be conveyed to the borrower or a designated affiliate (MVT Exs. 27-29). A conveyance directly to each of the Woodgreen Banks would obviate the need for them to conduct

a non-judicial sale of the lots under the deeds of trust.

50.     The Title Companies did not provide the Woodgreen Banks with a copy of the Unofficial Plat until the Title Companies had delivered the deeds of conveyance.

51.     On July 8, 2010, July 13, 2010, and July 28, 2010, First Alliance, First State, and Patriot, respectively, each wrote a letter to the Title Companies directing the Title Companies to convey the lots directly to them.

52.     In the meantime, the Hensons conveyed the Woodgreen Property, in its entirety, to Woodgreen Development on July 16, 2010 (Banks Ex. 7). This conveyance was deemed necessary by the Title Companies in order to correct certain gaps in the legal descriptions in the deeds of trust.

53.     Trustee Henderson on July 30, 2010, filed a Motion to Approve Trustee's Sale of Tract 1G and Tracts 10A Through 10Q Free and Clear of All Liens, Claims and Interest as Contemplated by the Title Resolution Order (the "Sale Motion") (Bankr. Dkt. 812).

54.     No objection or response to the Sale Motion was filed.

55.     On August 11, 2010, the Court approved the Sale Motion, that is, the sale of Tracts 10E, 10F, 10G, 10H, 10J and 10K, as subdivided on the Unofficial Plat (Dkt. 823-25, & 827; MVT Exs. 21-24).

56.     On August 18, 2010, the Title Companies, through their subsidiary, Mississippi Real Estate Dispositions, LLC ("MRED"), executed deeds of conveyance transferring Tracts 10E, 10F, 10G, 10H, 10J and 10K to the Woodgreen Banks.[26]  All of the deeds were prepared by Powell G. Ogletree ("Ogletree"), counsel for the Title Companies.

57.     Also on August 18, 2010, the Title Companies executed a Right of Way and Utility Easement ("ROW Easement") to First State and Patriot for the purpose of constructing and maintaining a future road on the Woodgreen Property.

58.     Woodgreen Development conveyed the lots to MRED by virtue of special warranty deeds filed in the DeSoto County Chancery Clerk's Office on August 20, 2010.  (Banks Ex. 8). Presently, MRED owns approximately 40% of the Woodgreen Property.  The other 60% of the Woodgreen Property is owned by the Title Companies and other lenders who are not parties in the Adversary.

---

[26] Although MRED did not own the lots before conveying them, Mississippi recognizes the doctrine of after-acquired title.  MISS. CODE ANN. § 89-1-39.  Under the after-acquired title doctrine, the deeds conveyed title to the Woodgreen Banks immediately upon MRED's acquisition of the lots on August 20, 2010.  Butler v. City of Europa, 725 So. 2d 158, 160 (Miss. 1998).

**Transfers of Lots by MRED to the Woodgreen Banks**

**First State**

59.     The conveyance of Tracts 10G and 10H by MRED to First State was by virtue of a special warranty deed filed in the DeSoto County Chancery Clerk's Office on August 20, 2010. (Banks Ex. 13).

60.     The conveyance of the ROW Easement by MRED to First State was recorded in DeSoto County, Mississippi, on August 20, 2010.  The ROW Easement provides access from Goodman Road to Tract 10H, which is located precisely at the end of the cove but does not reach Tract 10G.  (1 Trial Tr. at 110).

**First Alliance**

61.     The conveyance of Tracts 10E and 10F by MRED to First Alliance was by virtue of a special warranty deed filed in the DeSoto County Chancery Clerk's Office on August 20, 2010 (Banks Exs. 9 & 11).

**Patriot**

62.     The conveyance of Tracts 10J and 10K by MRED to Patriot was by virtue of a special warranty deed filed in the DeSoto County Chancery Clerk's Office on August 20, 2010.

63.     The conveyance of the ROW Easement by MRED to Patriot was recorded in the DeSoto County Chancery Clerk's Office on August 20, 2010.  (Banks Exs. 16 & 18).

64.     The ROW Easement granted by MRED provides access from Goodman Road to Tracts 10J and 10K and occupies approximately 0.018 acres of Tract 10J and approximately 0.096 acres of Tract 10K.

65.     The Title Companies offered to convey 0.114 acres of additional land from the Woodgreen Property to Patriot or to pay Patriot the diminished value of the lots if Patriot believed the ROW Easement diminished the value of Tracts 10J and 10K.

66.     Patriot never advised the Title Companies whether Patriot believed Tracts 10J and 10K were diminished in value by the ROW Easement.

**Losses Sustained by the Woodgreen Banks**

67.     Each of the Woodgreen Banks seek an award of their expectancy damages which they calculate to be the *lesser* of the outstanding debt *or* the monetary amount of insurance provided in

their respective title insurance policies.[27]

68.   A summary of losses that the Woodgreen Banks seek to recover from the Title Companies is reflected in the chart below.[28]

| Woodgreen Banks | Insured Amounts | Outstanding Loan Amounts | Claimed Losses |
|---|---|---|---|
| First Alliance | $760,000.00 | $762,680.03 | $760,000.00 |
| First State | $420,000.00 | $355,947.82 | $355,947.82 |
| Patriot | $500,000.00 | $342,044.41 | $342,044.41 |

(Banks Exs. 38, 45 & 53; 1 Trial Tr. at 124, 163, 201-02).

## CONCLUSIONS OF LAW

In the Adversary, there are five important issues that the parties do not dispute: (1) that the Related Entities defaulted on the loans secured by the deeds of trust on the lots, (2) that the liens held by the Woodgreen Banks were defective on the dates of the Policies, (3) that the Title Companies had the "right" to cure title defects in satisfaction of their indemnity obligations to the Woodgreen Banks, (4) that the Title Companies "technically" cured those defects, and (5) that any "subdivision" of the Woodgreen Property violated the Subdivision Ordinance.   The crux of the parties' dispute, according to the Woodgreen Banks, is the method that the Title Companies chose to establish the titles to the lots.   The Woodgreen Banks contend that the Title Companies breached their implied duty to act in good faith in establishing the titles, as insured, when they attempted to cure the defects by subdividing the Woodgreen Property into lots, a method that rendered the lots valueless. (1 Trial

---

[27] The Woodgreen Banks apparently do not dispute that the liability limitations set forth in ¶ 7 of the Policies apply to their Cross-claims.

[28] As mentioned previously, the Woodgreen Trial was bifurcated into two phases.  Here, the Court considers only the issues of liability. The facts regarding the amount of damages claimed by the Woodgreen Banks are provided in the Opinion as background information only.

Tr. 7:1-6).

In contrast, the Title Companies contend that the curative actions they performed fully satisfied their indemnity obligations under the Policies (including the exclusions and exceptions). They maintain that regardless of whether the conveyances violated the Subdivision Ordinance, the Woodgreen Banks presently own the lots (as set forth in the legal descriptions in the deeds of trust) free and clear of all liens and encumbrances. The Title Companies cite <u>Seymour v. Evans</u>, 608 So. 2d 1141, 1146 (Miss. 1992), as supporting authority for this position. In <u>Seymour</u>, the Mississippi Supreme Court held that "a deed which runs afoul of subdivision regulations is perfectly valid despite the violation." <u>Id.</u> at 1145. It is the <u>Seymour</u> decision, according to the Title Companies, that convinced them to go forward with the conveyances of the lots. The Title Companies insist that the only issue before the Court is whether they are "required to cure alleged defects that are not covered by the [Policies]." (MVT Brief at 20).

