## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**JON CHRISTOPHER EVANS,**                                    **CASE NO. 09-03763-NPO**

        **DEBTOR.**                                    **CHAPTER 7**

**JOINTLY ADMINISTERED WITH RELATED CASES**

 

**FIRST ALLIANCE BANK, FIRST STATE BANK,**
**FIRST SECURITY BANK, AND PATRIOT BANK**          **CROSS-PLAINTIFFS**

**VS.**                                    **ADV. PROC. NO. 10-00005-NPO**

**MISSISSIPPI VALLEY TITLE INSURANCE**
**COMPANY AND OLD REPUBLIC NATIONAL**
**TITLE INSURANCE COMPANY**                          **CROSS-DEFENDANTS**

 

### MEMORANDUM OPINION
### AND ORDER ON CROSS-CLAIMS OF
### FIRST SECURITY BANK AGAINST MISSISSIPPI
### VALLEY TITLE INSURANCE COMPANY AND OLD
### REPUBLIC NATIONAL TITLE INSURANCE COMPANY
### <u>RELATED TO TRACTS 10 AND TC—PHASE ONE:  LIABILITY</u>

This matter came before the Court on February 29, 2012, for the liability phase ("Phase

One")[1] of the trial (the "Trial") on the Amended Crossclaim Against Mississippi Valley Title

Insurance Company and Old Republic National Title Insurance Company (the "Cross-claims") (Adv.

Dkt. 135)[2] filed by First Security Bank ("FSB") and Mississippi Valley Title Insurance Company and

Old Republic National Title Insurance Company's Answer and Affirmative Defenses to Amended

---

[1] With the consent of the parties, the Court bifurcated the bench trial into two phases:  (1)
liability and (2) damages.

[2] Citations to the record are as follows: (1) citations to docket entries in the Adversary are
cited as "(Adv. Dkt. ____)"; and (2) citations to docket entries in the main bankruptcy case of
Jon Christopher Evans, Case No. 09-03763-NPO, are cited as "(Bankr. Dkt. ____)".

Cross-claim of First Security Bank (Adv. Dkt. 142) filed by Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies") in the above-referenced adversary proceeding (the "Adversary"). At the Trial,[3] William C. Brabec and M. Scott Jones represented the Title Companies; Richard T. Phillips and Jason L. Nabors represented FSB. Having considered the evidence presented at the Trial, as well as the post-trial briefs, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (O).[4] Notice of the Trial was proper under the circumstances.

---

[3] The cross-claims of First State Bank, First Alliance Bank, and Patriot Bank against the Title Companies, which were tried on February 21-22, 2012, have been addressed in a separate opinion. *See* Mem. Op. & Order on Cross-Cls. of First State Bank, First Alliance Bank, & Patriot Bank Against Miss. Valley Title Ins. Co. & Old Republic Nat'l Title Ins. Co. Related to the Woodgreen Property  Phase One: Liability, First Alliance Bank v. Miss. Valley Title Ins. Co. (In re Evans) ("Evans II")(Adv. Dkt. 490).

[4] This finding of core jurisdiction is undisputed. *See* Pretrial Order at 2 (Adv. Dkt. 444). The United States Supreme Court in Stern v. Marshall, 131 S. Ct. 2594 (2011), held that bankruptcy courts lack constitutional authority to enter a final judgment on a state-law, compulsory counterclaim that did not stem from the bankruptcy itself. *See* Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp., 673 F.3d 399 (5th Cir. 2012) (suggesting a narrow interpretation of Stern in holding that Stern does not, *sub silentio*, reach so far as to render constitutionally infirm the statutory powers of federal magistrate judges). In the event that a higher court disagrees that the Adversary involves "core" matters and/or otherwise determines that the Court lacks constitutional authority to enter a final order, the Court recommends that this Opinion be regarded as its proposed findings of fact and conclusions of law and further recommends that the District Court enter this Opinion as its own, after due consideration, in accordance with 28 U.S.C. § 157(c)(1).

**Facts**

The factual and procedural background of the Adversary were set forth in detail in an opinion rendered by the Court on June 22, 2012.  *See* Mem. Op. & Order on Cross-Cls. of First State Bank, First Alliance Bank, & Patriot Bank Against Miss. Valley Title Ins. Co. & Old Republic Nat'l Title Ins. Co. Related to the Woodgreen Property   Phase One: Liability,  <u>First Alliance Bank v. Miss. Valley Title Ins. Co. (In re Evans)</u>("<u>Evans II</u>")(Adv. Dkt. 490).  Included below are only those facts and procedural background pertinent to the issues raised by FSB and the Title Companies at Trial.

1.      FSB's breach of good faith and fair dealing claim involves two title insurance policies issued on two separate properties located in Desoto County, Mississippi.  FSB made loans to Brashear Heath, LLC ("Brashear Heath") in 2008 and to Twin City Commons Development, LLC ("Twin City") in 2009, and, in return, received deeds of trust on the properties.  The loans, and a brief history of the various interests in the properties that secured the loans, are discussed in detail below.

**Brashear Heath and Tracts 10E and 10O**

2.      On August 5, 2004, James C. Henson and Cassandra E. Henson (the "Hensons") sold twenty-three acres of vacant land situated in Southaven, DeSoto County, Mississippi, to Jon Christopher Evans ("Chris Evans") through Woodgreen Development Corporation LLC ("Woodgreen Development")  (Jt. Stip. 3 & 6).[5]  This property is referred to as the Woodgreen Property.  The deed conveying the Woodgreen Property to Woodgreen Development was recorded in the office of the Chancery Clerk of DeSoto County, Mississippi (the "DeSoto County Chancery Clerk's Office"), on December 29, 2004.  (Jt. Stip. 6).

3.      To fund the purchase of the Woodgreen Property, Chris Evans, through Woodgreen Development, obtained four loans from four different lenders.  The loans were secured by deeds of trust on different parcels of the Woodgreen Property, each one roughly equal in size.  The four parcels are referred to as Tracts 9A, 9B, 9C, and 9D.  The four lenders involved in these initial transactions are referred to collectively as the "Tract 9 Lenders."  One of the Tract 9 Lenders was Merchants and Farmers Bank, who held the deed of trust on Tract 9A.[6]

---

[5] The joint stipulated facts in the Pretrial Order are numbered one through six.  (Adv. Dkt. 444 at 63-64).  Joint stipulated facts are cited as "(Jt. Stip. ____)".  The stipulated facts for FSB begin at fifty and end at sixty-six, and are cited as "(Stip. ____)".  (Adv. Dkt. 444 at 69-70).

[6] The three other Tract 9 Lenders were BancorpSouth, Community Bank, and BankFirst Financial Services.

4.      After these initial purchase-money loans, Chris Evans obtained additional loans on behalf of other entities he controlled, that were also purportedly secured by first priority liens on parcels of the same Woodgreen Property.  Two of these loans were secured by deeds of trust in favor of First Alliance Bank and First Commercial Bank on two smaller parcels of Tract 9A, known as Tracts 10E and 10O.  These deeds of trust were recorded in the DeSoto County Chancery Clerk's Office on December 2, 2004.  Tracts 10E and 10O are each about one acre in size and lie adjacent to each other.[7]

5.      On April 28, 2008, Chris Evans, through Brashear Heath, executed a promissory note to FSB in the amount of $900,165.00, secured by a deed of trust on Tracts 10E and 10O and purportedly obtained by Brashear Heath for the purchase of that property. (Stip. 50; FSB Ex. 5)[8]

6.      On May 22, 2008, the Title Companies issued FSB a title insurance policy, bearing policy number LP-107030, in the amount of $900,165.00, on two parcels of the Woodgreen Property. (Stip. 52, FSB Ex. 1).  Loan policy number LP-107030 is referred to as the Brashear Heath Policy.

