## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

      JON CHRISTOPHER EVANS,                 CASE NO. 09-03763-NPO

      DEBTOR.                               CHAPTER 7

DEREK A. HENDERSON, TRUSTEE FOR           PLAINTIFF
BANKRUPTCY ESTATE OF JON
CHRISTOPHER EVANS AND JOINTLY
ADMINISTERED RELATED CASES

VS.                            ADV. PROC. NO. 10-00005-NPO

COMMUNITY BANK OF MISSISSIPPI,          DEFENDANTS
ET AL.

## MEMORANDUM OPINION AND ORDER
## ON CROSS-CLAIMS OF FIRST ALLIANCE BANK,
## FIRST STATE BANK, AND PATRIOT BANK AGAINST
## MISSISSIPI VALLEY TITLE INSURANCE COMPANY AND
## OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
## RELATED TO THE WOODGREEN PROPERTY--PHASE TWO:  DAMAGES

    The liability and uncontested damages phase ("Phase One")[1] of the trial (the "Woodgreen Trial") of this adversary proceeding (the "Adversary") took place on February 21-22, 2012.  In Phase One of the Woodgreen Trial, the Court found that Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company (the "Title Companies") had breached the implied duty of good faith and fair dealing contained in the title insurance policies acquired by First Alliance Bank ("First Alliance"), First State Bank ("First State"), and Patriot Bank ("Patriot").  Together, First Alliance, First State, and Patriot are referred to as the Woodgreen Banks.  *See* Memorandum Opinion and Order on Cross-Claims of First State Bank,

---

[1] With the consent of the parties, the Court bifurcated the bench trial into two phases:  (1) liability and (2) damages.

First Alliance Bank, and Patriot Bank Against Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company Related to the Woodgreen Property—Phase One: Liability, *First Alliance Bank v. Mississippi Valley Title Insurance Company*, Adv. Proc. No. 10-00005-NPO, 2012 WL 2374237 (Bankr. S.D. Miss. June 22, 2012) (the "Liability Opinion") (Adv. Dkt. 490).[2]

The claims of the Woodgreen Banks, and the responses of the Title Companies, are asserted in the following pleadings: Crossclaim of Patriot Bank (Adv. Dkt. 177) filed by Patriot; Crossclaim of First Alliance Bank (Adv. Dkt. 178) filed by First Alliance; Amended Crossclaim of First State Bank (Adv. Dkt. 188) filed by First State; Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First Alliance Bank's Cross-Claim (Adv. Dkt. 212) filed by the Title Companies; Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to First State Bank's Amended Cross-Claim (Adv. Dkt. 213) filed by the Title Companies; and Mississippi Valley Title Insurance Company and Old Republic National Title Insurance Company's Amended Answer and Affirmative Defenses to Patriot Bank's Cross-Claim (Adv. Dkt. 217) filed by the Title Companies. The damages phase ("Phase Two") of the Woodgreen Trial took place on December 10-11, 2012. In Phase Two, William C. Brabec and Michael Scott Jones represented the Title Companies; William Liston, III and W. Lawrence Deas represented the Woodgreen Banks.

---

[2] Citations to docket entries in the Adversary are cited as "(Adv. Dkt. ____)"; and citations to docket entries in other adversary proceedings and bankruptcy cases are cited to the proceeding or case number first, and then to the docket number.

Prior to Phase Two of the Woodgreen Trial, the Woodgreen Banks filed a Motion *in Limine* to Exclude Opinions and Testimony of J. Walter Allen Filed by First Alliance Bank, First State Bank, and Patriot Bank (the "Motion *in Limine*") (Adv. Dkt. 512) and the Memorandum Brief in Support of Motion *in Limine* to Exclude Opinions and Testimony of J. Walter Allen Filed by First Alliance Bank, First State Bank, and Patriot Bank (Adv. Dkt. 513). The Title Companies filed the Title Companies' Response in Opposition to Motion *in Limine* to Exclude Opinions and Testimony of J. Walter Allen (Adv. Dkt. 519). The Court deferred ruling on the Motion *in Limine* until the Title Companies attempted to qualify J. Walter Allen ("Allen") as an expert during Phase Two of the Woodgreen Trial. When that time arrived, the Court denied the Motion *in Limine* from the bench, accepted Allen as an expert in real estate appraisals, and allowed the introduction into evidence of Allen's appraisal report (the "Allen Report") (MVT Ex. 84). The basis for the Court's denial of the Motion in *Limine* is discussed later in this Opinion.

On February 1, 2013, the Woodgreen Banks submitted the Memorandum Brief of the Woodgreen Banks on Issues Raised at Trial on Damages (Adv. Dkt. 527), and the Title Companies submitted the Title Companies' Post-Trial Brief Regarding Damages (Adv. Dkt. 528). Having considered the pleadings as well as the testimony, exhibits, and the arguments of counsel presented at Phase One and Phase Two of the Woodgreen Trial, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:[3]

---

[3] Specifically, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

# TABLE OF CONTENTS

JURISDICTION ................................................................................................................ 4

FACTS ............................................................................................................................... 5

DISCUSSION .................................................................................................................. 19

   A.   Whether the Woodgreen Banks bear the burden of proof ................................. 22

   B.   Whether "value" is an ambiguous term .......................................................... 30

   C.   Whether the Woodgreen Banks reasonably expected the defects ..................... 32

   D.   Whether the Woodgreen Banks sustained a loss .............................................. 34

   E.   Whether the Woodgreen Banks' appraisals show no loss in value ................... 35

   F.   Whether the Woodgreen Banks failed to mitigate their damages...................... 36

   G.   Whether Allen's valuation analysis is credible................................................ 37

       1.   Whether Allen actually appraised the six (6) lots ...................................... 40

       2.   Whether Allen's adjustments were speculative ......................................... 41

       3.   Whether Allen relied on unsupported costs ............................................... 42

       4.   Whether Allen failed to analyze the Henson sale ..................................... 42

   H.   Whether the Title Companies are entitled to a set off ..................................... 48

CONCLUSION................................................................................................................. 49

# JURISDICTION

The Court has jurisdiction over the parties to and the subject matter of this case pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (O).[4] Notice of Phase Two of the Woodgreen Trial was proper under the circumstances.

---

[4] This finding of core jurisdiction is undisputed.  *See* Amended Pretrial Order at 2 (Adv. Dkt. 515).  The United States Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), held that bankruptcy courts lack constitutional authority to enter a final judgment on a state-law, compulsory counterclaim that did not stem from the bankruptcy itself.  *See Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir. 2012) (suggesting a narrow interpretation of *Stern* in holding that *Stern* does not, *sub silentio*, reach so far as to render unconstitutional the statutory powers of federal magistrate judges).  In the event that a higher court disagrees that the Adversary involves "core" matters and/or otherwise determines that the Court lacks constitutional authority to enter a final judgment, the Court recommends that this Opinion be regarded as its proposed findings of fact and conclusions of law and further recommends that the District Court enter this Opinion as its own after due consideration, in accordance with 28 U.S.C. § 157(c)(1).

# FACTS[5]

Because the facts and history of this Adversary are unwieldy, the Court recounts only those facts and history that are pertinent to the damages issues. This Opinion assumes familiarity with the Court's Liability Opinion.

The Adversary involves 23.38 acres, or 1,018,433 square feet, of undeveloped land along Goodman Road in Southaven, DeSoto County, Mississippi. On August 5, 2004, the Woodgreen Development Corporation LLC, through Jon Christopher Evans ("Chris Evans"), purchased this property from James C. Henson and Cassandra E. Henson (the "Hensons") for $3.35 million. Since then, the property has become known as the Woodgreen Property.

**Woodgreen Property**

The Woodgreen Property is located on the north side of Goodman Road, approximately 1,965 feet east of where Goodman Road intersects Getwell Road. Its square shape is split in the middle by a drainage ditch that runs east to west. The ditch, in turn, runs into Nolehole Creek, which flows north to south along the eastern border of the Woodgreen Property. A separate branch of Nolehole Creek transverses the Woodgreen Property in an eastwardly direction. According to Allen, Nolehole Creek is "very deep, . . . very wide, [and] very formidable" and wide enough for a pick-up truck. (2 Trial Tr. at 32).[6] There is an awkward slope, so that the topography of the Woodgreen Property resembles a piece of paper folded in the middle with the

---

[5] Hereinafter, the trial exhibits of the Woodgreen Banks are cited as "(WB Ex. ____)"; and the trial exhibits of the Title Companies are cited as "(MVT Ex. ____)".

[6] Citations to the transcript of Phase One of the Woodgreen Trial are preceded by "Phase One". The transcript of Phase Two of the Woodgreen Trial is divided into two parts. The first transcript, which is a record of the proceedings that took place on December 10, 2012, is cited as "(1 Trial Tr. at ____)"; the second transcript, which is a record of the proceedings that took place on December 11, 2012, is cited as "(2 Trial Tr. at ____)".

highest elevation along Goodman Road and the lowest elevation near Nolehole Creek.   A contour map shows the severity of the elevation problem on both the northern and southern borders of the Woodgreen Property.   The ditch, creek, and slope present problems for the commercial development of the Woodgreen Property.   Allen described the Woodgreen Property as "below average functional utility."  (Allen Rep. at 48).

**Deeds of Trust**

On the empty promise that he would develop the Woodgreen Property into a commercial subdivision, Chris Evans obtained loans from the Woodgreen Banks on behalf of various entities he controlled.[7]   As part of his fraudulent scheme, Chris Evans arranged for a surveyor to prepare plats (the "Evans Plats") dividing the Woodgreen Property into seventeen (17) lots, each lot roughly one acre in size.   Copies of the Evans Plats are attached to the Liability Opinion as Appendices 2-A, 2-B, and 2-C.  Also attached to the Liability Opinion is Appendix 1, which is a survey of the Woodgreen Property depicting a subdivision of fifteen (15) lots, marked as Tracts 10A through 10O.  To secure the loans, Chris Evans granted the Woodgreen Banks deeds of trust on six (6) of the fifteen (15) lots.  These six (6) lots are Tracts 10E, 10F, 10G, 10H, 10J, and 10K.   In connection with the original loan transactions consummated in 2004 and 2005, the Woodgreen Banks obtained appraisals of the six (6) lots.   The values in those appraisals are shown in the following chart:

| Woodgreen Bank | Appraisal Date | Lot | Value |
|---|---|---|---|
| First Alliance | August 4, 2004 | 10E | $479,000.00 |
| | | 10F | $479,000.00 |
| | November 22, 2004 | 10E | $175,747.00 |
| | | 10F | $175,747.00 |

---

[7] With respect to the loan transactions with the Woodgreen Banks, these other entities were Snowden Grove Investors LLC and Cedar Lake Investors LLC.

| | | | |
|---|---|---|---|
| First State | May 11, 2005 | 10G & 10H | $660,000.00 |
| | June 17, 2005 | 10G | $103,691.00 |
| | | 10H | $ 38,664.00 |
| Patriot | November 18, 2004 | 10J | $310,000.00 |
| | | 10K | $310,000.00 |
| | July 22, 2005 | 10J | $ 87,873.00 |
| | | 10K | $ 87,873.00 |

(MVT Exs. 50-51, 53, 55-56, 84).