**A.      Abandonment and/or Waiver of Breach of Good Faith and Fair Dealing Claims**

As a preliminary matter, the Court will address the contention of the Title Companies that "the Woodgreen Banks abandoned their claims pertaining to the cure efforts by the Title Companies [and] are left with no remedy at law." (MVT Brief at 8). If the Title Companies are correct, then it is unnecessary for the Court to reach the merits of the parties' dispute.

The only claims that properly remained for the Woodgreen Trial, say the Title Companies, were claims for breach of contract, which the Woodgreen Banks abandoned before the Woodgreen Trial. The Title Companies posit three reasons why the Woodgreen Banks did not have viable claims for breach of the duty of good faith and fair dealing. First, the Title Companies contend that the Woodgreen Banks did not expressly assert causes of action for breach of the duty of good faith

and fair dealing in their Cross-claims (Adv. Dkt. 177, 178 & 188). The Title Companies insist that the omission of such claims prejudiced them because they did not have an opportunity to take discovery or to seek summary judgment.

Second, the Title Companies contend that even if the Woodgreen Banks had asserted claims for breach of good faith and fair dealing in the Cross-claims, then counsel for the Woodgreen Banks waived these Cross-claims at the status conference held on January 31, 2012 (before the Woodgreen Trial began on February 21, 2012), as shown in the following exchange:

> Bankruptcy Judge:     All right, I'm going to call the docket for January 31st, the 3 o'clock docket in the Jon Christopher Evans case, Adversary 10-05. . . . We can go ahead and start with the status conference. I know I gave everybody an opportunity to consider what claims are remaining for trial which is set to begin on February 21st. And I went through what we thought the remaining issues were, and I just wanted to hear from everybody to see if we were all on the same page. I will let the Title Companies start.

> Counsel for the Title Companies:  . . . Your Honor, we just put together a little chart. *But the claims that we've got that we show, were First State Bank, First Alliance and Patriot Bank are a breach of contract claim.* And I think we are on the is that right, Mr. Liston?

> Counsel for the Woodgreen Banks: *Uh-huh, yeah*.

(MVT Brief, Ex. 1, Status Conference Tr. at 2-3) (emphasis added).

Third, the Title Companies contend that the Court has disposed of all claims asserted by the Woodgreen Banks in the Adversary by summary judgment, with the exception of their breach of contract claims. In other words, the Title Companies argue that only the breach of contract claims survived the Contract Opinion and the Tort Opinion. Because the breach of contract claims were abandoned by the Woodgreen Banks, they "are left with no remedy at law," according to the Title Companies. (MVT Brief at 8.)

In summary, the Title Companies maintain that the Woodgreen Banks abandoned and/or

waived their claims for breach of good faith and fair dealing.  They urge three reasons in support of their argument.  The Title Companies contend that these claims either (1) were not pled in the Cross-claims, (2) were expressly waived by counsel for the Woodgreen Banks, or (3) were dismissed by the Court in the Tort Opinion.

As to the first contention of the Title Companies, the Court finds that the Woodgreen Banks did not omit, waive, or lose their Cross-claims for breach of good faith and fair dealing.  The factual allegations presented in the Cross-claims are substantially similar to those presented by the Woodgreen Banks at the Woodgreen Trial, as shown in the following five paragraphs, with only slight variations among them:

> 18.     Rather than work in good faith with [the Woodgreen Banks] to meet [their] obligations under the Title Policy, the Title Companies' claim-handling practices have been purposefully and intentionally managed so as to reduce the liability of the Title Companies at the expense of their insureds . . . .  The Title Companies' self-serving actions have violated their duty of good faith and fair dealing that exists between an insurer and its insureds, giving rise to causes of action for extra-contractual compensatory damages and punitive damages.

(Cross-claims ¶ 18, Adv. Dkt. 177, 178 & 188).

> 23.     Due to the Title Companies' failure to consider, research or investigate the requirements for subdividing the Woodgreen Property, the easement provided by the Title Companies proved to be unusable, leaving First State and others without access to their property.  Due to the lack of access and the Title Companies' inability to meet other requirements to ensure marketability of the property, the title provided to First State remains unmarketable.  Hence, the Title Companies have wholly failed to cure as promised and have breached their promise to cure in such a manner as to ensure marketability of Tracts 10G and 10H by providing legal access to the tracts and/or by meeting any other requirements pertinent to marketability.

(Cross-claims ¶ 23, Adv. Dkt. 188).

> 23.     The easement provided by the Title Companies proved to be unusable and/or insufficient, leaving [Patriot and First Alliance] without access to their property.  Due to the lack of access and the Title Companies' inability to meet other

requirements to ensure marketability of the property, the titles provided to [Patriot and First Alliance] remain unmarketable.  Hence, the Title Companies have wholly failed to cure and have breached their contractual promise to cure.

(Cross-claims ¶ 23, Adv. Dkt. 177 & 178).

>    68.    As a result of such breaches of the Title Policies by the Title Companies, the Title Policies have failed in their essential purpose, and [the Woodgreen Banks have] been damaged . . . through [their] ownership of [the lots] which are neither marketable nor accessible.

(Cross-claims ¶ 68, Adv. Dkt. 177, 178 & 188).

>    72.    The Title Companies are liable to [the Woodgreen Banks] for their intentional and tortious conduct in breach of their duty of good faith and fair dealing which is inherent in the Title Policies and their duty to handle and manage [the Woodgreen Banks'] claims under the Title Policies in good faith.  Such bad faith and tortious breaches of duty are evidenced by: (a) the Title Companies' attempt to cure by causing [the lots] to be deeded to [the Woodgreen Banks] with the knowledge that marketability and accessibility conditions affecting [the lots] could not be cured.

(Cross-claims ¶ 72, Adv. Dkt. 177, 178 & 188).

With respect to the waiver argument of the Title Companies, the "uh-huh, yeah" response of counsel for the Woodgreen Banks at the status conference did not constitute a binding concession by the Woodgreen Banks, if for no other reason than because the response, *albeit* affirmative in nature, was too casual and too vague to have the weighty import given to it by the Title Companies. It is unlikely that counsel for the Woodgreen Banks intended to make a huge concession in such an offhand manner, given that it would have negated the need for the Woodgreen Trial to take place at all.  Indeed, counsel confirmed at the start of the Woodgreen Trial that he did not intend to stipulate to anything. (1 Trial Tr. at 23).

In reaching this result, the Court recognizes that "[a]n attorney, as any other agent, may make statements which the law attributes to the principal."  Laird v. Air Carrier Engine Serv., Inc., 263 F.2d 948, 953 (5th Cir. 1959); *see also* King v. Armstrong World Indus., 906 F.2d 1022, 1025 (5th

Cir. 1990) (attorney's remarks during closing arguments constituted binding admission against the party he represented).  However, to prevent manifest injustice, and given the tenor of the status conference, the Court exercises its discretion to ignore the purported concession.