7.      The Brashear Heath Policy insured FSB as the holder of a first deed of trust against any loss or damage sustained because of "[t]itle [to Tracts 10E and 10O] being vested other than as stated in Schedule A" and/or because of a "defect in the Title caused by . . . fraud."  (FSB Ex. 1).

8.      At that time, title to Tracts 10E and 10O was actually vested in Woodgreen Development, and not in Brashear Heath.  Also, Merchants and Farmers Bank held a prior deed of trust on Tract 9A, which included Tracts 10E and 10O.  In addition, First Alliance held a prior deed of trust on Tract 10E, and First Commercial held a prior deed of trust on 10O.

9.      According to appraisals obtained by FSB, the fair market value of Tracts 10E and 10O was $1,437,400.00 when the Title Companies issued the Brashear Heath Policy. (FSB Ex. 11). This amount is greater than the loan amount and the face amount of the Brashear Heath Policy.

**Twin City and Tract TC-2B**

10.      On June 17, 2004, a deed of trust that granted First Tennessee Bank a first priority lien was recorded in the DeSoto County Chancery Clerk's Office on certain property located in DeSoto County, Mississippi.  This property, which is not part of the Woodgreen Property, is known as Tract TC-2B.

11.      On July 24, 2008, a deed of trust that purportedly granted Bank of Bartlett a first

---

[7] It is unclear why Tracts 10E and 10O, although adjacent to each other, are not in alphabetical order.

[8] The trial exhibits of FSB are cited as "(FSB Ex. _____)"; and the trial exhibits of the Title Companies are cited as "(MVT Ex. _____)".

priority lien on Tract TC-2B was recorded in the DeSoto County Chancery Clerk's Office.

12.     On January 16, 2009, Chris Evans, through Twin City, executed a promissory note to FSB in the amount of $801,128.00 secured by a deed of trust that purportedly granted FSB a first priority lien on Tract TC-2B (FSB Ex. 6).

13.     On January 20, 2009, the Title Companies issued FSB a title insurance policy, bearing policy number LP-107084, in the amount of $801,128.00. (FSB Ex. 2).  Loan policy number LP-107084 is referred to as the Twin City Policy.

14.     The Twin City Policy insured FSB's interest as the holder of a first deed of trust against any loss or damage sustained because of "Title [to Tract TC-2B] being vested other than as stated in Schedule A" and/or because of a "defect in the Title caused by . . . fraud."  (FSB Ex. 2).

15.     At that time, two other lenders (First Tennessee Bank and Bank of Bartlett) held valid prior deeds of trust on Tract TC-2B.

16.     According to an appraisal obtained by FSB, the fair market value of Tract TC-2B was $1,012,800.00 when the Title Companies issued the Twin City Policy. (FSB Ex. 12).  This amount is greater than the loan amount and the face amount of the Twin City Policy.

**The Policies**

17.     The title insurance policies issued to FSB by the Title Companies are based on standardized forms promulgated by the American Land Title Association in 1992.  Hereinafter, they are collectively referred to as the "Policies."

18.     The Policies issued by the Title Companies provide protection against loss or damage incurred by FSB, *inter alia*, because of:

> 1.     Title being vested other than as stated in Schedule A.
> 2.     A defect in the Title . . . .
>         * * *
> 9.     The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title.
> 10.    The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

(FSB Exs. 1-2).

19.     The Policies provide options for the Title Companies to satisfy their contractual

obligations if an insured incurs a covered loss.  Of relevance here is the option under ¶ 5(b).[9] Paragraph 8 and ¶ 9(a) determine the extent of the Title Companies' liability based upon whether the Title Companies chose to pursue their rights under the option provided in ¶ 5(b), which states:

> 5.    DEFENSE AND PROSECUTION OF ACTIONS
> . . . .
> (b)    The Company shall have the right, . . . at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy.  If the Company exercises its rights under this subsection, it must do so diligently.

(FSB Exs. 1 & 2).

20.    If the Title Companies pursue their rights under ¶ 5(b) "to establish the Title or the lien of the Insured Mortgage" and are successful, they have no further contractual obligations, pursuant to ¶ 9(a), which states:

> 9.    LIMITATION OF LIABILITY
> (a)    If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, . . .or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, . . . it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the insured.

(FSB Exs. 1 & 2).

21.    If the Title Companies do not pursue their rights under ¶ 5, the extent of their liability is determined under ¶ 8(a), which states:

_____

[9] Some options other than ¶ 5(b) include:  ¶ 7(a)(i) (right to pay the "Amount of Insurance" together with costs, attorney's fees, and expenses); ¶ 7(a)(ii) (right to purchase the secured indebtedness); ¶ 7(b)(i) (right to pay or otherwise settle with other parties for or in the name of the insured); ¶ 7(b)(ii) (right to pay or otherwise settle with insured).  (FSB Exs. 1-2).

8.   DETERMINATION AND EXTENT OF LIABILITY

(a)   The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)   the Amount of Insurance,

(ii)   the Indebtedness,

(iii)   the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)   if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(FSB Exs. 1-2).

22.   If the Title Companies pursue their rights under ¶ 5(b) and are unsuccessful in establishing the title or lien of the insured, as insured, the extent of their liability is determined under ¶ 8(b), which states:

8.   DETERMINATION AND EXTENT OF LIABILITY
. . . .

(b)   If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i)   the Amount of Insurance shall be increased by 10%, and

(ii)   the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(FSB Exs. 1-2).

**Title Insurance Claims**

23.   Because of fraud by Chris Evans, and by his brother Charles H. Evans, Jr. (together, the "Evans Brothers"), the title to Tracts 10E and 10O, and the priority of the liens of FSB on Tracts 10E and 10O, and Tract TC-2B were not "as insured" in the Policies by the Title Companies.

24.     Schedule A of the Brashear Heath Policy described the status of the estate of Tracts 10E and 10O, as follows:

Title is vested in: Brashear Heath, LLC

(FSB Ex. 1).  Actually, record title to Tracts 10E and 10O was vested in Woodgreen Development, and not in Brashear Heath.  (Stip. 53).  Also, Merchants and Farmers Bank had a first priority deed of trust on Tract 9A, which included Tracts 10E and 10O.  Moreover, First Alliance Bank held a deed of trust on Tract 10E, and First Commercial Bank held a deed of trust on Tract 10O, both of which predated FSB's lien.  The Title Companies had insured the deeds of trust held by Merchants and Farmers Bank on Tract 9A, First Alliance Bank on Tract 10E, First Commercial Bank on Tract 10O, and FSB on Tracts 10E and 10O, in that order, all as first priority liens.

25.     As to Tract TC-2B, record title was indeed vested in Twin City.  However, First Tennessee Bank and Bank of Bartlett held deeds of trust on Tract TC-2B which were ahead of FSB's lien.  The Title Companies had insured the deeds of trust held by First Tennessee Bank, Bank of Bartlett, and FSB, all as first priority liens on Tract TC-2B.  (Trial Tr. at 58, 91).[10]

26.     Any successful attempt by the Title Companies to establish FSB's liens on Tracts 10E and 10O, and Tract TC-2B, as they were insured, would have required the Title Companies to put FSB in a first lien position.