The entities on whose behalf Chris Evans acted when he signed the deeds of trust did not actually own the six (6) lots that purportedly secured the loans, and, moreover, different entities (also controlled by Chris Evans) previously had granted other lenders senior liens on the same six (6) lots. In the words of Brian W. Pray ("Pray"), an expert witness for the Woodgreen Banks, the Evans Brothers tried to "flim-flam" the Woodgreen Banks. (1 Trial Tr. at 129).

Chris Evans was assisted in his fraudulent scheme by his brother, Charles H. Evans, Jr. ("Charles Evans," or together with Chris Evans, the "Evans Brothers"). Charles Evans was an attorney "approved" by the Title Companies to submit applications for title insurance policies, and his involvement was integral to the success of the *Ponzi*-like scheme.

When the loans went into default in late 2009, the Woodgreen Banks discovered that the defects in the liens prevented them from foreclosing their interests in the lots. The Woodgreen Banks are now the owners of the six (6) lots, but if they sell them, they will violate local law. The current plight of the Woodgreen Banks requires background information, beginning with the land-use regulations enacted by the City of Southaven.

**City of Southaven**

Under the Land Subdivision Ordinance (the "Subdivision Ordinance") (SOUTHAVEN, MISS., ORDINANCE No. 29, art. III) (WB Ex. 35), no person may subdivide land into lots of ten (10) acres or less unless a plat of the subdivision previously has been approved by Southaven's

planning commission.  Moreover, it is a criminal offense for any person to sell property that does not conform to this requirement.  (*Id.*).

**Policies**

In connection with the loans involving the Evans Brothers, the Woodgreen Banks acquired policies of title insurance from the Title Companies in order to protect their interest in the lots.  These policies were patterned after 1992 standardized American Land Title Association ("ALTA") forms and are identical to one another except for schedule A, where the description of the insured interest appears.   (WB Exs. 38, 45, 53; MVT Ex. 10).  The Court will sometimes refer to the title insurance policies issued to the Woodgreen Banks collectively as the "Policies." Each of the Policies is discussed in detail below.

**First Alliance**

With respect to First Alliance, the Title Companies issued two policies of title insurance on December 2, 2004, which insured its interests in Tracts 10E and 10F as the holder of first deeds of trust.  The parties stipulated that "[t]he amount of insurance stated in schedule A of both title policies issued to First Alliance Bank is $760,000.00" and "that the amount of its unpaid principal indebtedness secured by the insured mortgages, together with interest thereon, equaled $762,680.03."  (Pretrial Order at 92, Adv. Dkt. 515).

**First State**

The Title Companies issued a policy of title insurance to First State on June 23, 2005, which insured First State's interest in Tracts 10G and 10H as the holder of a first deed of trust. The parties stipulated that "[t]he amount of insurance stated in schedule A of the policy issued to First State Bank is $420,000.00" and "that the amount of its unpaid principal indebtedness

secured by the insured mortgage, together with interest thereon, equaled $355,947.82." (Pretrial Order at 92, Adv. Dkt. 515).

**Patriot**

On August 2, 2005, the Title Companies issued a policy of title insurance which insured Patriot's interest in Tracts 10J and 10K as the holder of a first deed of trust. The parties stipulated that "[t]he amount of insurance stated in schedule A of the policy issued to Patriot Bank is $500,000.00" and "that the amount of its unpaid principal indebtedness secured by the insured mortgage, together with interest thereon, equaled $342,044.41." (Pretrial Order at 92, Adv. Dkt. 515).

**Special Warranty Deeds**

The Woodgreen Banks submitted claims to the Title Companies under the Policies due to the title defects. The Policies provided the Title Companies several options to satisfy their indemnity obligations. The Policies allowed them either to pay the "amount of insurance" (Policies ¶ 6(a)(i)), purchase the secured indebtedness (Policies ¶ 6(a)(ii)), or pay or otherwise settle with other parties or with the insured (Policies ¶ 6(b)(i), ¶ 6(b)(ii)). They chose the option that allowed them to institute any action "which in [their] opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured." (Policies ¶ 4(b)). The Title Companies attempted to cure the title defects by purchasing the Woodgreen Property, paying off the senior lienholders, and conveying the six (6) lots, by Special Warranty Deeds (the "Special Warranty Deeds"), to the Woodgreen Banks on August 18, 2010. (*See* WB Exs. 9, 11, 13, 15, 16). Significantly, until these conveyances occurred on August 18, 2010, the Woodgreen Property

had remained whole from the date of its original purchase from the Hensons on August 5, 2004.[8] The subdivision of the Woodgreen Property on August 18, 2010, *via* the Special Warranty Deeds, violated Southaven's Subdivision Ordinance and reduced or eliminated the value of the six (6) lots.

**Liability Opinion**

In the Liability Opinion, the Court ruled that the Title Companies breached their implied duty to act in good faith in establishing the titles, as insured. In reaching this result, the Court relied on the Mississippi Supreme Court decision in *Cenac v. Murry*, 609 So. 2d 1257 (Miss. 1992). The *Cenac* Court declared, "Each party to a contract has a justified expectation that the other will act in a reasonable manner, and when one party acts outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached. In an 'ordinary' contract situation, a breach of the covenant is a breach of the contract itself." *Id.* at 1273-74 (citation omitted); *see Unity Commc'ns, Inc. v. AT&T Mobility, LLC*, 643 F. Supp. 2d 829, 841 (S.D. Miss. 2009) (recognizing *Cenac* as "the leading case in Mississippi on the treatment of a claim for breach of good faith and fair dealing in a contractual setting").

The Court concluded that the Title Companies had prevented the Woodgreen Banks from enjoying the benefit of the indemnity provisions of the Policies and were liable to the Woodgreen Banks for breach of the duty of good faith and fair dealing. The Court found that it was unlikely that the Woodgreen Banks would have agreed to the loans if they had known in advance that the Policies allowed the Title Companies to cure the title defects in such a way as to

---

[8] As discussed in detail in the Liability Opinion, the Title Companies did not purchase the Woodgreen Property or transfer the lots directly to the Woodgreen Banks but used a subsidiary, Mississippi Real Estate Dispositions, LLC, which they formed for this specific purpose. (Liability Op., at *12) (WB Exs. 8, 10, 12, 14). This middle step is immaterial to the damages issue.

reduce or eliminate the resale value of the lots. Among the options available to the Title Companies, the title defects could have been cured without violating the Subdivision Ordinance or the claims could have been paid. The Title Companies chose an option that created an obstacle to the marketability of the lots that did not exist on the dates the Policies were issued. They did so because they believed that *Seymour v. Evans*, 608 So. 2d 1141 (Miss. 1992), allowed them to cure the title defects by conveying the lots directly to the Woodgreen Banks. In *Seymour*, the Mississippi Supreme Court held that a sale of land was not void, although the conveyance violated an ordinance requiring approval of a subdivision. *Id.* at 1148.

**Allen's Valuation Analysis**

At Phase Two, Allen testified on behalf of the Title Companies as an expert in the field of real estate appraisals. Allen is the managing director of the Memphis office of Integra Realty Resources. He is licensed as a real estate appraiser in Mississippi, Tennessee, and Arkansas. He is a member of the Appraisal Institute and possesses the MAI designation. He has appraised real estate since 1979 and has performed over 17,000 appraisals. The Woodgreen Banks did not challenge Allen's qualifications, only the reliability of his testimony and report.

Allen valued each of the six (6) lots on at least three dates: (1) the dates of the loans orchestrated by the Evans Brothers in 2004 and 2005, (2) the dates the Woodgreen Banks submitted their claims to the Title Companies in 2009 and 2010, and (3) the date the Title Companies conveyed the lots to the Woodgreen Banks on August 18, 2010. In summary, Allen testified that the values of the six (6) lots on these multiple dates were, as follows:

| Woodgreen Bank | Appraisal Date | Lots | Value |
|---|---|---|---|
| First Alliance | November 22, 2004 | 10E | $351,494.00 |
| | December 9, 2009 | & | $246,046.00 |
| | August 18, 2010 | 10F | $246,046.00 |

| | | | |
|---|---|---|---|
| First State | June 17, 2005 | 10G & 10H | $142,355.00 |
| | November 12, 2009 | | $ 99,648.00 |
| | August 18, 2010 | | $ 99,648.00 |
| Patriot | July 22, 2005 | 10J & 10K | $175,746.00 |
| | March 1, 2010 | | $123,022.00 |
| | August 18, 2010 | | $123,022.00 |

(Allen Rep. at 1). In Mississippi, the damages for breach of contract should put the insured party in the same position it would have occupied had the breaching party performed the contract. Therefore, the Court reviews Allen's valuation opinion in some detail as to the fair market value of the lots on August 18, 2010, just prior to the breach of the Policies. Although the Woodgreen Banks sustained losses when they funded the loans in 2004 and 2005, those losses were not causally related to the breach of the Policies.

There are three recognized methods for valuing real estate in Rule 1-4 of the Uniform Standards of Professional Appraisal Practice ("USPAP"). They are the sales comparison approach, the income capitalization approach, and the cost approach. (Allen Rep. at 6). Considered in isolation, these approaches generally do not establish the value of property; rather, value is "the product of a reconciliation of the indications yielded by the three approaches." *Rebelwood, Ltd. v. Hinds County*, 544 So. 2d 1356, 1360 (Miss. 1989).

With respect to the appraisal of the larger Woodgreen Property, Allen used the sales comparison approach and the income capitalization approach.[9] He did not engage in the cost approach because he concluded that there were no improvements that contributed value to the Woodgreen Property.

_____

[9] The Allen Report mistakenly indicates in the beginning paragraphs that Allen "use[d] only the sales comparison approach in developing an opinion of value for the subject." (Allen Rep. at 6). The Allen Report, however, applies both the sales comparison approach and the income capitalization approach. (*Id.* at 50).