The Court also rejects the third contention of the Title Companies that the good faith and fair dealing claims of the Woodgreen Banks were resolved in their favor in the Tort Opinion.  This contention ignores the ruling of the Court in the Contract Opinion, which addressed the relief sought by the Title Companies in the Contract Motion.  The Title Companies requested in the Contract Motion "summary judgment on the . . . claims asserted by [the Woodgreen Banks] for . . . breach of the covenant of good faith and fair dealing . . . ."  (Contract Motion at 1).  In the Contract Opinion, the Court denied the Title Companies summary judgment "on the claims of the [Woodgreen] Banks *for breach of the covenant of good faith and fair dealing*."  (Contract Op. at 3) (emphasis added). That the Court addressed the duty of good faith and fair dealing in the Contract Opinion, rather than in the Tort Opinion, was appropriate, given that the duty of good faith in this context emanates from contract law, and not from tort law.  Am. Bankers' Ins. Co. v. Wells, 819 So. 2d 1196, 1207 (Miss. 2001).

In addition, the Court does not find any prejudice to the Title Companies. Even absent the allegations in the Cross-claims, the Title Companies certainly were aware of the gist of the Woodgreen Bank's cause of action in the discovery phase of the Adversary, as shown by their participation in the deposition of Whitney Choat, city planner for the City of Southaven.  Her testimony focused almost entirely on the Subdivision Ordinance and its application to the Woodgreen Property.  (Banks Ex. 80).  The examination conducted by the Title Companies demonstrates a familiarity with the issues raised by the Woodgreen Banks in support of their good

faith claims.

Finally, in the Pretrial Order, the Woodgreen Banks outlined their claims for breach of the duty of good faith and fair dealing. (Adv. Dkt. 444 at 5, 14-15, 24). Although the Title Companies added language to the Pretrial Order stating that they "do not consent to trial of any breach of good faith and fair dealing claims," their objection came too late. (Pretrial Order at 13). In conclusion, the Court finds that the breach of good faith and fair dealing claims of the Woodgreen Banks (1) were sufficiently pled in the Cross-claims to provide proper notice to the Title Companies, (2) were not waived by counsel for the Woodgreen Banks at the status conference on January 31, 2012, and (3) were not dismissed by the Court in the Tort Opinion.

## B.    Overview of Law of Good Faith and Fair Dealing[29]

Every contract entered into in Mississippi contains an implied duty of good faith and fair dealing. Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992). Justice Cardozo explained the contractual duty of good faith, as follows: "A promise may be lacking, and yet the whole writing may be 'instinct with an obligation imperfectly expressed.'" Wood v. Lucy, Lady Duff-Gordon, 118 N.E. 214, 214 (N.Y. 1917). In Mississippi, the duty of good faith attaches to both the performance and enforcement of a contract. Davis v. General Motors Acceptance Corp., 406 F. Supp. 2d 698, 701 (N.D. Miss. 2005); Hill v. Galaxy Telecom LP, 176 F. Supp. 2d 636, 642 (N.D. Miss. 2001).

The Policies at issue here are insurance contracts. The Mississippi Supreme Court has recognized that the duty of good faith and fair dealing applies to insurance contracts. Andrew Jackson Life Ins. Co. v. Williams, 566 So. 2d 1172, 1188-89 (Miss. 1990).

---

[29] The Policies specifically provide that they are governed by Mississippi law. (Banks Exs. 38, 45 & 53, at ¶ 16). The parties apparently agree that Mississippi law applies. Erie R.R. v. Tompkins, 304 U.S. 64 (1938).

> The relationship between the insurer and the insured arises by contract, and under Mississippi law, one of the reciprocal legal duties between the insurer and the insured is that of good faith and fair dealing, a duty that exists in the performance of every contract under Mississippi law.

Owen v. Universal Underwriters Ins. Co., 252 F. Supp. 2d 324, 328 (S.D. Miss. 2003).

The duty of good faith and fair dealing prohibits a party from doing any act that impairs the right of the other party from receiving the benefits that flow from their agreement. Cothern v. Vickers, Inc., 759 So. 2d 1241, 1248 (Miss. 2000). The covenant imposes a duty not to interfere with the other party's performance and even, in certain circumstances, "to take some affirmative steps to cooperate in achieving these goals." Cenac, 609 So. 2d at 1272 (quoting Farnsworth, Contracts §7.17, 526-27 (1982)). A breach of the duty of good faith provides the injured party with a cause of action in addition to his claim for breach of contract. A breach of the duty occurs where there is some violation by a contracting party of standards of decency, fairness, or reasonableness. Cenac, 609 So. 2d at 1272 (citing RESTATEMENT (SECOND) OF CONTRACTS § 205, 100 (1979)).

As explained by the Mississippi Supreme Court, "[g]ood faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party." Cenac, 609 So. 2d at 1272. The duty to act in good faith in the performance of a contract is based on fundamental notions of fairness and varies somewhat depending upon the contractual setting in which it arises. Id. For that reason, it is impossible to provide a complete catalogue of types of breaching conduct. "[A]ny but the most vacuous general definition of good faith will . . . fail to cover all the many and varied specific meanings that it is possible to assign to the phrase." Robert S. Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195, 206 (1968). Examples of some forms of bad faith identified in the RESTATEMENT (SECOND) OF CONTRACTS include: "evasion of the spirit of the bargain, lack

of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." RESTATEMENT (SECOND) OF CONTRACTS § 205.

Notably, malicious intent is not a required element of contractual bad faith.  This point is illustrated in two Mississippi cases.  First, in Entergy Mississippi, Inc. v. TCA Cable Partners, 22 So. 3d 284, 288 n.2 (Miss. Ct. App. 2009), the Mississippi Court of Appeals affirmed on appeal a finding that a cable television company had breached the duty of good faith when it failed to produce a copy of the liability insurance policy that it had agreed to purchase.  The appellate court reached this finding even though the parties' agreement did not explicitly require the cable television company to do so.  Second, in Ferrara v. Walters, 919 So. 2d 876, 884 (Miss. 2005), the Mississippi Supreme Court affirmed a finding that the sellers of real property had breached the duty on the ground they had failed to cure a defect in the chain of title within a reasonable period of time.

At the opposite end of the spectrum of good faith is "bad faith," which is not simply "bad judgment or negligence."  Bailey v. Bailey, 724 So. 2d 335, 338  (Miss. 1998); see also Univ. of S. Miss. v. Williams, 891 So. 2d 160, 170-71 (Miss. 2004) (adopting bad faith standard in Bailey in breach of duty of good faith claim).  Rather, the term "bad faith"[30] implies "a neglect or refusal to fulfill some . . . contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Id. (quoting BLACK'S LAW DICTIONARY 139 (6th ed.1990). Before providing an analysis of the legal issues in this complex real estate matter, the Court summarizes the position of the parties, beginning with the arguments of the Woodgreen

---

[30] The Court has previously granted the Title Companies partial summary judgment on the bad faith tort claims of the Woodgreen Banks (Contract Op. at 3 & 20).  The term "bad faith" is used here in the context of the contractual obligation of good faith and fair dealing.