27.     FSB first learned that there was a problem in the deed of trust granted on Tracts 10E and 10O on September 17, 2009, when Gene D. Berry ("Berry"), an attorney retained by the Title Companies, notified Jason Edward Pressgrove ("Pressgrove"), who was then FSB's assistant vice-president,  that he had been retained by Mississippi Valley Title to file an action to establish legal title in the name of the borrower, Brashear Heath.[11]  (Trial Tr. at 31-32; FSB Ex. 15).  Berry did not tell Pressgrove that there were two prior liens ahead of FSB's lien on Tracts 10E and 10O.

28.     On September 18, 2009, Berry filed on FSB's behalf a Complaint for Declaratory

---

[10] The transcript of the Trial is cited as "(Trial Tr. at ____)".

[11] A stipulation in the Pre-trial Order indicates that Berry initiated the Chancery Court Action against both Brashear Heath and Twin City.  FSB contends that it agreed to this stipulation by mistake.  Because it is plain from the testimony and exhibits presented at Trial that the stipulation was incorrect and that the Title Companies knew, or should have known, that the stipulation was incorrect, the Court will allow the amendment of the Pre-trial Order so that it states that the Chancery Court Action involved only Brashear Heath and not Twin City.  *See* FED. R. BANKR. P. 7015(b). The Court, however, declines FSB's invitation to view the position taken by counsel for the Title Companies regarding FSB's mistake as a "gotcha" mentality that supports the merits of FSB's claim for breach of good faith and fair dealing.  (FSB Resp. Post-trial Br. at 13 & n.9).

Relief, Reformation, Equitable Lien and for Other Equitable Relief in the Chancery Court of DeSoto County, Mississippi in civil action number 09-09-1972 (the "Chancery Court Action") (FSB Ex. 13; MVT Ex. 18). The lawsuit named as defendants Woodgreen Development and Brashear Heath and asked the court to issue an injunction requiring Woodgreen Development to convey Tracts 10E and 10O to Brashear Heath. The lawsuit did not mention Tract TC-2B or Twin City.

29.     Brashear Heath and Twin City defaulted on the loans pursuant to § 17 of the deeds of trust, which provided:

> DEFAULT.  Grantor will be in default if any of the following occur:
> . . . .
>     C.     The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Grantor or any person or entity obligated on the Secured Debt;

(FSB Exs. 5-6)

30.     FSB submitted a title insurance claim to the Title Companies under the Brashear Heath Policy on September 25, 2009. (Stip. 57; FSB Ex. 17). The value of FSB's liens on Tracts 10E and 10O, as they were insured, was zero.

31.     Following the receipt of FSB's claims, the Title Companies attempted to establish FSB's liens on Tracts 10E and 10O and on Tract TC-2B, as insured, although FSB alleges that their attempts to cure were part of a scheme to avoid paying FSB its full measure of damages under the Policies.

32.     The Title Companies obtained a preliminary injunction in October, 2009, in the Chancery Court of Madison County, Mississippi, that required the Evans Brothers "to execute deeds and/or modification agreements, as directed by Mississippi Valley Title, to correct and/or cure title problems." (MVT Ex. 16). In conjunction with that action, the Title Companies also filed a *lis pendens* notice.[12] (Trial Tr. at 80).

33.     On October 26, 2009, Chris Evans filed a voluntary petition under chapter 7 of the United States Bankruptcy Code in Case No. 09-03763-NPO. Derek A. Henderson was appointed the chapter 7 trustee (the "Trustee").

34.     In the Chancery Court Action, a Clerk's Entry of Default was entered against

---

[12] MISS. CODE ANN. § 11-47-3. In Mississippi, the purpose of a *lis pendens* is to give notice to the world of an alleged claim on land. Hooker v. Greer, 81 So. 3d 1103, 1109 (Miss. 2012).

Woodgreen Development on November 9, 2009, and against Brashear Heath on November 16, 2009.

35.     FSB submitted a title insurance claim to the Title Companies under the Twin City Policy on November 10, 2009 (Stip. 58, FSB Ex. 18).  The value of FSB's lien on Tract TC-2B, as insured, was zero.

36.     From November 12, 2009, until January 14, 2010, Chris Evans filed voluntary petitions for relief under chapter 7 on behalf of numerous companies he controlled, referred to as the "Related Entities."  The Trustee was appointed the chapter 7 trustee for each of these Related Entities.  In a series of orders, the Court consolidated the bankruptcy cases of the Related Entities for joint administration with the main bankruptcy case of Chris Evans (Bankr. Dkt. 161, 298 & 513).

37.     Of particular relevance to the Adversary are the chapter 7 petitions for relief filed by Chris Evans on behalf of the following Related Entities:  Twin City on November 19, 2009 (Case No. 09-04091-NPO); Woodgreen Development on November 20 , 2009 (Case No. 09-04120-NPO); and Brashear Heath on December 22, 2009 (Case No. 09-04494-NPO).

38.     The filing of the chapter 7 petition by Woodgreen Development on November 20, 2009, resulted in an automatic stay of the Chancery Court Action.

**Adversary**

39.     The Trustee initiated the Adversary by filing the Complaint (Adv. Dkt. 1) on January 15, 2010, followed closely by the First Amended Complaint (the "Complaint") (Adv. Dkt. 3) on January 18, 2010.  In the Complaint, the Trustee asked the Court to determine the validity, extent, and priority of liens on multiple tracts of real property.  The Trustee sued the Title Companies and FSB, as well as other lenders.  FSB filed the Cross-claims, in which it asserted the following four causes of action against the Title Companies:

      Count I:   Breach of Contract
      Count II:  Breach of Obligation of Good Faith and Fair Dealing in Claims Handling
      Count III: Negligence, Including Negligent Supervision and Retention
      Count IV: Aiding and Abetting

**Title Resolution Agreement**

40.     The Title Companies decided to purchase the Woodgreen Property (including Tracts 10E and 10O), and Tract TC-2B, and pay the outstanding principal and interest owed on the loans funded by the Tract 9 Lenders who had perfected first liens (including Merchants and Farmers Bank, and First Tennessee).  After the cancellation of the deeds of trust by the Tract 9 Lenders, the Title Companies arranged for the conveyance of the properties to the lenders who held second lien positions (including First Alliance Bank and Bank of Bartlett).  Because the Title Companies

concluded that FSB's lien was third in line, the Title Resolution Agreement did not include any specific provision to resolve FSB's loss.

41.     On April 17, 2010, the Title Companies and the Trustee entered into a Title Resolution Agreement for the purchase of the Woodgreen Property, as well as for other real estate, from the bankruptcy estates of the Related Entities.[13] (Bankr. Dkt. 552).

42.     On April 18, 2010, the Trustee filed a Motion to Approve Title Resolution Agreement, Including (I) Conditional Sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II) Recognition of Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims, (IV) Resolution of Certain Litigation, and (V) Other Relief in the main bankruptcy case of Chris Evans (the "Motion for TRA Approval") (Bankr. Dkt. 552).