The sales comparison approach is predicated upon prices actually paid in open market transactions for comparable properties. The sales comparison approach assumes that an informed purchaser would pay no more for a property than the cost of producing a substitute property with the same utility. (Allen Rep. at 50). The income capitalization approach involves discounting to present value the anticipated net income that the property is expected to generate over its usable life. The income capitalization approach assumes than an investor would pay no more than the present value of the anticipated net income of the property. (*Id.*)

After reconciling the indicated value of the larger Woodgreen Property based upon the sales comparison approach and the income capitalization approach, Allen used the principle of contribution to arrive at a value for each of the smaller six (6) lots. The principle of contribution states that "the value of a particular component is measured in terms of its contribution to the value of the whole property or as the amount that its absence would detract from the value of the whole [property]." (Allen Rep. at 97) (citations omitted). Allen used a ranking analysis to compare the characteristics of each lot to the characteristics of an ideal lot. He based the ranking criteria upon four physical characteristics: (1) access/exposure, (2) drainage, (3) shape, and (4) size.

**Woodgreen Property: Sales Comparison Approach**

In applying the sales comparison approach to the larger Woodgreen Property, Allen analyzed land sales using the following parameters: (1) location (DeSoto County); (2) size (greater than 5 acres); (3) use (commercial); and (4) transaction date. Allen excluded from his analysis the original sale of the Woodgreen Property by the Hensons to the Evans Brothers on the ground that the sales price of $3.35 million on August 5, 2004, was inconsistent with the market value of the Woodgreen Property. (Allen Rep. at 4). Apparently, Allen also excluded the

later acquisition of the six (6) lots by the Title Companies on the ground they were not arms-length transactions.[10]  (*Id.* at 3).

With respect to the appraisal date of August 18, 2010, Allen considered the most relevant land sales to be the following four (4) sales:  (1) the November, 2008, sale of 25.20 acres (or 1,097,712 square feet) of land located in Southaven at "Airway Road Extended" at a total sales price of $2,850,000.00 or $2.60 per square foot; (2) the August, 2008, sale of 16.66 acres (or 725,710 square feet) of land located in Olive Branch on Pleasant Hill Road at a total sales price of $1,680,000.00 or $2.31 per square foot; (3) the April, 2008, sale of 13.19 acres (or 574,556 square feet) of land located in Olive Branch on Goodman Road at a total sales price of $2,105,000.00 or $3.66 per square foot; and (4) the January, 2008, sale of 26.36 acres (or 1,148,242 square feet) of land located in Olive Branch on Goodman Road at a total sales price of $2,650,000.00 or $2.31 per square foot.  (Allen Rep. at 73-76).  Prior to any adjustments to the sales prices, he found a range of $2.31 to $3.66 per square foot.  (*Id.* at 77).

Next, Allen adjusted these sale prices downwards in amounts ranging from twenty-five (25) percent to fifty (50) percent.  Allen applied a -50 percent adjustment to all four (4) land sales because of the superior shape and topography of the land in relation to the Woodgreen Property.  He also applied a -25 percent size-adjustment to two of the four (4) land sales because they were smaller than the Woodgreen Property and a smaller parcel of land will sell for more than a larger parcel.  After making these adjustments, Allen arrived at a range of $1.04-$1.95 per square foot, with an average price of $1.41 per square foot.  (*Id.* at 77). Then, he determined that

---

[10] The Title Companies purchased the Woodgreen Property and paid the lenders holding first deeds of trust.  *See* Liability Op., at *10-11.  The details are irrelevant to the damages issues.

the indicated value of the Woodgreen Property was $1.50 per square foot or approximately $1,530,000.00.[11]   (Allen Rep. at 78).

Allen's valuation of the larger Woodgreen Property as of August 18, 2010, is significantly lower than his $2,040,000.00 valuation of the Woodgreen Property in 2004 and 2005 when the original loan transactions took place. (Allen Rep. at 57).   Allen testified that beginning in 2007, the real estate market slid into a decline, as shown by the dramatic decrease in the number of land sales.  For example, there were 61 comparable land sales in 2004, but only 17 in 2010.  When new construction ended, so did the demand for new land.  Rent stabilized, and lending criteria for undeveloped land changed.

**Woodgreen Property:  Subdivision Development Method**

For the purpose of the income capitalization approach, Allen determined that the "highest and best use" of the Woodgreen Property was commercial development and estimated the Woodgreen Property's long-term future income by employing the subdivision development method.   For that purpose, Allen used a conceptual site plan prepared by David Dichiara ("Dichiara") with Guest Consultants, Inc. (the "Dichiara Plat") (Allen Rep. at 40; MVT Ex. 85), a copy of which is attached to the end of this Opinion as Appendix 1.  Dichiara is a Mississippi-licensed professional engineer.

Prior to the Diachiara Plat, the Title Companies had retained Guest Consultants, Inc. to prepare a plat depicting all of the various and overlapping interests in the Woodgreen Property granted by the Evans Brothers.  That plat, known as the MVT Plat[12] (WB Ex. 87), is attached to the end of this Opinion as Appendix 2.  The MVT Plat shows the same lots as the Evans Plats

---

[11] $1,527,649.50 = $1.50 × 1,018,433 square feet.

[12] In the Liability Opinion, the MVT Plat is referred to as the "Unofficial Plat."  (Liability Op., at *11).

but differs from the Evans Plats in that the MVT Plat includes an easement that ends in a cove, rather than a circular drive.  Dichiara did not prepare the MVT Plat, but he was aware of its existence, and to some degree, relied upon it.  As with the Evans Plats, neither the Dichiara Plat nor the MVT Plat has ever been submitted to the City of Southaven for its approval.

The Dichiara Plat emulates the MVT Plat in that it carves out parcels of land approximately one-acre in size, and depicts the same exterior boundary lines for the Woodgreen Property.  The Diachiara Plat and the MVT Plat differ in almost every other way.  The Dichiara Plat shows twenty-six (26) lots; the MVT Plat shows seventeen (17) lots.  The configurations of the lots are completely different.  The MVT Plat does not account for the drainage ditch, Nolehole Creek, or the slope.  The Dichiara Plat attempts to minimize these problems with the construction of two (2) bridges and two (2) water detention ponds.

Seven (7) of the twenty-six (26) lots in the Dichiara Plat are located along Goodman Road.  These seven (7) lots contain 4.050 acres or 175,763 square feet of land.  The remaining nineteen (19) lots are all interior lots; they do not abut Goodman Road.  These nineteen (19) lots include 14.970 acres or 652,921 square feet of land.  The total useable acreage shown in the Diachara Plat is 19.02 acres, which is less than the 23.88 acres that comprise the entire Woodgreen Property.  According to Allen, this reduction in useable acreage is necessary to account for the topography and water issues as well as to comply with the Subdivision Ordinance.

In reaching his valuation appraisals based upon the subdivision development method, Allen made numerous critical assumptions.  Allen assumed that the Woodgreen Banks and all other entities that held an interest in the Woodgreen Property would agree to the Diachiara Plat.  Moreover, Allen assumed that all entities would agree to share the financial burden of

developing the Woodgreen Property in the way depicted in the Diachiara Plat. Other assumptions by Allen included the approval of the Dichiara Plat by the City of Southaven and the future development of the Woodgreen Property as indicated in the Diachiara Plat.

With the Dichiara Plat in hand, Allen then calculated the potential cash flow of all twenty-six (26) lots. He considered the timing and cost for the approval and development of the subdivision as shown in the Dichiara Plat. He estimated a planning and design period of four (4) months and a construction period of seven (7) or eight (8) months. To complete the cost analysis, Allen relied upon a quantitative survey performed by Dichiara, who concluded that drainage ditches would have to be realigned, water detention ponds would have to be constructed, and concrete bridges would have to be built over Nolehole Creek. (1 Trial Tr. at 51-52). These improvements translated to construction costs, as of August 18, 2010, of $1,854,724.00, according to Dichiara. (Allen Rep. at 85). Other development costs, according to Allen, included "soft" costs and the developer's profit. "Soft" costs include bonds, interest, permit fees, legal and accounting fees, and appraisal fees, estimated at twelve (12) percent of the "hard" costs. Allen forecasted the developer's profit as fifteen (15) percent of gross sales revenue. Allen believed that all twenty-six (26) lots would sell in seven (7) years or, at a rate of 2.717 acres per year. (Allen Rep. at 86). He estimated that the average sales price for the lots that abut Goodman Road would be $15.00 per square foot, and for the interior lots, would be $8.25 per square foot, as derived from his sales comparison analysis. This resulted in an aggregate retail value of $8,020,000.00 or $1,145,714.00 per year. (Allen Rep. at 87). From these totals, Allen subtracted construction costs, "soft" costs, and the developer's profit. He then discounted the present cash value at a rate of fifteen (15) percent. Allen testified that the value of the Woodgreen Property as of August 18, 2010, was $1,370,000.00.

**Six (6) Lots and their Contributory Value**

As noted earlier, Allen's sales comparison approach yielded a value of $1,530,000.00 for the larger Woodgreen Property as of August 18, 2010, and his income capitalization approach, a value of $1,370,000.00, also as of August 18, 2010. The fact that these two numbers are only $160,000.00 apart, according to Allen, validated his valuation analysis. Allen reconciled these values to reach $1.4 million.

For determining the value of each of the six (6) lots as they appear in the Evans Plats, Allen used $1.4 million as a starting point for the value of the Woodgreen Property as a whole. He then determined the contributory value of each lot applying four criteria: (1) access/exposure, (2) drainage, (3) shape, and (4) size. (Allen Rep. at 94). For each of the criteria, he scored all seventeen (17) lots, with a score of ten (10) representing the most desirable feature and one (1) representing the least desirable feature. He then multiplied that number by the ranking number. A perfect score for an ideal lot would be 100 points (10×4 + 10×3 + 10×2 + 10×1). The sum of all seventeen (17) lots, as scored by Allen, was 1,138 points. The total score of each lot was then divided by 1,138 points to determine the specific lot's contribution to the overall value of the Woodgreen Property. (Allen Rep. at 98). The contribution was then multiplied by the value of the Woodgreen Property ($1.4 million) to arrive at the following values, as of August 18, 2010:

| Woodgreen Bank | Lot | Value |
|----------------|-----|-------|
| First Alliance | 10E | $123,023.00 |
|                | 10F | $123,023.00 |
| First State    | 10G | $ 72,583.00 |
|                | 10H | $ 27,065.00 |

| Patriot | 10J | $ 61,511.00 |
| | 10K | $ 61,511.00 |

(Allen Rep. at 1).