Banks.

### C.   Woodgreen Banks' Arguments

The Woodgreen Banks claim that they are *much worse off* now then they were before the Title Companies attempted to cure the title defects.  (1 Trial Tr. at 122, 162, 197-98).  Any cure by the Title Companies under the Policies, according to the Woodgreen Banks, should have placed them in a position to be able to sell their lots to reduce their loan losses, which was what they reasonably expected. The Woodgreen Banks maintain that the "faithfulness of an agreed purpose between [the] parties" in the Policies is evidenced by the "sell" language included in the special warranty deeds and the ROW Easement.  Tellingly, Ogletree testified that the "sell" language was included so that any purchaser of the lots from the Woodgreen Banks could obtain title insurance.  The Woodgreen Banks insist that his testimony indicates that Ogletree understood that it was reasonable for the Woodgreen Banks to expect that they would be able to sell the individual lots (that is, obtain subdivision approval from Southaven to sell the lots).  Yet, according to the Woodgreen Banks, the cure actually made them perpetual owners of the lots and, in this way, deprived them of the protection they enjoyed in the Policies    the promise of legally enforceable deeds of trust (that is, the right to sell the lots).   The Woodgreen Banks maintain that these actions eliminated any benefit to them under the Policies and constituted a breach of the implied duty of good faith and fair dealing. *See* Baker v.  First Am. Title Ins. Co., No. 08-0690, 2009 WL 3463973, *5 (Ariz. Ct. App. Oct. 27, 2009) ("[C]ovenant of good faith and fair dealing may be breached even in the absence of a breach of an express [contractual] provision if the action denies [contracting] party the reasonably expected benefits of the agreement.") (unpublished).  The Woodgreen Banks outline how the subdivision of the Woodgreen Property prejudiced them and why they disagree with the Title Companies that their

losses are not excluded or excepted under the Policies.

## 1. Subdivision of the Woodgreen Property

The Woodgreen Banks maintain that the Title Companies, while attempting to "cure" the title defects, created an illegal subdivision when they conveyed the Woodgreen Property to them in individual lots, as shown in the Unofficial Plat, without first obtaining the approval of Southaven. The Woodgreen Banks point out that Choat testified that Southaven would never have approved the Unofficial Plat.

As a result of what the Woodgreen Banks describe as a "technical, but meaningless cure," the Woodgreen Property is no longer owned in its entirety by Woodgreen Development but instead is owned in individual lots by numerous parties. They complain that at this juncture, any attempt by them to recoup their loan losses by offering the lots for sale, would place them at risk for criminal prosecution by Southaven for a misdemeanor offense, a monetary fine of $500.00 per day for each day the violation continued, and an injunctive action prohibiting any attempted sale.[31] The Woodgreen Banks further complaint that even if they were inclined to accept the risk, they would

---

[31] The Woodgreen Banks cite MISS. CODE ANN. § 17-1-19, which reads:

**Violation of zoning law; remedies of local governing authorities**

In case any building or structure is erected, constructed, reconstructed, altered, repaired, converted or maintained, or any building, structure, or land is used in violation of the zoning law or of any ordinance or other regulation made under authority conferred hereby, the proper local authorities of any county or municipality, in addition to other remedies, may institute any appropriate action or proceedings, to prevent such unlawful erection, construction, reconstruction, alternation, repair, conversion, maintenance or use, to restrain, correct, or abate such violation, to prevent the occupancy of said building, structure or land, or to prevent any illegal act, conduct, business, or use in or about such premises.

MISS. CODE ANN. § 17-1-19.

be hard pressed to find any interested buyer, given that any such sale could possibly be enjoined by Southaven. (1 Trial Tr. at 153). For the likelihood of this possibility, they cite Johnson v. Hinds County, 524 So. 2d 947, 951-52 (Miss. 1988), where the Mississippi Supreme Court upheld injunctive relief prohibiting a real estate developer from selling lots in a subdivision until the lots were brought into compliance with the county's subdivision ordinance. Id.; see also City of Eupora v. Hodges, 722 So. 2d 695, 697 (Miss. 1998) (recognizing that local governments may obtain injunctive relief pertinent to violation of local ordinances).

The Title Companies were aware of the Subdivision Ordinance before entry of the Title Resolution Order on May 21, 2010, and for an even longer period of time before the conveyances of the lots by MRED to the Woodgreen Banks on August 20, 2010. Ogletree testified that he first read the Subdivision Ordinance on May 1, 2010. (2 Trial Tr. at 42-43). Nevertheless, the Title Companies did not inform Trustee Henderson about the Subdivision Ordinance and did not inform Choat, the planning director for Southaven, of their intention to subdivide the Woodgreen Property beforehand. Ogletree testified that he met with Choat in December 2011, concerning the Woodgreen Property and that Choat had informed him of a litany of problems with the Unofficial Plat[32] but that meeting took place well after the conveyances of the lots had already occurred. The Title Companies took no action to obtain approval of the Unofficial Plat.

More to the point, the Woodgreen Banks contend that the Title Companies never notified them of their intent to ignore local law when conveying the lots. (1 Trial Tr. at 122, 162-63). To the contrary, the Title Companies informed the Woodgreen Banks that they would cure "any other title,

---

[32] These problems included the length of the circular road, which Choat testified exceed 500 feet, the limit for emergency vehicular traffic. (1 Tr. at 53).

or access defects" and that the Woodgreen Banks would be able to sell their lots immediately. (Banks. Exs. 20-21). According to the Woodgreen Banks, if the Title Companies were insistent on conveying the lots in order to cure the defects, they should have obtained the approval of Southaven before doing so to avoid making them perpetual owners of the lots. (1 Trial Tr. at 122; 1 Trial Tr. at 198-99). The Woodgreen Banks insist that if Southaven had refused to approve the Unofficial Plat of the subdivided Woodgreen Property, the Title Companies could have explored other methods for establishing titles to the lots that would not have prejudiced them, or alternatively, could have paid off their liens, just as they had done for the Tract 9 Lenders.

The Woodgreen Banks argue that whether they were negligent in failing to uncover the fraud of the Evans Brothers or to verify the status of the Evans Plat before paying the loans to Chris Evans, is irrelevant. The tort doctrine of comparative negligence, as set forth in MISS. CODE ANN. § 11-7-15, does not apply to claims arising out of the breach of a contractual obligation, whether expressed or implied. Weaver v. Grenada Bank, 179 So. 564, 565 (Miss. 1938); *see also* Fidelity Nat'l Title Ins. Co. v. Matrix Fin. Servs. Corp., 567 S.E.2d 96, 101 (Ga. Ct. App. 2002) (lender's failure to discover truth about borrower's fraudulent representations was irrelevant because, regardless, title insurer had agreed to insure loan).