## Payment by the Title Companies

43.     The Title Companies concluded that the value of FSB's liens, as insured, was zero, and that the title defects were incurable. (Stip. 61). They decided to pay FSB's claims under ¶ 8(b) of the Policies, determined by the fair market value of Tracts 10E and 10O and of Tract TC-2B, both as of the dates the claims were made by FSB on September 25, 2009, and November 10, 2009, respectively, and the date the payments were made by the Title Companies on May 6, 2010.

44.     On May 6, 2010, the Title Companies paid FSB $460,000.00 under the Brashear Heath Policy and another $460,000.00 under the Twin City Policy. (Stip. 62-63; MVT Exs. 40-41). Because of a decline in the fair market value of Tracts 10E and 10O, and in Tract TC-2B, between the time the loans were made and the dates FSB submitted its claims to the Title Companies, these payments covered only about one-half of FSB's loan losses. FSB contends that these payments were insufficient to indemnify it for its losses as insured in the Policies.

45.     FSB accepted the Title Companies' payments of their claims under a reservation of rights to assert claims against them arising out of the Brashear Heath Policy and the Twin City Policy. (Stip. 62-63; FSB Ex. 19).

## Title Resolution Order

46.     Objections and responses to the Motion for TRA Approval were filed by various lenders, including the Objection to Motion to Approve Title Resolution Agreement, Including (1) Conditional Sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II) Recognition of Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims,

---

[13] As stated previously, the Trustee was appointed the case trustee in each of the Related Cases.

(IV) Resolution of Certain Litigation, and (V) Other Relief [Dkt. #552] (Bankr. Dkt. 617) filed by FSB.

47.     The Trustee resolved all of the objections, and on May 21, 2010, this Court entered an Order Granting Motion to Approve Title Resolution Agreement, Including (I) Conditional Sale of Property Free and Clear of Liens, Interests, Encumbrances and Claims, (II) Recognition of Equitable Liens, (III) Certain Distributions in Respect of Certain Unsecured Claims, (IV) Resolution of Certain Litigation, and (V) Other Relief in the main bankruptcy case of Chris Evans (the "Title Resolution Order") (Bankr. Dkt. 683).

48.     The Trustee on July 30, 2010, filed a Motion to Approve Trustee's Sale of Tract 1G and Tracts 10A Through 10Q Free and Clear of All Liens, Claims and Interest as Contemplated by the Title Resolution Order (the "Sale Motion") (Bankr. Dkt. 812).

49.     No objection or response to the Sale Motion was filed.

50.     On August 11, 2010, the Court approved the Sale Motion, including the sale of Tract 10E by the Trustee to the Title Companies (Bankr. Dkt. 823).

51.     On August 18, 2010, the Title Companies, through their subsidiary, Mississippi Real Estate Dispositions, LLC ("MRED"), executed deeds of conveyance.[14] One of these deeds conveyed Tract 10E to First Alliance Bank.

52.     Woodgreen Development conveyed the lots to MRED by virtue of special warranty deeds filed in the DeSoto County Chancery Clerk's Office on August 20, 2010.

**Motions and Cross-Motion for Partial Summary Judgment**

53.     Three partial summary judgment motions, and one cross-motion for summary judgment, were filed by the parties in the Adversary. The Court's rulings on these motions lessened the length and complexity of the Trial.

---

[14] Although MRED did not own the lots before conveying them, Mississippi recognizes the doctrine of after-acquired doctrine. MISS. CODE ANN. § 89-1-39. Under the after-acquired title doctrine, the deeds conveyed title to the Woodgreen Banks immediately upon MRED's acquisition of the lots on August 20, 2010. Butler v. City of Europa, 725 So. 2d 158, 160 (Miss. 1998).

**Contract Opinion**

54.     FSB filed the Motion of First Security Bank for Partial Summary Judgment (Adv. Dkt. 148).  The Title Companies filed the Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Response in Opposition to First Security Bank's Motion for Partial Summary Judgment and Cross-Motion for Partial Summary Judgment (Adv. Dkt. 210).  The gist of the legal dispute presented before the Court was the appropriate date for the valuation of FSB's liens.

55.     In the Memorandum Opinion and Order on Motion of First Security Bank for Partial Summary Judgment and Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Cross-Motion for Partial Summary Judgment (the "Contract Opinion") (Adv. Dkt. 388), the Court found that the Title Companies had paid the full measure of losses it owed FSB under the express provisions of the Policies when it paid FSB the value of its liens at the time FSB submitted its claims.  The Court awarded summary judgment to the Title Companies on FSB's breach of contract claims and, consequently, denied FSB summary judgment on those same claims.

**Tort Opinion I**

56.     The Title Companies filed the Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Partial Summary Judgment.  (Adv. Dkt. 301).

57.     In the Memorandum Opinion and Order on Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Partial Summary Judgment (the "Tort Opinion I") (Adv. Dkt. 389), the Court granted the Title Companies summary judgment on FSB's claims for (1) negligent failure to audit, monitor, or supervise Charles Evans, (2) negligent retention of Charles Evans, and (3) civil aiding and abetting.

**Tort Opinion II**

58.     The Title Companies filed the Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Summary Judgment on Insurance Contract Claims of Patriot Bank, First Alliance Bank, First State Bank and OmniBank [sic][15] (Adv. Dkt. 318).

59.     In its Memorandum Opinion and Order on Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Motion for Summary Judgment

---

[15] Because of a scrivener's error, the caption names Patriot Bank, First Alliance Bank, First State Bank, and OmniBank when it should refer to FSB and Holmes County Bank.

on Insurance Contract Claims of Patriot Bank, First Alliance Bank, First State Bank and OmniBank [sic] (the "Tort Opinion II") (Adv. Dkt. 392), the Court ruled that the Title Companies were entitled to partial summary judgment on FSB's bad faith claims. The Court also ruled that the Title Companies were not entitled to summary judgment on FSB's claim for breach of the duty of good faith and fair dealing.

**Trial of Remaining Claims**

60.     As a result of multiple settlements and concessions among the parties,[16] the only claims in the Adversary that remain in dispute are those asserted against the Title Companies by FSB, First Alliance, Patriot, and First State. The consolidated Pretrial Order (Adv. Dkt. 444) submitted by the parties was approved by the Court on February 13, 2012.

61.     The Trial of FSB's claims on the issue of liability took place on February 29, 2012.

62.     At the conclusion of the Trial, the parties submitted the following post-trial briefs: the Post-Trial Brief (Adv. Dkt. 485) filed by the Title Companies on March 21, 2012, and First Security Bank's Post-Trial Brief (Adv. Dkt. 486) filed by FSB on March 21, 2012. Then, on April 4, 2012, the Title Companies filed the Title Companies' Response to Post-Trial Briefs Filed by the Banks (Adv. Dkt. 488), and FSB filed First Security Bank's Response to the Post-Trial Brief [#485] Filed by the Title Insurance Companies (Adv. Dkt. 489).