## DISCUSSION

In Phase Two of the Woodgreen Trial, the Woodgreen Banks seek an award of their expectation damages as a remedy for the breach by the Title Companies of their duty of good faith and fair dealing. *Theobald v. Nosser*, 752 So. 2d 1036, 1042 (Miss. 1999). Expectation damages are the conventional remedy for breach of contract. The Mississippi Supreme Court held in *Cenac* that the appropriate measure for breach of the covenant of good faith is the measure of expectancy type damages. *Cenac*, 609 So. 2d at 1273.

> Each party to a contract has a justified expectation that the other will act in a reasonable manner, and when one party acts outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached. In an 'ordinary' contract situation, a breach of the covenant is a breach of the contract itself, and contract damages are due.

*Id.* (citation omitted). Expectation damages are intended to "put the injured party in the position where she would have been but for the breach." *Theobold*, 752 So. 2d at 1042. The Mississippi Supreme Court has repeatedly held that "absolute certainty in the proof of damages is not required, [but] reasonable certainty is." *Cenac*, 609 So. 2d at 1274. As further explained by the Mississippi Supreme Court, "damages . . . may be recovered only where and to the extent that the evidence removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty." *Wall v. Swilley*, 562 So. 2d 1252, 1256 (Miss. 1990).

The Policies consist of two main sections:  (1) EXCLUSIONS FROM COVERAGE and (2) CONDITIONS AND STIPULATIONS.   The parties agree that paragraph 7(a) of the CONDITIONS AND STIPULATIONS section of the Policies controls the method for determining the amount of damages due the Woodgreen Banks, but that is the extent of their agreement.

Paragraph 7, which is entitled "Determination and Extent of Liability," but is commonly known as the "Maximum Payment Provision," provides as follows:

> *7.  Determination and Extent of Liability*
> This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damages by reason of matters insured against by this policy and only to the extent herein described.
>   (a) The liability of the Company under this policy shall not exceed the least of:
>     (i)    the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2(c) of these Conditions and Stipulations.
>     (ii)   the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or
>     (iii)  the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

Under the Maximum Payment Provision, the Title Companies pay "the least of" either:  (1) the face amount of the policy; (2) the indebtedness secured by the insured mortgage; or (3) the difference between the value of the insured estate or interest, as insured, and the value of the insured estate or interest subject to any covered defects.   It is the third option in paragraph 7(a)(iii), the difference between the value of the lots as insured and the value of the lots subject to the Subdivision Ordinance,[13] that has generated much of the dispute in Phase Two.

---

[13] The Woodgreen Banks point out that they bear the financial burden of property taxes, which they maintain renders the value of the lots subject to the Subdivision Ordinance less than zero.

The Woodgreen Banks calculate their damages to be the lesser of either the amount of insurance or the unpaid loan amount, as indicated in the chart below:

| Woodgreen Bank | Lots | Date of Loan | Amount of Insurance ¶ 7(a)(i) | Unpaid Loan Amount ¶ 7(a)(ii) | Damages Claimed by Woodgreen Bank |
|---|---|---|---|---|---|
| First Alliance | 10E & 10F | November 22, 2004 | $760,000.00 | $762,680.03 | $760,000.00 |
| First State | 10G & 10H | June 17, 2005 | $420,000.00 | $355,947.82 | $355,947.82 |
| Patriot | 10J & 10K | July 22, 2005 | $500,000.00 | $342,044.41 | $342,044.41 |

The Woodgreen Banks allege that with respect to First Alliance, the least amount is the amount of insurance under paragraph 7(a)(i), and with respect to First State and Patriot, the least amount is the outstanding loan amount under paragraph 7(a)(ii). Therefore, these amounts are the amount of their damages. The Woodgreen Banks purposefully presented no evidence to establish the amount under paragraph 7(a)(iii) because they contend that the value of the six (6) lots is incapable of adequate proof.

The Title Companies maintain that the Woodgreen Banks each own "the collateral intended as security for their respective loans with the Evans Brothers," and they are not entitled to recover any monetary damages. (MVT Br. at 16). They contend that the Woodgreen Banks did not seek rescission of the Special Warranty Deeds and, therefore, "they have elected damages as their sole remedy." (MVT Br. at 3). They cite the holding of the Mississippi Supreme Court in *Hudson v. Farrish Gravel Co.*, 279 So. 2d 630 (Miss. 1973), for the proposition that:

> [N]o recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether or not the damages resulted from the act of which complaint is made, or some other cause, or where it is impossible to say what of any portion of the damages resulted from the fault of the defendant.

*Id.* at 636.

In the alternative, the Title Companies contend that the Woodgreen Banks' damages are the least of: (1) the amount in paragraph 7(a)(iii) determined by subtracting the original value of the lots subject to certain uncovered defects and the present value of the lots or (2) the value of the lots on August 18, 2010, less their present value. (MVT Br. at 11). At a minimum, the Title Companies assert that they are entitled to a set off for the current value of the lots.

## A.   Whether the Woodgreen Banks bear the burden of proof

The Title Companies maintain that the Woodgreen Banks have failed to meet their burden of proving the full extent of their damages because they have not proved by a preponderance of the evidence the amounts of all the options in paragraph 7(a). (MVT Br. at 2). Although the amounts under paragraphs 7(a)(i) and 7(a)(ii) are undisputed, the Woodgreen Banks did not proffer any evidence as to the amounts under paragraph 7(a)(iii), that is, the difference between the value of the lots as insured and the value of the lots subject to the Subdivision Ordinance. According to the Title Companies, the failure of the Woodgreen Banks to produce evidence of the amounts due under paragraph 7(a)(iii) is fatal to their damages claim because the least amount is the only amount they are entitled to receive under the Policies. The Title Companies cite *Savage v. LaGrange*, 815 So. 2d 485 (Miss. Ct. App. 2002), where the Mississippi Court of Appeals held that the plaintiff bears the burden to prove "not only the *fact* of his injury, but the *extent* of the injury in order to support an award of monetary damages." *Id.* at 491 (emphasis added). Consequently, the Title Companies insist that the Woodgreen Banks

have not met their burden of proving their damages by a reasonable degree of certainty, and, therefore, are not entitled to recover any damages whatsoever for the breach of the Policies.

In contrast, the Woodgreen Banks maintain that they have adequately proved the extent of their damages, and the Title Companies have the burden of proving the third option in paragraph 7(a)(iii), if they want to dispute their claim. Moreover, according to the Woodgreen Banks, the third option in paragraph 7(a)(iii) does not apply because the amount cannot be proved by the Title Companies with any degree of reasonable certainty, given that the term "value" is ambiguous. The Woodgreen Banks further contend that even if "value" in paragraph 7(a)(iii) is defined as the value of the lots as measured by a real estate appraisal, Allen's valuation opinions do not satisfy the Title Companies' burden of proof because his opinions are unreliable, speculative, and irrelevant. The amounts in paragraph 7(a)(i) and paragraph 7(a)(ii), according to the Woodgreen Banks, are undisputed and the least of those two amounts properly represent the measure of their damages.

The Woodgreen Banks further maintain that the Policies imposed upon them only one requirement with respect to proving the amount of their damages, that is, submitting a written "proof of loss or damage" stating the "basis of calculating the amount of the loss or damage." (Policies ¶ 5). The Woodgreen Banks assert that they submitted their claims to the Title Companies in accordance with this provision and have met their burden of proving the extent of their loss. In the alternative, the Woodgreen Banks insist that there is evidence in the record, which the Title Companies themselves introduced, of the appraised values of the six (6) lots as of the dates the loans were funded.

| Woodgreen Bank | Appraisal Date | Lots | Value |
|---|---|---|---|
| First Alliance | August 4, 2004 | 10E & 10F | $958,000.00 |
| First State | May 11, 2005 | 10G & 10H | $660,000.00 |
| Patriot | November 18, 2004 | 10J & 10K | $620,000.00 |

(WB Br. at 20; *see* Pretrial Order ¶¶ 38(B)(2), (C)(17), & (D)(31); MVT Exs. 50, 51, 53, 55, 56). These appraisals do not include deductions for development costs or downward adjustments for size, shape, or topography.   The Title Companies challenge these appraisals as unreliable because they rest on the false assumption that the Evans Brothers would lawfully subdivide the Woodgreen Property.

Both the Woodgreen Banks and the Title Companies recognize the difficulty in proving the difference in the value of the six (6) lots under paragraph 7(a)(iii), given that the Subdivision Ordinance prohibits their sale without an approved subdivision plat.   The Title Companies attempt to use the difficulty in measuring the lots to their advantage.

In general, the insured has the burden of proving that coverage exists under an insurance policy.  *See* 17A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 254:11 (3d ed. 2005). "Under Mississippi law a plaintiff has the burden of proving a right to recover under the insurance policy sued on," and this basic burden never shifts from the plaintiff.  *Britt v. Travelers Ins. Co.*, 566 F.2d 1020, 1022 (5th Cir. 1978).   On the other hand, the insurer has the burden of proving the applicability of any exclusion or limitation.  *Commercial Union Ins. Co. v. Byrne*, 248 So. 2d 777, 782 (Miss. 1971).   The parties treat the dispute regarding the allocation of the evidentiary burden under paragraph 7(a)(iii) as requiring the Court to decide whether paragraph 7(a) is a "coverage" provision or an "exclusion" provision.   Treating paragraph 7(a) like a coverage provision results in the Woodgreen Banks bearing the burden of proof; conversely, treating paragraph 7(a) like an exclusion provision results in the Title Companies bearing the burden of proof.

As stated previously, the Title Companies contend that the Woodgreen Banks have the burden of proving the difference between what they received (the lots subject to the Subdivision

Ordinance) and what they were entitled to receive.  The Title Companies point out that paragraph 7(a) appears under the "CONDITIONS AND STIPULATIONS" section of the Policies and not the "EXCLUSIONS FROM COVERAGE" section.  According to the Title Companies, the Woodgreen Banks' interpretation would rewrite paragraph 7(a) to read, "The liability of the Title Companies under this policy shall not exceed the least of whatever damage calculations the insured chooses."  (MVT Br. at 18).  *See Leonard v. Nationwide Mut. Ins. Co.,* 499 F.3d 419, 429 (5th Cir. 2007) (quoting *State Auto. Mut. Ins. Co. v. Glover*, 176 So. 2d 256, 258 (Miss. 1965) ("No rule of construction requires or permits [the Court] to make a contract differing from that made by the parties themselves, or to enlarge an insurance company's obligations where the provisions of its policy are clear.")).