### 2.    Exclusions and Exceptions in the Policies

According to the Woodgreen Banks, the decision of the Title Companies to disregard the Subdivision Ordinance was deliberate and was based on their conclusion that problems with public land-use regulations, even if they created those problems, were excluded or excepted in the Policies. The Woodgreen Banks allege that the Title Companies were concerned only about whether the deeds of conveyance would be enforceable transfers under Mississippi law, an issue addressed in Seymour,

608 So. 2d at 1146. The Woodgreen Banks maintain that their reliance on Seymour is misplaced because in doing so, they overlook the purpose behind the Policies by eliminating any consideration as to the marketability of the lots or the economic benefit to the Woodgreen Banks.  Simply stated, the Woodgreen Banks allege that in their haste to cure, the Title Companies failed to recognize that their course of action would prejudice the Woodgreen Banks by leaving them without the benefit of the bargain they made in the Policies.

**D.     Title Companies' Argument**s

In contrast to the view of the Woodgreen Banks about their present status, the Title Companies insist that the Woodgreen Banks are *much better off* now then they would have been even if their liens had been valid because the Woodgreen Banks today own the lots free and clear of any liens or encumbrances.   The Title Companies list the following benefits that they claim the Woodgreen Banks received as a result of their efforts:  (1) an accurate and complete survey of the properties (1 Trial Tr. 85-86; 2 Trial Tr. 10-11-23), (2) corrected legal descriptions ( 1 Trial Tr. 87:20-88:14; 2 Trial Tr. 10:11-23), (3) the benefit of not having to move for stay relief from this Court; (4) the benefit of not incurring foreclosure costs because the Title Companies conveyed the lots directly to them (1 Trial Tr. 169-70); (5) special warranty deeds rather than trustee's deeds (or substituted trustee's deeds) having the legal affect of a quitclaim deed typically provided in foreclosures (2 Trial Tr. 22:2-23:6); and (6) an access easement for those Woodgreen Banks with land-locked lots (1 Trial Tr. 85-86).

The Title Companies contend that they fully performed their indemnity obligations under the Policies or, in other words, that the Woodgreen Banks received all the benefits they were entitled to receive under the Policies.  Theobald v. Nosser, 752 So. 2d 1036, 1042 (Miss. 1999) (contract

damages are intended to "put [the injured party] in as good a position as he would have been in had the contract been performed.") (citation omitted). According to the Title Companies, they exercised their right to cure defects in the titles to the lots and "establish[] . . . the lien of the insured mortgage, all as insured." (MVT Ex. 10 at 2, ¶ 8(a)). Although the Title Companies admit they sent letters to the Woodgreen Banks stating that they would cure any other title or access defects before they conveyed the lots to them, the promise they made related to the access easement. (1 Trial Tr. at 101).

 The Title Companies maintain that they were required to establish the lien "as insured," but they were not required to "improve title to the best and most economical option for the insured and as requested by the Woodgreen Banks." (MVT Brief at 21). They insist that they cured the title problems covered by the Policies by paying off the Tract 9 Lenders, correcting legal descriptions, and putting each of the Woodgreen Banks into the chain of title, just as if the Woodgreen Banks had foreclosed on the lots under their deeds of trust. Under ¶ 8(a) of the Policies, "[i]f the Company establishes the title, or removes the alleged defect, lien or encumbrance[s], . . . all as insured, . . . it shall have fully performed its obligations . . . and shall not be liable for any loss or damage caused thereby." (MVT Ex. 10 at 2, ¶ 8(a)).

### 1.    Subdivision of the Woodgreen Property

The Title Companies disagree that the Woodgreen Property was illegally subdivided because a subdivision plat of the Woodgreen Property was never approved by Southaven (MVT Reply Brief at 15). The Title Companies further disagree that they created an illegal subdivision when they conveyed, *via* MRED, the lots on August 20, 2010.[33] They maintain that the Woodgreen Property

---

[33] As previously mentioned, the Title Resolution Order, which authorized the sale of the Woodgreen Property, did not require the Title Companies (once they had purchased the Woodgreen Property) to convey the lots to the Woodgreen Banks, but merely reflected their

was subdivided, if at all, either when Chris Evans granted deeds of trust to the Tract 9 Lenders or the Tract 10 Lenders, including the Woodgreen Banks. The transactions involving the Woodgreen Banks, which led to the creation of the legal descriptions at issue, occurred on December 4, 2004, June 23, 2005, and August 2, 2005, years before MRED's conveyances took place on August 20, 2010.

The Title Companies contend that the Woodgreen Banks' interpretation of the Subdivision Ordinance is flawed because it fails to recognize that "ownership of property is not a consideration for purposes of defining the subdivider." (MVT Brief at 26 n.7). Therefore, the Title Companies consider the fact that the Woodgreen Property was owned by a single entity (Woodgreen Development) before it was conveyed *via* MRED to the Woodgreen Banks as irrelevant because an illegal subdivision can exist even when all of the property is owned by the same individual or entity. (1 Trial Tr. 103:4-12, 105:4-14). They insist that their position is consistent with the testimony of Whitney Choat, the planning director for Southaven, who identified Chris Evans as the first "subdivider" of the Woodgreen Property on the assumption that it was Chris Evans who conveyed the deeds of trust on the lots to the Woodgreen Banks. (1 Trial Tr. 62:21-63:9). They note that no one raised any objection to the Court's approval of MRED's conveyances of the lots, including any objection based on MRED's alleged failure to comply with the Subdivision Ordinance.

Finally, with regard to the Subdivision Ordinance, the Title Companies point out that the Subdivision Ordinance precludes "sales," but not "conveyances." The relevant portion of the Subdivision Ordinance states, "No lots *shall be sold* nor any plats recorded until the plat has been

_____

intention to do so. The Woodgreen Banks do not attempt to collaterally attack the Title Resolution Order.

Page 39 of 53

approved as herein provided." (Banks Exs. 35, § 12-4) (emphasis added). Yet, according to the Title Companies, they did not actually "sell" the lots to the Woodgreen Banks. (2 Trial Tr. at 20-23).

In this respect, the Title Companies also take issue with the distinction the Woodgreen Banks make between the deeds of *conveyance* by MRED and the deeds of *trust* by Chris Evans. They maintain that if the conveyances constituted a "sale," then the deeds of trust did too.[34]

The Title Companies agree that each of the deeds of conveyances included the phrase "grant, bargain, sell, convey, and warrant" (Banks Exs. 9, 11, 13 & 15), but they point out that the deeds of trust obtained by the Woodgreen Banks contained similar "sell" language. As an example, the Title Companies cite the following language that appears in the deed of trust to First State from Cedar Lake : "Grantor irrevocably grants, bargains and sells to Trustee, in trust for the benefit of [First Bank], with power of sale, the following property . . . ." (Banks Ex. 5, § 2). The deeds of trust to

---

[34] In Mississippi, a deed of trust is similar in legal effect to a mortgage, and the two terms are sometimes used interchangeably. In the Policies, for example, the term "mortgage" is defined to include "deed of trust." (Banks Exs. 38, 45, 53; MVT Ex. 10). A leading treatise explains:

> A deed of trust is a three party instrument whereby a borrower (grantor) grants an interest in real estate to a third party trustee who holds the interest for the benefit of a lender (beneficiary) to whom the borrower is indebted. In the event that the borrower subsequently defaults on the indebtedness, a deed of trust may facilitate the sale of the property by the trustee in a nonjudicial foreclosure.