63.     In the Adversary, FSB seeks damages from the Title Companies in the amount of $781,293.00, based on the difference between the face amount of the Policies ($1,701,293.00) and the partial payments ($920,000.00) made by the Title Companies. FSB also seeks extra-contractual

---

[16] By agreement of the parties, an Order Dismissing Certain Claims (Adv. Dkt. 118) was entered on July 13, 2010, which dismissed all of the Trustee's claims in the Adversary. The voluntary dismissal of The Trustee's claims did not affect any of the cross-claims against the Title Companies asserted by the lenders. A majority of these lenders then voluntarily dismissed their cross-claims, as reflected in the following orders and stipulations, some of which were filed and/or entered after the Trial: Agreed Order (Adv. Dkt. 261), entered on June 13, 2011, dismissing the cross-claim of BankFirst Financial Services; Agreed Order (Adv. Dkt. 293), entered on July 26, 2011, dismissing the cross-claim of Guaranty Bank and Trust Company; Agreed Order Referring BankPlus' Claims to Arbitration (Adv. Dkt. 425), entered on January 13, 2012, referring the claims of BankPlus to arbitration; Stipulation of Dismissal with Prejudice (Adv. Dkt. 462), filed on February 23, 2012, dismissing the cross-claims of Merchants & Farmers Bank; Stipulation of Dismissal without Prejudice (Adv. Dkt. 470), filed on February 27, 2012, dismissing the cross-claim of OmniBank; and the Stipulation of Dismissal with Prejudice (Adv. Dkt. 480), filed on March 7, 2012, dismissing all claims by State Bank and Trust Company.

damages, costs, and attorney's fees.[17]

## Discussion

It is undisputed that Brashear Heath and Twin City defaulted on the loans secured by the deeds of trust held by FSB, and that FSB's first priority liens on Tracts 10E and 10O and on Tract TC-2B were not as they were insured in the Policies.   The crux of the parties' dispute is whether the Title Companies breached their implied duty to act in good faith in attempting to establish the liens held by FSB, as insured.   The Title Companies contend that they attempted to cure the defects in good faith and that the payments they made to FSB fully satisfied their indemnity obligations under the Policies.   In contrast, FSB argues that the Title Companies' attempt to cure    because there was no possibility that a cure would succeed    was "illusory" and violated the requirement of Mississippi law that the Title Companies perform their indemnity obligations pursuant to a duty of good faith and fair dealing.   FSB argues that their attempt to cure served no purpose other than to reduce their liability by allowing them to benefit from the "unsuccessful cure" provision in ¶ 8(b) of the Policies, which, in turn, allowed them to use a valuation date for payment of their claims that was advantageous to them and detrimental to FSB.   According to FSB, the Title Companies should have paid them the loan amount in the Policies.

## A.    Judicial Estoppel

Before turning to the merits of FSB's contract claim, the Court must address the Title Companies' request that the Court invoke the equitable doctrine of judicial estoppel to preclude

---

[17] As mentioned previously, the Trial was bifurcated into two phases.  Here, in Phase One, the Court considers only the issues of liability. The facts regarding the amount of damages claimed by the FSB are provided in the Opinion as background information only.

FSB from contradicting its alleged earlier position "that the Title Companies acted pursuant to their rights under paragraph 5 of the FSB Policies" when the Title Companies paid FSB under ¶ 8(b) of the Policies. (MVT Post-trial Br. at 30). FSB should not be allowed to contradict itself, say the Title Companies, by asserting at Trial "that the manner in which the Title Companies performed the authorized acts was a supposed breach of the duty of good faith and fair dealing." (MVT Post-trial Br. at 33). By requiring FSB to maintain its alleged earlier position, the Title Companies seek a finding that their actions were indisputably authorized by the Policies. This finding would be tantamount to a determination on the merits in favor of the Title Companies.

According to the Title Companies, FSB was motivated to change its purported position after the Court issued its opinion in a separate, but related adversary proceeding, known as Evans I. *See* Mem. Op. & Order on Cross-Cls. of Miss. Valley Title Ins. Co., Old Republic Nat'l Title Ins. Co., Bank of Forest, & Heritage Banking Group Related to Tract IV Phase One: Liability & Uncontested Damages, G&B Investments, Inc. v. Henderson (In re Evans) ("Evans I"), Adv. Case No. 10-00040-NPO, Adv. Dkt. 446. In Evans I, the Court held that the Title Companies had underpaid Heritage Banking Group under ¶ 8(a) by valuing the insured title as of the date of a hypothetical foreclosure sale, rather than as of the date of its actual loss. The Court reached this result after finding an ambiguity in the valuation date under ¶ 8(a). The Court in Evans I rejected the Title Companies' argument that ¶ 8(b), rather than ¶ 8(a), applied because of insufficient credible evidence that the Title Companies had attempted to cure the title defects under ¶ 5. If ¶ 8(b) had applied, it would have resolved the ambiguity in ¶ 8(a) by providing a date certain for valuing the insured title as of the date Heritage Banking Group submitted its claim or the date it was paid, both of which were

much later than the date under ¶ 8(a).  The timing of FSB's purported switch, according to the Title Companies, demonstrates FSB's ulterior motive to bootstrap Evans I in order to obtain the earliest date possible for measuring its losses under the Policies, that is, a date well before the real estate market in general declined and specifically before the value of Tracts 10E and 10O and Tract TC-2B declined.

Judicial estoppel is an equitable doctrine that prevents a party who asserted a position in the same or earlier proceeding from asserting an inconsistent position.[18]  Love v. Tyson Foods, Inc., 677 F.3d 258, 261 (5th Cir. 2012).  The doctrine serves to "prevent[] parties from playing fast and loose with the courts to suit the exigencies of self interest."  In re Coastal Plains, Inc., 179 F.3d 197, 205 (5th Cir. 1999).  The United States Supreme Court has explained that the purpose of the doctrine is to protect the integrity of the judicial system by reducing the risk of inconsistent decisions.  New Hampshire v. Maine, 532 U.S. 742, 751 (2001).

In assessing whether judicial estoppel should apply, the Fifth Circuit Court of Appeals primarily considers whether three elements are present: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently."  Reed v. City of Arlington, 650 F.3d 571, 573-74 (5th Cir. 2011).  These factors, however, are not exclusive in determining the applicability of judicial estoppel because numerous considerations "may inform the doctrine's application in specific factual contexts."  New Hampshire, 532 U.S. at 751.

---

[18] Because the Title Companies' contention relates to the integrity of the federal judicial process, the Court applies federal, rather than state law to the issue of judicial estoppel.  Hall v. GE Plastic Pac. PTE Ltd., 327 F.3d 391, 395 (5th Cir. 2003).

### 1.    FSB's Alleged Prior Position

The Title Companies maintain that FSB's alleged prior assertion that the Title Companies "genuinely" attempted to cure contradicts the position that FSB previously asserted in its: (1) Cross-claims, (2) summary judgment pleadings, and (3) answers to requests for admissions.   These purported assertions are summarized below.

### a.    Cross-claims

As to the Cross-claims, the Title Companies primarily rely on three paragraphs in which FSB sought benefits under ¶ 8(b), as follows:

> Sub-section (b) of Section 8 of the policy provides additional *rights* to the policyholder in the event the Company seeks to limit the cost of its liability under the policy of insurance by pursuing *its* rights under Section 5 to attempt to clear the title through litigation with third parties.
>
> . . . .
>
> The amounts due under the terms of Section 8(a) already exceed the Amounts of Insurance plus the 10% increase mandated by Section 8(b)(i).
>
> . . . .
>
> The [Title] Companies are in breach of the [Policies] and remain indebted to [FSB] under the terms of said contracts of insurance in the . . . face amount of the [Policies] plus 10% as required by Section 8(b)(i).

(Cross-cls., Adv. Dkt. 135, at 11-12,14-15 & 18).

### b.    Summary Judgment Pleadings

The Title Companies further maintain that similar admissions appear in FSB's summary judgment pleadings.   In the Motion for Summary Judgment, FSB alleged the following:

> Pursuant to the contractual rights of the Title Companies under Paragraph 5(b), Page 4, of the contracts of insurance, the Title Companies attempted to cure the defects.