The Title Companies further maintain that the Policies are "named-peril" policies and that the Fifth Circuit and the Mississippi Supreme Court have drawn an important distinction between "named-peril" and "all-risk" policies.  *See Tuepker v. State Farm Fire & Cas. Co.*, 507 F.3d 346, 356-57 (5th Cir. 2007); *see also Lunday v. Lititz Mut. Ins. Co.*, 276 So. 2d 696, 698 (Miss. 1973).  "All-risk" policies provide coverage for all risks except those risks that are specifically excluded, whereas "named-peril" policies provide coverage only if the damage is caused by a peril listed in the policy.  *See* 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:7 (3d ed. 2005).  The purpose of an "all-risk" policy is to insure a loss when the cause of the loss is uncertain.  (*Id.*).

The Title Companies rely on *Broussard v. State Farm Fire & Casualty Company*, 523 F.3d 618 (5th Cir. 2008), in support of their contention that the Woodgreen Banks bear the burden of proving paragraph 7(a)(iii) because the Policies are named-peril policies.  In *Broussard*, the insureds, who lost their home during Hurricane Katrina in 2005, submitted a

claim under their homeowners' insurance policy.  The policy specifically excluded water-related losses from both its "named-peril" coverage for their personal property and its "open-peril" coverage for any "accidental direct loss" to their home.  Both coverages were subject to an anti-concurrent cause clause.  The insureds argued that their home was destroyed by tornadic winds prior to the arrival of the storm surge and that they were entitled to recover under their homeowners' insurance policy because the insurance company could not show that their losses were caused by water, an excluded peril, and not by wind.  The expert for the insurance company testified at trial that he could not determine whether wind or water caused the damages to the home.

The Fifth Circuit acknowledged that "[t]he parties bear different burdens of proof under the personal property and dwelling coverages."  *Id.* at 625.  Under "named-peril" coverage, the Fifth Circuit ruled that the insured had the burden of proving that the peril insured in the policy caused the loss to their personal property.  *Id.*  Under "open-peril" coverage, the Fifth Circuit ruled that the insurer had the burden of proving that the excluded peril caused the loss to their home.  The Title Companies compare the Maximum Payment Provision in paragraph 7(a) to the "named-peril" coverage provision at issue in *Broussard*.

The Woodgreen Banks contend that paragraph 7(a) is an exclusion provision because it limits the Title Companies' obligation to indemnify by excluding those damages incurred by the Woodgreen Banks that exceed certain amounts.  The Woodgreen Banks further contend that even though paragraph 7(a) does not fall under the "EXCLUSIONS FROM COVERAGE" section of the Policies, it functions like a limitation on the liability of the Title Companies.  According to the Woodgreen Banks, their view is consistent with the Fifth Circuit's decision in *Penthouse Owners Association, Inc. v. Certain Underwriters at Lloyds, London*, 612 F.3d 383

(5th Cir. 2010), a case that like *Broussard* involved property losses sustained in 2005 during Hurricane Katrina. In *Penthouse Owners*, the insured owned a condominium complex in Pass Christian, Mississippi, that was completely destroyed during Hurricane Katrina. Certain underwriters at Lloyd's of London ("Underwriters") insured the condominiums under an "all-risk" policy. The Underwriters denied the insured's claim because an anti-concurrent cause clause in the policy excluded damage caused by water, regardless of any other event that may have contributed concurrently to the loss. The district court, however, interpreted an endorsement in the policy that defined a "Windstorm or Hail Deductible" as providing coverage regardless of whether the loss was caused by wind or water. In other words, the district court ruled that the policy endorsement rendered the anti-concurrent cause clause meaningless.

On appeal, the Fifth Circuit rejected the district court's interpretation of the endorsement in the policy and concluded that the "Windstorm or Hail Deductible" did not expand the policy's scope of coverage. Instead, it operated only in deciding whether the deductible applied. Of significance to the Adversary, the Fifth Circuit recognized in its discussion of insurance contract interpretation that "[e]xclusions and limitations are reviewed stringently; they must be clear and unambiguous. An insurer 'bears the burden of showing that an exclusion applies and that it is not subject to some other reasonable interpretation that would afford coverage.'" *Id.* at 386 (quotations omitted); *see also Hankins v. Md. Cas. Co.*, 101 So. 3d 645, 659 (Miss. 2012) (to benefit from an exclusionary clause in an insurance contract, the insurer has the burden of showing that the exclusion applies and that no other reasonable interpretation of the policy would afford coverage)(dissenting opinion); *Miss. Phosphates Corp. v. Furnace & Tube Serv., Inc.*, No. 1:07CV1140, 2009 WL 1448967, at *4 (S.D. Miss. May 22, 2009) (under Louisiana law, insurer bears the burden of proving that a loss falls within a policy exclusion); *Mid-Continent Cas. Co.*

*v. Bay Rock Operating Co*, 614 F.3d 105, 114 (5th Cir. 2010) (under Texas law, the insurer bears the burden of proving that an exclusion or limitation applies).

The Woodgreen Banks argue that the Fifth Circuit in *Broussard* cited two decisions from the Mississippi Supreme Court that show that the Title Companies' reliance on *Broussard* is misplaced.  In those two decisions, *Lititz Mutual Insurance Company v. Boatner*, 254 So. 2d 765, 766 (Miss. 1971), and *Grace v. Lititz Mututal Insurance Company*, 257 So. 2d 217, 225 (Miss. 1972), the Mississippi Supreme Court held that the insured had the burden of proving, as part of his *prima facie* case, that the losses he sustained during Hurricane Camille were caused by wind, a peril specified in his policy.  The Mississippi Supreme Court, however, refused to shift the burden of proof back to the insured to show that the exclusion in the policy for water damage did not apply to negate coverage.

The Court finds that the Woodgreen Banks have satisfied their burden of producing evidence regarding the extent of their damages.  Moreover, the Court agrees with the Woodgreen Banks that paragraph 7(a)(iii) functions as a third limitation on the Title Companies' liability, which is how it was described by James Partin, vice-president and senior counsel of the Title Companies.  (1 Trial Tr. at 72; 2 Trial Tr. at 12).

The Court also finds that the Title Companies' citation of *Savage* for its holding that a plaintiff bears the burden of proving his damages is unpersuasive.  *Savage* involved a tort claim arising out of a motor vehicle accident.  Damages are an essential element of any tort claim. *Thomas v. Columbia Group, LLC*, 969 So. 2d 849, 852 (Miss. 2007).  This proceeding, however, involves a breach of contract claim where the liability of the Title Companies has already been established.

Moreover, the argument of the Title Companies regarding the placement of paragraph 7(a) in the Policies would carry weight only if paragraph 7(a) appeared within the opening paragraphs of the Policies where the types of losses are defined, but it does not. Instead, there is only a reference to the CONDITIONS AND STIPULATIONS section in the opening paragraphs and paragraph 7(a) itself appears on the third page of the Policies. More important, unlike *Broussard*, coverage is not at issue here. The Policies covered any loss sustained because of eight (8) named perils, at least five (5) of which squarely apply to the losses alleged by the Woodgreen Banks.[14] Indeed, the Title Companies attempted to cure the defects in the liens held by the Woodgreen Banks on August 18, 2010, without a whiff of a coverage dispute.

"One who violates his contract with another is liable for all the direct and proximate damages, which result from the violation." *Wells v. Nat'l Life Ass'n of Hartford*, 99 F. 222, 232 (5th Cir. 1900). The purported conflict between this long-standing rule of law and the rule of law cited by the Title Companies that damages must be proved with reasonable certainty was resolved by the Mississippi Supreme Court in *Adams v. United States Homecrafters, Inc.*, 744 So. 2d 736, 740 (Miss. 1999). "The rule that damages, if uncertain, cannot be recovered applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery." *Id.* (quotation omitted); *see* 4 ENCYCLOPEDIA OF MISSISSIPPI LAW § 25:48, at 39 (2001). In Mississippi, "a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused." *J.K. v. R.K.*, 30 So. 3d 290, 299 (Miss. 2009) (quotation omitted). Given the special and unique facts in

---

[14] These five (5) perils include: (1) title to the estate or interest described in Schedule A being vested other than as stated; (2) a defect in or lien or encumbrance on the title; (3) unmarketability of the title; (4) invalidity or unenforceability of the lien of the insured mortgage upon the title; and (5) priority of any lien or encumbrance over the lien of the insured mortgage. (Policies, at 1).

the Adversary, the Courts finds that the Woodgreen Banks have met their burden of proving that they sustained damages as a result of the breach of the Policies. *See Hawkins Hardware Co. v. Crews*, 169 So. 767, 769 (Miss. 1936) ("When the cause of the damages is reasonably certain, recovery is not to be denied because the data in proof does not furnish a perfect measure thereof."). The Title Companies, therefore, bear the burden of proving that the losses shown by the Woodgreen Banks exceed the reasonable expectation of the parties under the third option under paragraph 7(a)(iii). Before turning to the merits of whether the Title Companies have succeeded in challenging the damages through Allen's valuation analysis, the Court considers certain preliminary arguments presented by the parties.

**B.     Whether "value" is an ambiguous term**

The Woodgreen Banks contend that the amount in paragraph 7(a)(iii) cannot be proved by the Title Companies with reasonable certainty because the term "value" is ambiguous. The Woodgreen Banks insist that the Policies do not define the method for determining "value" and do not establish the date that should apply for determining "value." The Woodgreen Banks rely on this Court's decision in *G&B Investments, Inc. v. Henderson (In re Evans)*, 460 B.R. 848 (Bankr. S.D. Miss. 2011),[15] (*Heritage*), a separate adversary proceeding which arose from the same *Ponzi*-type scheme of the Evans Brothers but which involved commercial property located elsewhere. The Maximum Payment Provision in paragraph 8(a) of the title insurance policy at issue in *Heritage* is identical to paragraph 7(a) in the Policies. The Woodgreen Banks contend that the following rulings against the Title Companies in *Heritage* are relevant to the issue of ambiguity in this Adversary:

> 1.     The Title Companies drafted the Policies and any ambiguity must be interpreted against them. *Heritage*, 460 B.R. at 895-96.

---

[15] The Title Companies did not appeal *Heritage*.

> 2.    The Policies do not define "value" in paragraph 8(a) and do not establish the method of valuation, or the time for determining valuation. *Heritage*, 460 B.R. at 895-96.