> A deed of trust has all of the essential elements of a mortgage; it is a conveyance of land as security for a debt. Both instruments convey a defeasible title only; a mortgagee or trustee's title in fee being in the nature of a base or determinable fee; and the right to redeem is the same in one case as it is in the other.

 1-9 Asset Based Fin.: A Transactional Guide (MB) § 9.02 [4] (2012). (citing Manor Coal Co. v. Beckman, 133 A. 893, 898 (Md. 1926)). In Adams v. Colonial & U.S. Mort. Co., 34 So. 482 (Miss. 1903), the Mississippi Supreme Court discussed the United States Supreme Court's decision holding that mortgages of real estate "are in form defeasible sales, and in substance grants of specific security, or interest in the land for the purpose of security." Id. at 489 (citing Savs. & Loan Soc. v. Multnomah County, 169 U.S. 421, 429 (1898)).

Patriot and First Alliance likewise state that "Debtor hereby conveys and warrants unto Trustee the land described below . . . ." (Banks. Ex. 3, 4 & 6).  Moreover, the Title Companies maintain that the "sell" language in the deeds of conveyance is inconsistent with the testimony of Ogletree, the closing attorney for the transactions, who stated that he included the word "sell" solely for the purpose of complying with state law.  (2 Trial Tr. 22:2-25:16); MISS. CODE ANN. § 89-1-41.  In that regard, the Title Companies point to the testimony of the Woodgreen Banks, whose representatives  admitted at the Woodgreen Trial that no money exchanged hands for the conveyances.  (1 Trial Tr. 131:6-10; 170:21-24).

### 2.    Exclusions and Exceptions in the Policies

The Title Companies insist that the Policies expressly exclude and/or except from coverage the problems that the Woodgreen Banks now face in selling their lots.  They further insist that the claims of the Woodgreen Banks, if allowed, would require this Court to ignore those provisions in the Policies that define and limit the scope of the coverage outlined in the Policies.  The Mississippi Supreme Court has held:

> When parties to a contract make mutual promises (barring some defense or condition which excuses performance), they are entitled to the benefit of their bargain.  Thus, insurance companies must be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain and to ensure that rates have been properly calculated.

Corban v. United Servs. Auto. Ass'n, 20 So. 3d 601, 609 (Miss. 2009) (citing Noxubee County Sch. Dist. V. United Nat'l Ins. Co., 883 So. 2d. 1159, 1166 (Miss. 2004)).

According to the Title Companies, the Woodgreen Banks could have obtained additional insurance coverage for these problems but declined to do so.  Specifically, two exclusions and one exception in the Policies apply, say the Title Companies.  First, they point to the "Public Land-Use

Exclusion," which states there is no coverage for loss or damage arising from subdivision regulations like those in the Southaven Subdivision:

> 1.     (a)     Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land [or] . . . (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part.
>
> (b)     Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

(Banks Exs. 38, 45 & 53, at Exclusion 1; MVT Ex. 10, at Exclusion 1); *see* <u>Insured Titles v. McDonald</u>, 911 P.2d 209, 213 (Mont. 1996) (noting that standard language excludes violations of subdivision and platting laws).

Second, the Title Companies point to the "Prior Knowledge Exclusion," which states:

> Defects, liens, encumbrances, adverse claims or other matters:
>
> (a)     created, suffered, assumed or agreed to by the insured claimant;
> (b)     not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy.

(Banks Exs 38, 45 & 53, at Exclusion 3(a)-(b); MVT Ex. 10, at Exclusion 3(a)-(b)).  This exclusion applies, according to the Title Companies, because the evidence at the Woodgreen Trial showed that the Woodgreen Banks knew the lots were not part of an official subdivision when they funded the loans to the Related Entities. (1 Trial Tr. 134-35; 138-43; 175-77; 183-88; 206-07; 210).

Third, the Title Companies point to the "Survey Exception" in Schedule B, where there is an exception for:

Item 3.    Rights of parties in possession, deficiency in quantity of land, boundary line disputes, encroachments, roadways, unrecorded servitudes or easements, any matter not of record including lack of access which would be disclosed by an accurate survey and inspection of the property, and easements or other uses of subject property not visible from the surface.

(Banks Exs 38, 45 & 53, at Schedule B-1; MVT Ex. 10, at Schedule B-1).  The Title Companies

explain the purpose of the Survey Exception, as follows:

From a search of relevant records, a title company cannot ascertain the risks that an accurate survey would disclose.  It is for this reason that the title company puts that risk on the insured, who can control it either by obtaining a survey or arranging for the elimination of the survey exception.  Thus, the very purpose of a survey exception is to exclude from coverage errors that would be revealed not by a search of the public records, but by an accurate survey.

Alden v. Schuster, 2008 Conn. Super. LEXIS 1032, at *5-6 (Conn. Super. Ct. Apr. 22, 2008)

(quoting Am. Title Ins. Co. v. Carter, 670 So. 2d 1115 (Fl. Dist. Ct. App. 1996)).

**3.     Contractual Right to Cure**

The Title Companies contend that they cannot be held liable for exercising their right to cure

the title defects covered in the Policies because they had an express contractual right to chose that

option under ¶ 4 and because the implied duty of good faith cannot override a specific contract term.

In the absence of a discernible "gap" as to a particular contractual obligation, the Title Companies

insist that there can be no implied duty of good faith.  The Title Companies cite cases from the Fifth

Circuit and Mississippi that have recognized that a party cannot act in bad faith when the contract

authorizes the precise action (or inaction) about which a party complains.  Grand Hous., Inc. v.

Bombardier Capital, Inc., No. 04-60615, 2005 WL 673267, at *4 (5th Cir. Mar. 23, 2005) (because

agreement allowed company to provide financing "at its option," company was free to reduce or

withdraw any financing it provided); West v. Nationwide Trustee Servs., Inc., No. 1:09CV295, 2010

WL 3122801 (S.D. Miss. Aug. 4, 2010); <u>Cothern</u>, 759 So. 2d at 1249 (even assuming that a contract existed, defendant complied with contract and did not breach covenant of good faith and fair dealing); *see also* <u>Lambert v. Baptist Memorial Hosp. N.-Miss., Inc.</u>, 67 So. 3d 799, 803 (Miss. Ct. App. 2011)*;* <u>Johnston v. Palmer</u>, 963 So. 2d 586, 594-95 (Miss. Ct. App. 2007) (finding no breach of the covenant of good faith and fair dealing when defendant complied with contract terms drafted by plaintiff).  Limiting application of the duty of good faith in this way ensures that contracts are enforced only in accordance with their provisions. <u>Noxubee v. School Dist. v. United Nat'l Ins. Co.</u>, 883 So. 2d 1159, 1165 (Miss. 2004).  The Title Companies insist that the Woodgreen Banks "cannot wield a claim for breach of the duty of good faith and fair dealing to obtain rights they did not have under the Policies."  (MVT Brief at 16).

In a similar vein, the Title Companies argue that a breach of the duty of good faith and fair dealing generally exists only where there is also a breach of contract. <u>Cenac v. Murry</u>, 609 So. 2d 1257 (Miss. 1992).   This general rule is commensurate with the principle that "[t]he duty of good faith and fair dealing arises from the existence of a *contract* between parties." <u>American Bankers</u>,' 819 So. 2d at 1207 (citing <u>Cenac</u>, 609 So. 2d at 1272).