> The Title Insurance Companies, pursuant to their contractual right under Paragraph 5(b), page 4, of the [Policies], attempted to <u>cure</u> the defects in the Brashear Heath and Twin City Commons titles and the FSB liens thereon.   The Title Insurance Companies hired Attorney Gene D. Berry, of Madison, Mississippi, to file suit on behalf of First Security Bank against two Evans entities, Woodgreen Development Corporation and Brashear Heath, LLC, in an attempt to cure the title defects.

(FSB Summ. J. Mtn., Adv. Dkt. 148, at 2 & Ex. 16, at 4).   Similarly, in FSB's Brief in Support of

Motion for Summary Judgment, FSB alleged as follows:

> Efforts by the [Title] Companies to "cure" the title defects were unsuccessful.
>
> . . . .
>
> Pursuant to the rights afforded by Paragraph 5(b), page 4, of the [Policies], the Title Insurance Companies attempted to cure the defects.   The Title Companies hired Attorney Gene D. Berry of Madison, Mississippi, to file suit in Chancery Court against two Evans entities, Woodgreen Development Corporation and Brashear Heath, LLC.   The attempt by the Title Insurance Companies to cure the title defects was unsuccessful and the FSB liens insured by the Companies were ultimately determined to be worthless.
>
> . . . .
>
> Because the Title Insurance Company exercised its right under Section 5(b) of the policy to attempt to 'cure' the defects in the insured liens, and was unable to do so, the Face Amount of both policies are automatically increased by 10% by Section 8(b)(i) of the policy.
>
> . . . .
>
> Sub-section (b) of Section 8 of the policy provides <u>additional rights</u> to the policyholder in the event the Company seeks to limit the cost of its liability under the policy of insurance by pursuing <u>its rights</u> under Section 5 to attempt to clear the title through litigation with third parties.   Section 8(b)(i), p. 5, of the Policy, provides in the event the Company is unsuccessful in establishing the Title or the lien of the Insured Mortgage through such litigation, the face Amount of Insurance "**shall** be increased by 10%."

(FSB Br. in Supp. of Summ. J. Mot., Adv. Dkt. 149, at 3, 6, 13, & 14).  Also, in FSB's Response

to Cross-Motion of Title Companies for Summary Judgment, FSB asserted:

> Section 8(b)(i) of the Unsuccessful Cure Provision, provides a 10% increase in the Face Amount of the insurance in the event the Insurance Company exercises its right to attempt to "cure" the title under Section 5.  Section 8(b)(i) is *mandatory*.
>
> . . . .
>
> The <u>actual loss</u> incurred by FSB . . . exceeds the Face Amount of Insurance including the 10% increase mandated by Section 8(b)(i) of the Unsuccessful Cure Provision.

(FSB Resp. to Title Cos. Cross-Mot. for Summ. J., Adv. Dkt. 228, at 3 & 15).

### c.   Response to Request for Admission

Finally, according to the Title Companies, FSB admitted the following request for admission:

> <u>REQUEST NO. 3</u>: Admit that the Title Companies attempted to cure the title defects on the property, commonly referred to as Tract 10-O & 10E and Tract TC-2B, intended as collateral under notes held by First Security Bank.
>
> <u>RESPONSE</u>: Admitted.

(MVT Ex. 76).  Read together, these statements by FSB may be summarized as follows: (1) that the Title Companies attempted to cure the defects in the insured liens pursuant to ¶ 5(b) in the Policies; (2) that the Title Companies were unsuccessful in establishing FSB's liens as insured; and (3) that FSB's losses exceeded the 10% increase under ¶ 8(b)(i) that they were entitled to received as a result of the Title Companies' unsuccessful attempt.

### 2.   Inconsistency of Alleged Prior Position

The Court finds that the Title Companies have not satisfied the clearly-inconsistent element of judicial estoppel.  At Trial, FSB challenged the manner in which the Title Companies' attempted to cure the defects in the liens.  FSB did not challenge whether the Title Companies had actually attempted to cure the defects.  None of the many statements relied upon by the Title Companies as evidence of FSB's alleged prior inconsistency in the Adversary amounts to an admission by FSB that

the Title Companies attempted to cure the defects *in a manner consistent with the implied duty of good faith and fair dealing.* The Title Companies describe FSB's argument as an allegation that they failed to "genuinely" attempt to cure the lien defects. The Title Companies cannot eliminate the distinction between an attempt that complied with the implied duty of good faith and fair dealing and an attempt that did not, by using quotation marks around the term "genuinely" to set it apart from "attempt to cure."

This finding that FSB has not taken a plainly inconsistent position in the Adversary is in line with the purpose of the doctrine of judicial estoppel. FSB's claim that the Title Companies breached their implied duty in the Policies to attempt to cure the defects in good faith does not present a risk of inconsistent court determinations. Accordingly, the Court finds that FSB is not judicially estopped from claiming that the Title Companies breached the implied duty of good faith and fair dealing.

### 3.    Other Factors

Having examined the prior statements by FSB and having concluded that FSB's earlier positions are not clearly inconsistent with the position it asserted at Trial, the Court does not need to consider the two remaining elements of judicial estoppel, including whether FSB succeeded in the prior proceeding and whether FSB acted inadvertently or had an ulterior motive in changing its position. The Court, however, notes the presence of two other factors that militate against application of judicial estoppel.

Because the prior proceeding in which FSB asserted the alleged inconsistent statements occurred at different stages of the same litigation, there is a potential conflict between Rule

7008(d)(3) of the Federal Rules of Bankruptcy Procedure[19] and judicial estoppel.  Rule 7008(d)(3)

permits a party to "state as many separate claims or defenses as it has, regardless of consistency."

Fed. R. Bankr. P. 7008(d)(3).  The doctrine of judicial estoppel contemplates something other than

this permissible practice.  *See* Allen v. Zurich Ins. Co., 667 F.2d 1162, 1167 (4th Cir. 1982).

Moreover, in the bankruptcy context, the issue of judicial estoppel is frequently raised when

a debtor fails to disclose the existence of a claim or a lawsuit as an asset in his bankruptcy case.  *See,*

*e.g.,* Kane v. Nat'l Union Fire Ins. Co., 535 F.3d 380 (5th Cir. 2008); Superior Crewboats, Inc. v.

Primary P&I Underwriters (In re Superior Crewboats, Inc.), 374 F.3d 330, 333 (5th Cir. 2004).  The

issue here arises differently because it does not involve a debtor's deliberate failure to meet his

disclosure obligations.  Unlike bankruptcy cases involving hidden assets, there is no indication that

the integrity of the bankruptcy process is at risk of being undermined by FSB.

## B.      Good Faith and Fair Dealing[20]

Having determined that judicial estoppel does not apply, the Court turns to the merits of

FSB's claim for breach of good faith and fair dealing.  The Court does not tread on new ground in

its analysis of Mississippi law on the duty of good faith and fair dealing.  The Court engaged in a

similar analysis in Evans II, and some of that discussion is repeated here.

Every contract entered into in Mississippi contains an implied-in-law duty of good faith and

fair dealing.  Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992); *see also* Wood v. Lucy, Lady

Duff-Gordon, 118 N.E. 214, 214 (N.Y. 1917) (agreement that did not recite a particular duty was

---

[19] Federal Rule Bankruptcy Procedure 7003(d)(3) incorporates by reference Rule 8(d)(3) of the Federal Rules of Civil Procedure.