In *Heritage*, this Court ruled that "value" in the Maximum Payment Provision must be interpreted as valuing the insured interest as of the date that the lender made its loan.  The Woodgreen Banks assert that they too sustained their losses when they funded the loans because their respective borrowers, like those in *Heritage*, never actually held title to the lots.  Therefore, according to the Woodgreen Banks, "value" must be determined as of the date they made their loans in 2004 and 2005.  These dates favor the Woodgreen Banks because the real estate market did not begin its decline until 2007.  As a result, the values of the lots, by any method, would yield a higher benefit for the Woodgreen Banks when the loans were made, than when the Title Companies breached the Policies on August 18, 2010.

In *Heritage*, the Title Companies paid Heritage Bank the fair market value of its collateral using a date that they believed Heritage Bank could have hypothetically brought a foreclosure action, which was well after the downfall of the real estate market.  The Court found that the Title Companies had breached the title insurance policy by underpaying Heritage Bank's claim.  The Court rejected the hypothetical foreclosure date embraced by the Title Companies and ruled that the Maximum Payment Provision, which was silent on this issue, was ambiguous both as to the date and method for valuation.

The facts underlying Heritage Bank's allegations are not analogous to those of the Woodgreen Banks.  In *Heritage*, there was a factual dispute as to whether the Title Companies had attempted to cure the defect.  Resolving this dispute, the Court found that no attempt to cure had been made by the Title Companies.  This finding in *Heritage* was important because there was a specific provision in the title insurance policy that allowed the insured to choose the date

to calculate its loss if the Title Companies unsuccessfully attempted to cure the defect. That dispute is not present here, because the Title Companies actually did attempt to cure the defects and because the Policies are based on a different ALTA form with different provisions. The Court declines the Woodgreen Banks' invitation to interpret *Heritage* as providing a definitive ruling on the date for measuring losses in all title insurance claims in Mississippi.

**C.    Whether the Woodgreen Banks reasonably expected the defects**

The Title Companies maintain that the measure of damages for breach of the Policies is governed by the reasonable expectations of the parties arising from the language of the Policies. Tying the expectancy damages to the language of the Policies is necessary, according to the Title Companies, to ensure that any monetary "remedy . . . be such that the breaching party is not charged beyond the trouble the breach caused." *Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 176 (Miss. 2004) (citing *Frierson v. Delta Outdoor, Inc.,* 794 So. 2d 220, 225 (Miss. 2001)).

According to the Title Companies, the Woodgreen Banks' only reasonable expectation regarding their indemnity obligations under the Policies was that the Woodgreen Banks could "take the collateral securing their loans." (MVT Br. at 21). The Title Companies contend that it was unreasonable for the Woodgreen Banks to expect anything more than what they have already received because the Woodgreen Banks never had coverage for defects "created, suffered, assumed or agreed to by the insured" (Policies ¶ 3(a)) or defects arising out of the enforcement of "[a]ny law, ordinance or governmental regulation" (Policies ¶ 1(a)). Therefore, according to the Title Companies, the Woodgreen Banks willingly accepted the risk of these defects and are not entitled to monetary damages.

The Title Companies cite *Cynergy, LLC v. First American Title Insurance Company*, 706 F.3d 1321 (11th Cir. 2013), in support of their argument. There, a group of investors formed a

company to purchase land for the development of a residential subdivision. The investment company was aware when it purchased the land that the property did not abut a public road and lacked dedicated access to any public road. A year later, the investment company submitted a claim to its title insurance company for losses due to a "lack of a right of access to and from the land." *Id.* at 1329. The title insurance company denied the claim based on a provision in the policy that excluded coverage for matters "created, suffered, assumed or agreed to by the insured." The Eleventh Circuit affirmed the district court's award of summary judgment in favor of the title insurance company on the ground that any loss sustained by the investment company due to the "lack of a right of access" was excluded from the policy.

A title insurance policy, according to the Title Companies, "does not guarantee either that the mortgaged premises are worth the amount of the mortgage, or that the mortgage debt will be repaid." *See Associated Bank, N.A. v. Stewart Title Guar. Co.*, 881 F. Supp. 2d 1058, 1066 (D. Minn. 2012) (citation omitted). In the same vein, the Title Companies insist that a diminution in value due to a decline in market conditions is not a covered risk in the Policies.

The Court finds no merit in the Title Companies' argument. The Woodgreen Banks not only reasonably expected the Title Companies to indemnify them for losses they incurred as a result of the defects covered in the Policies, but the Woodgreen Banks also reasonably expected the Title Companies to cure the covered defects in a way that would not render the lots unmarketable. Indeed, the unreasonable and unexpected manner in which the Title Companies chose to attempt to cure the defects in the lots is the gist of the Court's conclusion in the Liability Opinion that the Title Companies breached the duty of good faith and fair dealing. (Liability Op., at *28).

Notwithstanding their present posture, the Title Companies fostered the expectation that the six (6) lots could be sold prior to conveying the lots to the Woodgreen Banks. The Title Companies wrote the Woodgreen Banks a letter indicating their intent "to deed the properties to the [Woodgreen Banks] who hold the second position notes and deeds of trust. *The conveyance will avoid the time and expense of a foreclosure for the banks and will allow the immediate resale of these properties without title defect*." (WB Ex. 20) (emphasis added). In a follow-up letter, the Title Companies wrote the Woodgreen Banks that "the Title Companies will cure any other title or access defects and then convey title to lenders holding second equitable liens." (WB Ex. 21).

The Eleventh Circuit's decision in *Cynergy*, which the Title Companies rely upon, is inapposite. In *Cynergy*, the lack of a right of access to the property existed, and was known to the insured, before the title policy was issued by the title company. Here, the unauthorized subdivision of the Woodgreen Property arose as a direct result of actions taken by the Title Companies, which occurred well after the Policies had been issued.

The expectation of the Woodgreen Banks that the lots would be marketable is consistent with paragraph 2(a) of the Policies, which provides that "coverage . . . continue[s] in force . . . in favor of (i) an insured who acquires all or any part of the estate or interest in the land by . . . conveyance in lieu of foreclosure." (Policies ¶ 2(a)). Similarly, paragraph 7(b) of the Maximum Payment Provision declares that "the liability of the Company shall continue" in the event the insured has acquired the estate or interest. (Policies ¶ 7(b)).

**D.    Whether the Woodgreen Banks sustained a loss**

The Title Companies next contend that if the Subdivision Ordinance rendered the lots valueless, as alleged by the Woodgreen Banks, than the Woodgreen Banks did not sustain a loss

as a result of the conveyances on August 18, 2010. If the value of the lots as insured in 2004 and 2005 was $0.00, according to the Title Companies, then the difference between the value as insured ($0.00) and the value of the lots subject to the same defect today ($0.00) remains the same ($0.00).

The Court again finds that the Title Companies' argument is misplaced. There was no violation of the Southaven Ordinance in 2004 and 2005 because the borrowers that purportedly signed the deeds of trust in favor of the Woodgreen Banks did not hold title to the six (6) lots. Moreover, the Subdivision Ordinance applied only to sales of land and, therefore, would not have applied to the deeds of trust even if the borrowers had held title to the six (6) lots. Consequently, the Woodgreen Property was not actually subdivided and, therefore, the violation of the Subdivision Ordinance did not actually occur until the Title Companies conveyed the six (6) lots on August 18, 2010. Thus, the Court rejects the Title Companies' contention that "[t]he Woodgreen Banks are in the exact same position they would have been in had their liens been enforceable." (MVT Br. at 25).

**E.     Whether the Woodgreen Banks' appraisals show no loss in value**

The Title Companies compare the value of the lots before they were conveyed to the Woodgreen Banks on August 18, 2010, as appraised by Allen and the value of the lots after they were conveyed, as appraised by the Woodgreen Banks' appraisers. (WB Exs. 43, 50). They then declare that "none of the [Woodgreen] Banks suffered a loss." (MVT Br. at 27). The chart below shows that the appraisals obtained by the Woodgreen Banks immediately after the conveyances are higher than the pre-conveyance appraisals performed by Allen immediately before the conveyances:

| Woodgreen Bank | Pre-conveyance Value | Post-conveyance Value | Losses |
|---|---|---|---|
| First Alliance | $246,046.00 | unknown | $0.00 |
| First State | $ 99,648.00 | $192,900.00 | $0.00 |
| Patriot | $123,022.00 | $168,600.00 | $0.00 |

(WB Exs. 43, 50; MVT Ex. 84).   Therefore, according to the Title Companies, none of the Woodgreen Banks suffered any loss because the lots are currently worth more.

The Title Companies' argument is misplaced for two main reasons.  First, the appraisals obtained by the Woodgreen Banks did not address the impact of the Subdivision Ordinance and because unlike the Title Companies, the Woodgreen Banks were unaware at that time that the lots were unmarketable.  Second, the appraisals were necessary for the Woodgreen Banks to classify the lots in their balance sheets as "other real estate owned" ("OREO"), which banking regulations required them to do.  *See* 12 C.F.R. § 34.87 (accounting treatment for OREO and sales of OREO).  The appraisals were not obtained by the Woodgreen Banks to assess the diminution in value sustained as a result of the Subdivision Ordinance.  (1 Trial Tr. at 108).

## F.     Whether the Woodgreen Banks failed to mitigate their damages

The Title Companies contend that the Woodgreen Banks failed to mitigate their losses and for that reason are precluded from recovering any monetary damages under Mississippi law. *Wall*, 562 So. 2d at 1258 (plaintiffs are "charged with a duty of mitigating their damages").  In Mississippi, the burden of producing "facts which will operate to bring the mitigation into effect" rests on the defendant.  *See Poteete v. City of Water Valley*, 42 So. 2d 112, 113 (Miss. 1949) (citations omitted).  It is undisputed that the Woodgreen Banks did not make any effort to market or sell the six (6) lots or to seek a variance or exception from the City of Southaven.  (1 Trial Tr. at 99-100, 202, 218).   The Title Companies describe this failure as "curious" because the Woodgreen Banks and the City of Southaven share the same counsel. (1 Trial Tr. at 20, 22).

The Title Companies point out that Whitney Choat ("Choat"), planning director for the City of Southaven, testified in Phase One of the Woodgreen Trial that Southaven had not yet taken any action to enforce the Subdivision Ordinance with respect to the Woodgreen Property and had no plans to do so at that time.  (Phase One, 1 Trial Tr. at 65-66).  According to Choat, the City still viewed the Woodgreen Property as a "large tract of 20-plus acres."  (Phase One, 1 Trial Tr. at 66).  The Title Companies complain that in light of the City's wait-and-see attitude, the Woodgreen Banks could have attempted to sell the lots after August 18, 2010, to minimize their losses.