## E.  Court's Analysis

The issue before the Court is not whether an implied duty of good faith exists in the Policies, because in Mississippi, the duty of good faith exists in every contract. *See* <u>Cenac</u>, 609 Sol. 2d at 1272.  Rather, the question before the Court is whether the Title Companies breached any of the obligations implied by the duty of good faith.

### 1.    Subdivision of the Woodgreen Property

The Court finds that the Title Companies violated the Subdivision Ordinance when they

arranged for the conveyances of the lots to the Woodgreen Banks, first from the Hensons to Woodgreen Development, then from Woodgreen Development to MRED, and finally, from MRED to the Woodgreen Banks.  The Court rejects the Title Companies' contention that a subdivision plat must be filed before a violation of the Subdivision Ordinance can occur.  Ogletree, who retained the surveyor and who prepared the deeds of conveyance, testified that the Unofficial Plat was "not a subdivision plat and it was not submitted to the City [of Southaven] as a subdivision plat."  (2 Trial Tr. 10:22-23).  Rather, the Unofficial Plat was intended only to provide the Woodgreen Banks with a survey of the access easement.   The Court finds this argument without merit.  Regardless of the intent of the Title Companies, the Woodgreen Property became an illegal subdivision as a result of their actions.  There is no language in the Subdivision Ordinance that supports the view that a violation hinges upon the actual submission of an unapproved subdivision plat.

The Court also rejects the argument of the Title Companies that the "conveyances" at issue were not "sales" covered by the Subdivision Ordinance.  Because sufficient consideration for a sale does not always require the actual payment of money, the fact that no money changed hands is not dispositive.

The Court further disagrees with the Title Companies' attempt to equate liens with conveyances under the Subdivision Ordinance.  Choat testified that "any person or company who buys a large tract of land, such as Woodgreen . . ., and then goes out and has that entire tract surveyed and divided into lots and then conveys those lots meets the definition of a subdivider, . . . regardless of when it happens."  (MVT Brief, Ex. I, 1 Trial Tr. at 65).  Choat also testified that Southaven has never intervened in the placement of liens on commercial property.  Her testimony is consistent with the fact that the words "deed of trust" do not appear anywhere in the Subdivision Ordinance.

2.      **Exclusions and Exceptions in the Policies**

The Court finds that the Title Companies had indemnity obligations to cure the defects (regardless of whether those defects would otherwise be excluded and/or excepted) when those defects were created by the Title Companies.  The Title Companies cite an extensive list of cases from various jurisdictions that have held that the implied duty of good faith cannot vary the express terms of an agreement made by the parties.  (MVT Reply Brief at 5-6 n.2).  However, they fail to cite (and the Court has not found) any case where this holding was applied when the title problem was created by the title insurer.  *See, e.g.*, Marriott Fin. Servs., Inc. v. Capitol Funds, Inc., 209 S.E.2d 423 (N.C. Ct. App. 1974) (upholding dismissal of title insurer where conveyor failed to obtain driveway permit).  Surely, the Woodgreen Banks did not contemplate a risk that the Title Companies (as opposed to the Evans Brothers) would violate subdivision regulations in clearing all liens and encumbrances on the title.  *See* Seymour, 608 So. 2d at 1145.

Accordingly, the provisions of the Land-Use Exclusion and Survey Exception are irrelevant.  In addition, as to the Prior Knowledge Exclusion, the Title Companies err by equating knowledge of the Evans Plat with knowledge that the Woodgreen Property had been subdivided unlawfully.  Eller Media Co. v. DGE, Ltd., Nos. 83273, 83286, 2004 WL 2002449, at *4 (Ohio Ct. App. Sept. 9, 2004).  Regardless, even if the Woodgreen Banks were negligent in their loan negotiations with Chris Evans, in their dealings with Charles Evans, or in their acceptance of the Evans Plat, none of these actions relieved the Title Companies of their duty to act in good faith in performing their obligations.

3.      **Contractual Right to Cure**

The Woodgreen Banks do not dispute that the Title Companies had the contractual right (but

not the duty) under the Policies to attempt to cure the title defects. Therefore, the Woodgreen Banks could not require the Title Companies to pay off their second priority liens. The Woodgreen Banks also do not dispute that they now possess fee simple title to the lots. Nevertheless, the Court agrees with the Woodgreen Banks that there was an "evasion of the spirit of the bargain" made in the Policies. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205.

The Mississippi Supreme Court found a breach of the duty of good faith and fair dealing in Ferrara, 919 So. 2d at 883-84. That case, as mentioned previously, involved a purchase agreement between a developer and sellers of commercial real estate, in which the sellers were required to deliver a warranty deed at closing. The agreement allowed for an examination of the title and required the sellers to cure any title defects disclosed as a result of that title examination as "expeditiously as possible." Id. at 879. After failing to cure a title defect that arose because of possible claims by heirs at law, the time to close the transaction expired, and the sellers attempted to sell the property to a third-party buyer. The developer sued the sellers for breach of contract and breach of the covenant of good faith and fair dealing. The Mississippi Supreme Court held that the sellers breached their agreement by "fail[ing] to reasonably cure the defect in title." Id. at 883. Additionally, the Ferrara Court concluded that the failure to resolve the title defect "amount[ed] to a breach of the covenant of good faith and fair dealings" because the sellers failed to meet the developer's justified expectations. Id. at 883-84. In Baker, 2009 WL 3463973, *5, the Supreme Court found that an issue of material fact existed as to whether a title insurer had breached its duty of good faith under an escrow contract.

The Title Companies rely heavily on the Mississippi Supreme Court's decision in Cenac in support of their argument that only in exceptional cases can a breach of the duty of good faith and

fair dealing exist in the absence of a breach of the underlying contract. <u>Cenac</u>, 609 So. 2d at 1257. In that case, the Cenacs entered into a "Contract of Deed" with the Murrys for the purchase of a small country store. The Contract of Deed functioned much like a deed of trust and a promissory note, in that the Murrys agreed to convey title to the store to the Cenacs only after the Cenacs had finished paying off the purchase price in monthly installments in the next ten years. The agreement included a forfeiture clause, so that ownership of the store would revert to the Murrys if the Cenacs ever defaulted in their monthly payments. The forfeiture provision is important because the Murrys began a course of bizarre behavior designed as part of a premeditated plan to force the Cenacs into forfeiting the store. The potential windfall to the Murrys (in addition to the return of the store) was more than $30,000 in payments already made by the Cenacs, most of it in the form of a down payment. Conveniently, the Murrys lived in a house next door to the store, and the Cenacs lived in a mobile home on store property, so the Murrys had plenty of opportunities to drive store customers away and harass the Cenacs. On appeal of an action by the Cenacs against the Murrys to rescind the Deed to Contract, the Mississippi Supreme Court concluded that the Murrys had not breached any of the express terms of the Deed to Contract. Even so, the Supreme Court held that "if the covenant of good faith and fair dealing has no meaning in this case, it has no meaning in any case." <u>Cenac</u>, 609 So. 2d at 1273.