[20] The parties agree that Mississippi law governs their rights and liabilities. Erie R.R. v. Tompkins, 304 U.S. 64 (1938).

"'instinct with an obligation' imperfectly expressed"). The duty of good faith attaches to the performance and enforcement of a contract. Davis v. GMAC, 406 F. Supp. 2d 698, 701 (N.D. Miss. 2005); Hill v. Galaxy Telecom LP, 176 F. Supp. 2d 636, 642 (N.D. Miss. 2001). The Mississippi Supreme Court has held that the duty of good faith and fair dealing applies to insurance contracts. See Andrew Jackson Life Ins. Co. v. Williams, 566 So. 2d 1172, 1188-89 (Miss. 1990).

> The relationship between the insurer and the insured arises by contract, and under Mississippi law, one of the reciprocal legal duties between the insurer and the insured is that of good faith and fair dealing, a duty that exists in the performance of every contract under Mississippi law.

Owen v. Universal Underwriters Ins. Co., 252 F. Supp. 2d 324, 328 (S.D. Miss. 2003).

As explained by the Mississippi Supreme Court, "[g]ood faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with the justified expectations of the other party." Cenac, 609 So. 2d at 1272. The duty of good faith and fair dealing, because it is based on fundamental notions of fairness, necessarily varies in scope according to the nature of the agreement. Robert S. Summers, "Good Fath" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195, 206 (1968). "[A]ny but the most vacuous general definition of good faith will . . . fail to cover all the many and varied specific meanings that it is possible to assign to the phrase." Id.

The duty of good faith and fair dealing prohibits a party from doing any act that impairs the right of the other party from receiving the benefits that flow from their agreement. Cothern v. Vickers, Inc., 759 So. 2d 1241, 1248 (Miss. 2000). The covenant imposes a duty not to interfere with the other party's performance and even, in certain circumstances, "to take some affirmative steps to cooperate in achieving these goals." Cenac, 609 So. 2d at 1272. A breach of the duty of good faith provides the injured party with a cause of action in addition to his claim for breach of

contract.  A breach of the duty occurs where there is some violation by a contracting party of standards of decency, fairness, or reasonableness.  Cenac, 609 So. 2d at 1272 (citing RESTATEMENT (SECOND) OF CONTRACTS § 205, 100 (1979)).

In Mississippi, malicious intent is not a required element of contractual bad faith.  *See, e.g.*, Ferrara v. Walters, 919 So. 2d 876, 884 (Miss. 2005) (finding a breach of the duty by the sellers of real property on the ground they had failed to cure a defect in the chain of title within a reasonable time period); Entergy Miss., Inc. v. TCA Cable Partners, 22 So. 3d 284, 288 n.2 (Miss. Ct. App. 2009) (finding a breach of the duty of good faith on the ground that a cable television company had failed to give the other contracting party a copy of the liability insurance policy that it had agreed to purchase).  On the other hand, a breach of good faith and fair dealing requires more than bad judgment or negligence.  There must also be evidence of "some interested or sinister motive." Bailey v. Bailey, 724 So. 2d 335, 338  (Miss. 1998).

FSB maintains that the Title Companies breached the implied duty of good faith and fair dealing in two ways:  First, their attempt to establish FSB's liens, as they were insured, was futile. Second, their actions violated the "agreed purpose" of the Policies and FSB's "justified expectations." (FSB Post-trial Br. at 3, 18).

### 1.  The Title Companies' "Attempt to Cure"

FSB's first argument is that it was not possible for the Title Companies to establish its liens, as they were insured, on any of the properties because of the presence of two prior liens.  (FSB Post-trial Br. at 14).  FSB points to the trial testimony of Partin, as follows:

> Q.     [Y]ou could not establish the title as a first lien for all three could you?
> A.     No.
> . . . .
> Q.     [T]hey couldn't all three be first priority liens as insured could they?

A.     No.

Q.     And the title insurance companies knew that?  They knew there can't be three first priority liens on the same tract of property didn't they?

A.     Yes.

(Trial Tr. at 61, 88).

FSB's argument rests on two assumptions.  First, it assumes that the Title Companies knew the priority of FSB's liens at the time they attempted to establish its liens.  Second, it assumes that the Title Companies were wholly unsuccessful in their efforts to establish FSB's liens. The Court finds that both assumptions are unsupported in the record.

First, it took months for the Title Companies to investigate and determine the various interests in the Woodgreen Property, including Tracts 10E and 10O, and Tract TC-2B.  No evidence was presented at Trial that suggested that the Title Companies knew in advance that the steps they took to attempt to establish FSB's liens as they were insured would be futile in the end.  Indeed, Partin testified that the Title Companies did not know the validity, extent, or priority of FSB's liens on Tracts 10E and 10O or Tract TC-2B until after entering into the Title Resolution Agreement with the Trustee.  (Trial Tr. at 91-92, 95-96).  As it turned out, FSB's liens were third in line, but the Title Companies did not know the low ranking of FSB's liens until much later.  FSB insists that the Title Companies must have had notice of the ranking of its liens from the bald fact that the Title Companies issued title insurance policies to the same lenders who held the prior liens.  Regardless, the Title Companies had no way of knowing the validity, extent, or priority of all the liens on all the properties.  The complexity of the fraudulent scheme undertaken by the Evans Brothers cannot be overstated.  The Title Companies could not make any reasonable assumptions about the nature of the interests of the various lenders in any of the real properties involved in transactions with the Evans Brothers.  The Title Companies certainly did not have available to them any of the neatly

Page 25 of  31

drawn surveys of the real properties showing the boundaries of the overlapping interests of the various lenders. *See, e.g.*, Bankr. Dkt. 552-1 at 28.

Second, the evidence at Trial established that the Title Companies succeeded in accomplishing some of their stated goals under ¶ 5. The Title Companies retained Berry to represent FSB in a lawsuit to establish legal title to Tracts 10E and 10O in the name of the borrower, Brashear Heath. (Trial Tr. at 101-05; FSB Ex. 14, MVT Ex. 18). This lawsuit was a reasonable and fair first step in establishing the validity, extent, and priority of FSB's lien on Tracts 10E and 10O. Berry testified that he filed it in good faith. FSB's criticism of the Title Companies for failing to file a similar curative lawsuit with regard to Tracts TC-2B is unfounded. The borrower, Twin City, unlike Brashear Heath, did actually own the property subject to FSB's deed of trust. The sole defect in FSB's lien on Tract TC-2B was its priority because it was junior in rank to two other liens.

In addition to the aforementioned lawsuit filed by Berry regarding Tracts 10E and 10O, Partin testified at Trial that the Title Companies took the following actions under ¶ 5:

1.      filed a lawsuit seeking injunctive relief against the Evans Brothers and FSB's borrowers to prevent further conveyances and fraud (Trial Tr. at 102-03; MVT Exs. 16-18);

2.      retained the law firm of McGlinchey Stafford LLC[21] to defend FSB (and other lenders) in Evans I (Trial Tr. at 104); and

3.      negotiated the Title Resolution Agreement which could have resulted in sales proceeds from Tract TC-2B flowing to FSB (Trial Tr. at 104).