The Court finds the Title Companies' mitigation argument unfounded.  Surely, the Woodgreen Banks were not required to prevent the Title Companies from conveying and subdividing the Woodgreen Property on August 18, 2010, and the Title Companies have not demonstrated how the Woodgreen Banks could have prevented the accumulation of damages after the conveyances.  There is no evidence that the Woodgreen Banks benefitted from their alleged inactivity, even assuming that their actions would not have been futile.

**G.      Whether Allen's valuation analysis is credible**

During Phase Two of the Woodgreen Trial, the Title Companies presented the testimony of Allen to prove the value of the insured lots before they were conveyed by the Title Companies to the Woodgreen Banks.  The Woodgreen Banks asked the Court to exclude Allen's testimony and the Allen Report based upon Federal Rule of Evidence 702 and the requirements set forth by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), for the admissibility of scientific testimony.  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (expanding *Daubert* analysis to include all expert testimony).  Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

In *Daubert,* the Supreme Court stressed the trial court's "gatekeeper" role in excluding unreliable evidence. The *Daubert* factors for evaluating expert testimony include "whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can and has been tested; whether the known or potential rate of error is acceptable; and whether there are standards controlling the technique's operation." *Wells v. SmithKline Beecham Corp.,* 601 F.3d 375, 379 (5th Cir. 2010) (citing *Daubert,* at 509 U.S. at 593). These factors are neither exclusive nor dispositive.

Appraisers fall within the scope of expert witnesses subject to the *Daubert* analysis and "[t]he essential elements of the real estate expert's competency include his knowledge of the property and of the real estate market in which it is situated, as well as his evaluating skill and experience as an appraiser." *Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1050 (5th Cir. 1998) (quotation omitted).

As mentioned previously, the Court denied the Motion *in Limine* and accepted Allen as an expert in the field of real estate appraisals. In accepting Allen as an expert, the Court noted that its role as a gatekeeper for the admission of expert testimony is not as essential in bench trials. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). The Court reserved its decision on what evidentiary weight to afford Allen's testimony and the Allen Report, an issue to which the Court now turns.

The Woodgreen Banks contend that Allen's testimony was speculative and not credible. *See Boltar, L.L.C. v. Comm'r*, 136 T.C. 326, 338 (2011) (appraisal hypothesizing 174-unit condominium was speculative because project was too large for land and did not comply with zoning law). The Woodgreen Banks criticize Allen's testimony and the Allen Report for four (4) main reasons: (1) Allen did not actually appraise the six (6) lots; (2) Allen's adjustments were speculative; (3) Allen relied on cost projections that were uncertain and unsupported; and (4) Allen failed to analyze the original sale of the Woodgreen Property.

The Woodgreen Banks called Pray as an expert in the field of real estate appraisals. Pray was one of the first real estate appraisers licensed in Mississippi.[16] In 2001, he was certified by the Appraisal Qualifications Board to teach USPAP. (1 Trial Tr. at 115). He served as a commissioner on the Mississippi Real Estate Commission for eight (8) years. (1 Trial Tr. at 114). Unlike Allen, Pray is not a member of the Appraisal Institute and does not possess the MAI designation. Pray testified that he did not pursue the MAI designation because of his belief that it could conflict with his role as a real estate commissioner. Pray has performed over 400 appraisals and about 50 appraisal reviews. (1 Trial Tr. at 117).

Pray did not prepare his own appraisal of the Woodgreen Property because he did not believe it was possible to provide a valuation opinion that conformed to USPAP standards. He testified that if he were asked to appraise the lots, "I would walk away from [the assignment]." (1 Trial Tr. at 158). His role as an expert, therefore, was limited to his review of the credibility of the Allen Report. (1 Trial Tr. at 125).

---

[16] Pray's general appraiser number is "GA-10." (1 Trial Tr. at 112).

1.      **Whether Allen actually appraised the six (6) lots**

With respect to Allen's subdivision development method, Pray testified on behalf of the Woodgreen Banks that Allen did not actually appraise the six (6) lots but instead appraised a "phoney baloney" subdivision of twenty-six (26) commercial lots, which Pray insisted did not bear any resemblance to the unapproved subdivision of the six (6) lots at issue. (1 Trial Tr. at 169). "None of the [Woodgreen] Banks loaned money against all 23 acres of [the] Woodgreen [Property] nor contracted to insure it." (WB Br. at 10). Allen used sales figures and development costs based on a hypothetical subdivision of twenty-six (26) lots, whereas the Woodgreen Property in the Evans Plats depicts only seventeen (17) lots. Pray stated that it was pure speculation for Allen to assume that all the current owners[17] of the Woodgreen Property would voluntarily agree to develop the Woodgreen Property as a commercial subdivision and to share in the development costs. Allen did not communicate the Diachiara Plat to any of the property owners, and representatives from the Woodgreen Banks made it clear that they would never agree to bear the financial burden. (1 Trial Tr. at 91, 193, 209).

The Woodgreen Banks point out that although USPAP standards may authorize the subdivision development method, an appraiser must follow certain requirements for employing that methodology. Under Standards Rule 1-2(g), a hypothetical condition may be used only if "use of the hypothetical condition results in a credible analysis." *See* 2012-13 USPAP Standards Rule 1-2(g) at U-18. USPAP defines "credible" as "worthy of belief" and comments that "credible assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use." *Id.* at U-3.

---

[17] Other than the Woodgreen Banks, the owners of the Woodgreen Property include BankPlus, NFPS, Inc. (Wachovia Bank), Renasant Bank, Magna Bank, Synovus Bank (Trust One), and Mississippi Real Estate Dispositions, LLC, a subsidiary of the Title Companies. (Allen Rep. at 3).

The Woodgreen Banks also assert that Allen's use of the subdivision development method violated USPAP's "Jurisdictional Exception" rule, which they contend required Allen to reject any approach unauthorized by the State of Mississippi.  *See* 2012-13 USPAP Standards at U-3.  The Woodgreen Banks assert that the Mississippi Supreme Court in *Jackson County Development, Inc. v. Mississippi State Highway Commission*, 262 So. 2d 416, 417-18 (Miss. 1972), ruled that the subdivision development approach for valuing land is inherently unreliable.

Moreover, the Woodgreen Banks challenge as a "meaningless mathematical computation" Allen's use of the contributory principle.  (WB Br. at 11).  They criticize Allen for allocating to each of the Woodgreen Banks a portion of land in which they never held an interest.  "An appraiser must refrain from valuing the whole solely by adding together the individual values of the various estates or component parts," as set forth in Standards Rule 1-4(e).  *See* 2012-13 USPAP Standards Rule 1-4(e).  The Comment to Rule 1-4(e) explains:

> Although the value of the whole may be equal to the sum of the separate estates or parts, it also may be greater than or less than the sum of such estates or parts.  Therefore, the value of the whole must be tested by reference to appropriate data and supported by an appropriate analysis of such data.
>
> A similar procedure must be followed when the value of the whole has been established and the appraiser seeks to value a part.  The value of any such part must be tested by reference to appropriate data and supported by an appropriate analysis of such data.

2012-13 USPAP Standards Rule 1-4(e), Comment.  According to the Woodgreen Banks, the contributory value approach watered down Allen's value conclusions by burdening the lots with problems that adversely affected lots other than the lots they own.

### 2.      Whether Allen's adjustments were speculative

Pray testified that Allen's sales comparison approach was faulty because he adjusted some of the comparable sales downward by as much as 25 percent based upon the large size of

the Woodgreen Property when none of the Woodgreen Banks actually owned more than three (3) acres. (1 Trial Tr. at 145-48; Allen Rep. at 57). Pray also testified that Allen's methodology failed because he determined the value of each of the Woodgreen Banks' lot based upon the square footage of the entire twenty-three (23) acres, although, paradoxically, he reduced the starting value due to the inverse relationship between size and price. Moreover, according to Pray, Allen's downward adjustments of -35 percent for size and -50 percent for shape and topography were so excessive as to be unreliable and rendered his alleged comparable sales approach irrelevant. (Allen Rep. at 57, 77). Pray criticized Allen for pulling the "adjustment numbers out of the air." (1 Trial Tr. at 183).

### 3.    Whether Allen relied on unsupported costs

The Woodgreen Banks disagreed with Dichiara regarding the necessity for the construction of two concrete bridges to provide access to the Woodgreen Property. According to the Woodgreen Banks, development costs in excess of $300,000.00 for the construction of the bridges were unnecessary, given that the six (6) lots were not impacted.

### 4.    Whether Allen failed to analyze the Henson sale

The original sale of the Woodgreen Property from the Hensons for $3.35 million took place on August 5, 2004, within approximately four (4) months of Allen's November, 2004, valuation of the Woodgreen Property. The Allen Report mentioned the fact that the Henson sale had taken place and that the land had sold for $3.35 million, followed by the statement that "[t]he historic sale price is not consistent with our estimated market value as of November 22, 2004." (Allen Rep. at 4). There was no further explanation, however, as to why the sales price was not used in the comparable sales analysis. Pray criticized the paucity of Allen's analysis of the

Henson sale, comparing it to "something that my granddaughter could put in an appraisal report."  (1 Trial Tr. at 142).

Pray testified that the USPAP required Allen to analyze any sale of the Woodgreen Property that occurred during the three-year period of time prior to the date of his value determination.  Pray relied upon Standards Rule 1-5, which provides:

> Standards Rule 1-5
>
> When the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business:
>
> (a) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and
>
> (b) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal.

2012-2013 USPAP, Standards Rule 1-5, at U20.  Further, Pray referred to Advisory Opinion 1, which states:

> The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process.  Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself.  This is not to say that the agreed price in a pending or recent sale of the subject property is necessarily representative of value as defined in the report, but the appraiser's failure to analyze and report these facts may exclude important information from the sales comparison approach.  Information pertaining to the current market status and the sales history of the subject property may also be useful information for the determination of highest and best use or the analysis of market trends.

2012-13 USPAP Advisory Opinion 1, at A1-A2.  Pray also testified that Allen's failure to explain why he excluded the Henson sale from his valuations in 2004 and 2005 had a domino-like effect because Allen carried the values he reached throughout his analysis.  The Woodgreen Banks argue that the omission is sufficient reason for the Court to reject his sales comparison approach in *toto*.