The Title Companies maintain that the <u>Cenac</u> exception, as the ruling has become known, applies only where conduct amounts to "abusive, aberrant, intimidating, harassing behavior which had made . . . life a living hell." <u>Id.</u> at 1272. They argue that their own behavior toward the Woodgreen Banks was not nearly as extreme.

Although the Court does not equate the behavior of the Title Companies to the antics of the

Murrys in <u>Cenac</u>, there is no authority that holds that the Murrys have set the minimum standard for conduct that must be met in order for a breach of good faith to arise when there has been no breach of the underlying contract.  Here, the Title Companies, like the Murrys,  frustrated the purpose of the agreement, although in a more sophisticated way.

Like every contract, the Policies must be enforced according to their terms.  It is not the role of this Court to rewrite the obligations of the parties or to substitute a different (or better) deal from the one contemplated by the Woodgreen Banks.  Instead, the job of the Court is to construe the Policies as written so that the Title Companies have the obligation to perform only according to the terms they bargained for and so that the Woodgreen Banks have the right to expect compensation in the event of a failure of the Title Companies to perform so.

The point of the duty of good faith is to honor the reasonable expectations of the parties created by the express terms of their contract.  Where a contracting party does retain an unlimited right to decide the nature or extent of his performance, that promise must be respected for what it is.  It is certainly possible for parties to agree to render the duty of good faith irrelevant to their deal, for example, by drafting a contract so as to leave certain decisions absolutely within the unfettered discretion of one of the parties.  <u>Tymshare, Inc. v. Covell</u>, 727 F.2d 1145, 1153 (D.C. Cir. 1984) (Scalia, J.).  It is incorrect, however, to say that every expressly-conferred contractual power is of this nature, because doing so would virtually read the implied duty of good faith nonexistent.  <u>Id.</u> at 1153-54.

The Court agrees with the Title Companies that "[n]o rule of construction requires or permits [the Court] to made a contract differing from that made by the parties themselves, or to enlarge an insurance company's obligations where the provisions of its policy are clear."  <u>Leonard v. Nationwide</u>

Mut. Ins. Co., 499 F.3d 419, 429 (5th Cir. 2007) (citing State Auto. Mut. Ins. Co. of Columbus, Ohio v. Glover, 176 So. 2d 256, 258 (Miss. 1965).   The Court finds that the conduct of the Title Companies at issue here (curing the title defects in a way that violated local law and greatly diminished or eliminated the value of the lots) is not authorized by any express provision of the Policies. The precise method for establishing title is not prescribed in the Policies in order to allow the Title Companies a certain amount of flexibility.   Even so, the flexibility allowed the Title Companies contained an implied duty requiring that they act in a reasonable way.

The Court finds that the decision to attempt to cure the defects in titles, as insured, was within the absolute power of the Title Companies so that the Woodgreen Banks did not have the contractual right to require the Title Companies to pay them for the diminution in or elimination of value of the lots.   There is no express term in the policies that required the Title Companies to act in the best financial interests of the Woodgreen Banks irrespective of the costs to the Title Companies. The implied duty of good faith likewise did not require the Title Companies to perform its obligations in such a way.   Interpreting the Policies any other way would fall outside the reasonable expectation of the parties.   Instead, the Policies expressly gave the Title Companies an alternative to paying the Woodgreen Banks their losses from the defects.   Once the Title Companies exercised that option, however, the discretion they enjoyed to establish the title, rather than paying the losses, was not unfettered.   In other words, the option to cure carried with it an inherent duty to act in good faith in the performance of that option.

The Title Companies cannot escape their obligation to cure the problems in a reasonable way by pointing to the provision in the Policies that gave them that choice.   See Barlow Burke, Law of Title Insurance § 6.05 (2010) (the right to establish the title as insured "is a right coupled with a

duty   that is, a duty to provide some form of suitable relief to an insured, using prudent judgment and reasonable diligence"). The Title Companies place too much emphasis on the word "right." There is a linkage between the "right" to establish title and the duty to indemnify the insured.  Only after satisfying the implied duty of good faith in attempting to establish title do the Title Companies enjoy the benefit of having their indemnity obligations discharged in ¶ 8(a).  This construction requires that the Policies be read as a whole, rather than in piecemeal fashion.  J.W. Foods Corp. v. State Farm Mut. Auto. Ins. Co., 723 So. 2d 550, 552 (Miss. 1998) (the court must read "the policy as a whole, consider all  relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result.").  Simply stated, ¶ 8(a) does not apply unless and until the Title Companies first comply with ¶ 4(b).  The Title Companies' interpretation of the cure provision is overreaching.

## CONCLUSION

The Court concludes that the Title Companies prevented the Woodgreen Banks from enjoying the benefit of the indemnity provisions of the Policies and are liable to the Woodgreen Banks for breach of the duty of good faith and fair dealing.  It is not likely that the Woodgreen Banks would have agreed to loan the money to Chris Evans, through the Related Entities, had they known in advance that the Policies allowed the Title Companies to cure the title defects in such a way as to reduce or eliminate the resale value of the lots.[35] Yet, the Title Companies would have the Court interpret the cure provision so that it reads: "We have the right to cure rather then to pay you money, but we do not promise you that we will establish your insured interest in a way that complies with

---

[35] For example, Choat testified that the Evans Plat likely would have been approved with minor mark ups.  (1 Trial Tr. at 60).

subdivision regulations or that allows you to sell your collateral to mitigate any of your insured losses." It is not the role of the Court to instruct the Title Companies how they could have satisfied their indemnity obligations in the Policies so that they would have complied with the duty of good faith.[36] Undoubtedly, among the options available to the Title Companies, the title defects could have been cured without violating the Subdivision Ordinance or the claims could have been paid. Because they decided there was no need to comply with the Subdivision Ordinance, however, the Title Companies chose an option that created an obstacle to the sale of the lots that did not exist on the dates of the Policies.

The Court recognizes that the decisions challenged by the Woodgreen Banks occurred during a period of time when the Title Companies were inundated with a "menagerie of problems" with the Woodgreen Property in the aftermath of the *Ponzi* scheme of the Evans Brothers. They were victims of fraud, as were the Woodgreen Banks, and their task in handling the title insurance claims of the Woodgreen Banks and other lenders was monumental. In the light of the duty of good faith and fair dealing, however, the Court cannot sanction an interpretation of the Policies that would allow the Title Companies, "prompted . . . by some interested . . . motive," to take advantage of the Woodgreen Banks. Bailey, 724 So. 2d at 338. Their conduct violated "standards of . . . fairness, or reasonableness." Cenac, 609 So. 2d at 1272 (citing RESTATEMENT (SECOND) OF CONTRACTS § 205, 100 (1979)).

The Court will set a status conference to schedule Phase Two of the Woodgreen Trial for an

---

[36] *See* Summers, *supra* p. 31, at 201 (using "excluder analysis" to define good faith).

adjudication of damages against the Title Companies.  A final judgment will not be entered until the

final disposition of all matters in the Adversary.

SO ORDERED.

_____
Neil P. Olack
United States Bankruptcy Judge
Dated:  June 22, 2012



APPENDIX 1



APPENDIX 2-A



APPENDIX 2-B



APPENDIX 2-C



APPENDIX 3