The Court agrees with the Title Companies that the initiation of the lawsuit for injunctive relief, prefaced by the filing of the *lis pendens* notice, and the negotiation of the Title Resolution Agreement are both curative actions under ¶ 5. The Court also finds that the retention of the law

---

[21] McGlinchey Stafford LLC represented FSB only for a brief period of time.

Page 26 of 31

firm of McGlinchey Stafford PLLC squarely fits within the "duty to defend" provision in ¶ 5(a) of the Policies.

FSB contends that "from day one, FSB's liens could never be cured." (FSB Post-trial Br. at 16). That contention is most probably true. Regardless, the appropriate time frame for measuring the actions of the Title Companies was at the time they took the actions and not now when the parties have the benefit of hindsight to determine the validity, extent, and priority of FSB's liens. *See, e.g.*, <u>Roesler v. TIG Ins. Co.</u>, 251 Fed. Appx. 489, 498 (10th Cir. 2007) (unpublished) (noting that duty of good faith and fair dealing exists during the period of time an insurance claim is being reviewed).

FSB's argument contradicts the plain language of ¶ 8(b) of the FSB Policies. Paragraph 8(b) must be read in conjunction with ¶ 9(a). Under ¶ 9(a) of the Policies, "[i]f the Company establishes the Title, or removes the alleged defect, lien or encumbrances, . . . all as insured, . . . it shall have fully performed its obligations . . . and shall not be liable for any loss or damage caused to the Insured." (FSB Ex. 1-2). Paragraph 8(b) comes into play only if the Title Companies pursue their rights under ¶ 5, but are unsuccessful. In that event, the insured's loss or damage under ¶ 8(b) may be "determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid." (FSB Exs. 1-2)

In summary, ¶ 5 permits the Title Companies to chose at least three separate actions: (1) "provide for the defense of an insured in litigation;" (2) "institute and prosecute any action or proceeding . . . that in its opinion may be necessary or desirable to establish the Title or the lien; or (3) "institute and prosecute any action or proceeding . . . that in its opinion may be necessary or desirable . . . to prevent or reduce loss or damage to the Insured." (FSB Exs. 1-2). If the Title

Page 27 of 31

Companies had succeeded in removing the defects, then there is no liability ¶ 9.  If they did not succeed, then ¶ 8(b) governed the extent of their liability, including a later valuation date for payment of FSB's claims.  Because of a recent decline in the real estate market, a later valuation date was beneficial to the Title Companies when previously, it would have been more beneficial to FSB.

FSB's argument that any cure attempt, to be fair and reasonable, must have been narrowly tailored to establish FSB liens as first in line, would render ¶ 8(b) superfluous because it would never be triggered if the Title Companies were ultimately unsuccessful or unable to cure the defects.  In other words, FSB's reading of ¶ 8(b) would require the Title Companies to "accomplish"  rather than "pursue"  their rights under ¶ 5, an interpretation that contradicts the clear meaning of the Policies.

### 2.      The Agreed Purpose of the Policies and FSB's Justified Expectations

FSB's second argument is that the Title Companies violated the justified expectations of FSB and the agreed purpose of the Policies.  In support of this argument, FSB returns to its contention that the Title Companies' "attempt[] to cure incurable and worthless liens" in pursuit of ¶ 5 were futile.  (FSB Post-trial Br. at 4).   FSB contends that "[j]ust telling the insured that an 'attempt to cure' is being made, followed by mere 'hocus pocus'  where the only result is vastly reduced claims payments to the insured   violates the duty of good faith and fair dealing, the justified expectations of FSB and the agreed purpose of the contract of indemnity." (FSB Post-trial Br. at 13).

As stated previously, the Court has found that the evidence at Trial showed that the Title Companies' pursuit of its rights under ¶ 5 were not altogether pointless but did accomplish some curative steps.  Moreover, the Court has found that there was no evidence at Trial that the Title Companies pursued actions that they knew *at that time* were futile.  To the contrary, Partin testified

at Trial that ¶ 8(b) had no influence on his decision to assert the rights of the Title Companies under ¶ 5(b).  (Trial Tr. at 100, 105-07).

FSB complains that the actions of the Title Companies under ¶ 5(b) were not designed to reduce FSB's losses but to reduce the Title Companies own losses by invoking to its benefit the valuation date in ¶ 8(b).  (FSB Post-trial Br. at 2).  FSB insists that it was misled into believing that the Title Companies were working in FSB's best interests, as their insured.  Pressgrove, FSB's corporate representative at Trial, testified:

> Q.     Mr. Pressgrove, were you and First Security Bank under the impression that First Security Bank and the other banks defrauded by the Evans brothers and Mississippi Valley Insurance Company both stood to benefit if you could work together?
>
> A.     We were under that impression based on a letter we received from Mississippi Valley.

(Trial Tr. 45-46).

Paragraph 5, however, does not limit the Title Companies in the way urged by FSB, that is, ¶ 5 does not limit the Title Companies' actions solely to those that directly benefit its insured.  The point of the duty of good faith is to honor the reasonable expectations of the parties created by the express terms of the contract itself.  Using the figure of speech employed by FSB, "the implied covenant of good faith and fair dealing is [not] a magic wand . . . [and] may not be used as a subtler way to rewrite the parties' deal and decline to give effect to express contractual terms."  Flood v. Clearone Communs., Inc., 618 F.3d 1110, 1121 (10th Cir. 2010).  There is no language in ¶ 5 that limits its application to circumstances where there is a possible cure.  "No rule of construction requires or permits [the Court] to make a contract differing from that made by the parties themselves, or to enlarge an insurance company's obligations where the provisions of its policy are clear."

Leonard v. Nationwide Mut. Ins. Co., 499 F.3d 419, 429 (5th Cir. 2007) (citing State Auto. Mut. Ins. Co. of Columbus, Ohio v. Glover, 176 So. 2d 256, 258 (Miss. 1965)).

This Court reached the opposite conclusion in Evans II, finding that the Title Companies had breached the implied duty of good faith and fair dealing when they cured the title defects in a way that violated local land regulations. Although the Title Companies had technically cured the title defects, the lenders in Evans II received no benefit from the indemnity provisions of the Policies. Evans II is distinguishable from this matter because the Title Companies in Evans II knew about the existence of the local subdivision regulations when they conveyed the lots to the lenders.

### Conclusion

FSB does not dispute that the Title Companies treated its corporate representative with courtesy during the period of time they handled its title insurance claims. (Trial Tr. at 42). The implied duty of good faith and fair dealing, however, requires parties to perform their contractual obligations in a manner that is not only decent but that is also reasonable and fair. Cenac, 609 So. 2d at 1271. Nevertheless, FSB has failed to show that the Title Companies acted unreasonably or unfairly during the period of time they exercised their rights to attempt to establish FSB's liens as they had insured them.

In summary, the Court concludes that FSB is not judicially estopped from asserting its claim that the Title Companies breached the duty of good faith and fair dealing. The Court further concludes that the evidence presented by FSB at Trial was insufficient to support its claim. A final judgment incorporating the findings and conclusions set forth in this Opinion will not be entered until the final disposition of all matters in the Adversary, including the calculation of damages in Evans II. In that regard, the Court was informed at Trial by counsel for the parties that a settlement

may have been reached regarding the damages issue.  The Court will set a status conference to consider whether to schedule a hearing on damages.  If it appears that there may be a significant delay until the final disposition of all claims in the Adversary, the Court will consider at that time whether the entry of a separate final judgment is proper.

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated:  July 27, 2012