Against this onslaught of thoughtful criticisms, the Court cannot uphold the reliability of Allen's testimony or the Allen Report.  The work of an appraiser is to provide an unbiased assessment of the value of property.  That assessment may be used in various contexts and for different purposes.  *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 797 (5th Cir. 1997).  "The value of collateral must be determined in light of the purpose of the valuation and of the proposed disposition or use of the collateral*." In re Gauthier*, No. 08-51002, 2009 WL 2226106, *1 (Bankr. W.D. La. July 16, 2009) (citing 11 U.S.C. § 506(a) and *Assoc. Comm. Corp. v. Rash*, 520 U.S. 953, 962 (1997)).  Here, the purpose of Allen's testimony and the Allen Report was to determine the diminution in value of the lots after the conveyances.  Needless to say, the valuation of the six (6) lots was complicated by the impact of the Subdivision Ordinance because it prohibited the "as is" sale of the six (6) lots.

The valuation process is not an exact science.  *In re Grind Coffee & Nosh, LLC*, No. 11-50011, 2011 WL 1301357, at *6 (Bankr. S.D. Miss. April 4, 2011).  Because of the subjective nature of the valuation process, courts are often greeted with conflicting appraisal testimony which must be evaluated depending upon the credibility of the expert's analysis.  *Anderson v. Mega Lift Sys., L.L.C. (In re Mega Lift Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *8 (Bankr. E.D. Tex. June 4, 2007); *In re Brown*, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003) ("Valuation of assets 'is not an exact science and has inherent vagaries.'") (quotation omitted).  A court may accept an appraisal in its entirety, may choose to give weight only to portions of the appraisal, or may reject the appraisal altogether.  *See Grind Coffee & Nosh*, 2011 WL 1301357, at *6.  As explained by the bankruptcy court in *Brown*, "the better reasoned approach is to

review all of the proposed comparables, including in its analysis only those that assist the Court in its determination." *Brown*, 289 B.R. at 238.

Commissioned by the Title Companies in anticipation of the Adversary, the Allen Report attempts to provide an estimation of the fair market value of the Woodgreen Property. Fair market value is consistently defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under any compulsion to buy or to sell. *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Bear Creek Water Ass'n, Inc. v. Town of Madison*, 416 So. 2d 399, 402 (Miss. 1982). The concept of "highest and best use" is an element in the determination of fair market value, but it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value. "If a hypothetical buyer would not reasonably have taken into account . . . [a] potential use in agreeing to purchase the property, such potential use should not be considered in valuing the property." *Stanley Works & Subsidiaries v. Comm'r*, 87 T.C. 389, 402 (1986) (citing *United States v. 320.0 Acres of Land*, 605 F.2d 762, 781 (5th Cir. 1979)).

The highest and best use of the Woodgreen Property, according to the Allen Report, was its commercial development into twenty-six (26) lots. When asked by the Court how the lots had any market value when they could not be sold without violating the Subdivision Ordinance, Allen answered, "I'm not here to testify to that particular value." (2 Trial Tr. at 106). The Court finds Allen's response troubling.

The four (4) land sales relied upon by Allen were too dissimilar to the Woodgreen Property to provide a realistic market value for the lots. The adjustments that Allen made are so large as to render the comparisons of no assistance to the Court. Allen offered nothing to support his adjustment percentages and agreed with counsel for the Woodgreen Banks that the Court

should "take [his] word for it that [his] judgment is accurate." (2 Trial Tr. at 93-94). A valuation that is unsupported by sufficient data is unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Courts must be wary of appraisals which contain unsupported but important assumptions, valuations which place property with a unique and extraordinary location on par with an ordinary lot, and comparable sales that are so dissimilar that they are of little use in supporting the opinion of value. *In re Belmont Realty Corp.*, 113 B.R. 118, 119-21 (Bankr. D.R.I. 1990).

The Court finds instructive *Walters v. State Road Department*, 239 So. 2d 878 (Fla. Dist. Ct. App. 1970), in which the court excluded as speculative and conjectural the testimony of an appraiser who could not say how he arrived at numerical percentages for his adjustments. The appraiser testified that his adjustments were based on his judgment of numerous factors, like the effect of time, location, and size of the property. The Florida court ruled that his opinion was purely subjective due to the lack of any recognized standard or formula. *Id.* at 880; *see also Wang v. Dept. of Revenue, State of Oregon*, No. 3054, 1991 WL 176269 (Or. T.C. Aug. 21, 1991) (lack of market data to support a fifty (50) percent adjustment for site size rendered value opinion speculative); *Richfield 81 Partners II, LLC v. SunTrust Bank (In re Richfield 81 Partners II, LLC)*, 447 B.R 653, 659 (Bankr. N.D. Ga. 2011) (appraisal adjustment percentages which are not computed or supported by an objective standard are arbitrary); *Gulf South Pipeline Co., LP v. Pitre*, 35 So. 3d 494, 497 (Miss. 2010) (appraiser's opinion that property suffered a fifteen (15) percent diminution in value was not supported by comparable sales data or other evidence and was purely speculative).

In finding the sales comparison approach unreliable, the Court does not find Allen's omission of the Henson sale to be fatal to his analysis because the Evans Brothers undoubtedly

were motivated by fraud to purchase the Woodgreen Property. Their fraudulent scheme vitiated treatment of the Henson sale as an arms-length transaction. Even so, Allen should have explained his reasons for excluding the Henson sale in the Allen Report.

The nature of the Woodgreen Property's future income was too indeterminate to provide a reasonable estimate of the market value of the Woodgreen Property. In finding the income capitalization approach unreliable, the Court does not interpret the Mississippi Supreme Court's decision in *Jackson County* as a blanket prohibition of the subdivision development method. There may be circumstances where the Mississippi Supreme Court would sanction the appraisal of land using the subdivision development method. The Woodgreen Bank's expert witness, Pray, did not testify that the methodology applied by Allen was fundamentally flawed. (1 Trial Tr. at 179). For example, Allen's use of the subdivision development method was not tantamount to use of a Ouija board to determine the value of the lots. Rather, Pray opined that in using the methodology, Allen made numerous mistakes, as outlined previously, that Pray described as unforgivable "cardinal sins," unlike forgivable "venial sins." (1 Trial Tr. at 144).

Moreover, the Court does not view Allen's compliance with USPAP standards as a determining factor as to the admissibility or reliability of his testimony. *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010). Compliance with USPAP Standards is not a substitute for a *Daubert* analysis. The nature and extent of Allen's deviations from the USPAP standards, however, weighed heavily against the credibility of his opinions, as discussed previously.

For these reasons, the Court finds that Allen's valuation analysis lacked credibility and did not satisfy the Title Companies' burden of proving the third option for measuring and limiting the damages of the Woodgreen Banks. The Court, therefore, finds that the extent of the

Woodgreen Banks' damages is the least of the amount of insurance stated in schedule A or the amount of outstanding indebtedness.

### H.     Whether the Title Companies are entitled to a set off

The Title Companies seek a set off of the value of the lots, given that the Woodgreen Banks currently hold title to the lots. The Title Companies' request for a set off raises the same valuation issues previously addressed. What is the value of the lots subject to the Subdivision Ordinance? Given the absence of reliable evidence regarding the current value of the lots, the Court finds that in lieu of a set off, the Special Warranty Deeds (WB Exs. 9, 11, 13, 15) and the "Right-of-Way and Utility Easement" (WB Ex. 16) should be cancelled or rescinded in order to restore the parties to the *status quo* before the conveyances on August 18, 2010. Cancellation or rescission of the Special Warranty Deeds is consistent with paragraph 6(a)(ii), which provides that "[i]f the Company offers to purchase the indebtedness . . . , the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor." (Policies 6(a)(ii)).

The Title Companies oppose rescission of the Special Warranty Deeds on the ground that the Woodgreen Banks chose monetary damages as their exclusive remedy for the breach of the Policies. (MVT Br. at 9). In Mississippi, "where rescission is not sought, the law seeks to place the victim in the economic position he would have enjoyed had he received what he bargained for." *Wall*, 562 So. 2d at 1256. The Title Companies' argument confuses rescission of the Special Warranty Deeds with rescission of the Policies. A rescission of the Policies would bar monetary damages under the doctrine of "election of remedies." *Garris v. Smith's G & G, LLC*, 941 So. 2d 228, 232 (Miss. Ct. App. 2006) (citation omitted). It would require the Title Companies to return the premiums and would restore the parties to the *status quo* before the

issuance of the Policies in 2004 and 2005.  The rescission proposed by the Court, in contrast, leaves the Policies intact, is consistent with the "benefit of the bargain" rule and the "election of remedies" doctrine, and places the parties in *status quo* before the breach of the Policies on August 18, 2010.

## CONCLUSION

In valuing the lots, the Title Companies asked Allen to assume there were no marketability problems, that is, that all owners of the Woodgreen Property would join together to sell the lots.  In doing so, the Title Companies violated the fundamental concept of Mississippi law that a party who breaches a contract may not take advantage of its own wrong.  *See Morris v. Macione*, 546 So. 2d 969, 971 (Miss. 1989).   Allen's appraisal evaluated the Woodgreen Property under an impediment presented by the Subdivision Ordinance which did not exist when the Policies were issued and which the Title Companies themselves created by subdividing the Woodgreen Property.  The Title Companies' own violation should not allow them to limit or reduce their obligations under the Policies.

The Court, therefore, concludes that the Woodgreen Banks are entitled to judgment against the Title Companies in an amount equal to the lesser of the amount of insurance stated in schedule A of the Policies or the amount of outstanding loan indebtedness, as follows:

1.      Judgment in favor of First Alliance in the amount of $760,000.00;

2.      Judgment in favor of First State in the amount of $355,947.82; and

3.      Judgment in favor of Patriot in the amount of $342,044.41.

In addition, the Woodgreen Banks are entitled to pre-judgment interest from August 18, 2010, and post-judgment interest calculated in accordance with 28 U.S.C. § 1961(a) from the date of the entry of final judgment until paid, and all costs of court.  Upon payment in full of these

amounts from the Title Companies to the Woodgreen Banks, the parties are restored to the positions they held before the conveyances on August 18, 2010.   Toward that end, the Woodgreen Banks may mark the Special Warranty Deeds "cancelled" and return them to the Title Companies, so that the Title Companies remain the owners of the Woodgreen Property. The parties, however, are not precluded from implementing a different procedure so long as the effect is the same as a reconveyance of the Woodgreen Property to the Title Companies.

A separate final judgment shall be entered in accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

SO ORDERED.

_____
Neil P. Olack
United States Bankruptcy Judge
Dated:  April 26, 2013



APPENDIX 1

| CONCEPTUAL SITE LAYOUT | ADAMS AND REESE, LLP | | Guest Consultants, Inc. |
| --- | --- | --- | --- |
| | WOODGREEN DEVELOPMENT SOUTHAVEN, MS | | |



APPENDIX 2